United States District Court
For the Northern District of California

1
2
3
4
5          UNITED STATES DISTRICT COURT
6          NORTHERN DISTRICT OF CALIFORNIA
7
8   MICHAEL GRESSETT,                          No. C-12-3798 EMC
9              Plaintiff,
                                               **ORDER GRANTING DEFENDANTS'**
10      v.                                     **MOTIONS TO DISMISS; AND**
                                               **GRANTING IN PART AND DENYING**
11  CONTRA COSTA COUNTY, *et al.*,             **IN PART O'MALLEY'S AND**
                                               **MCKENNA'S ANTI-SLAPP MOTIONS**
12             Defendants.
    _____/       **(Docket Nos. 73, 75, 79, 92-94)**
13
14
15                         I.   **INTRODUCTION**

16         Plaintiff Michael Gressett, a deputy district attorney with the Contra Costa County District

17  Attorney's Office ("DA's Office"), brings this case against approximately[1] sixteen different

18  Defendants from the DA's Office, California Attorney General's Office ("AG's Office"), and

19  Martinez Police Department ("MPD"), as well as two private Defendants, based on alleged

20  improprieties surrounding Plaintiff's prosecution for rape.

21         Plaintiff's Second Amended Complaint states claims for

22         •    (1) 42 U.S.C. § 1983 ("§ 1983") deprivation of Plaintiff's constitutional rights (a) to

23              engage in political speech and the political process under the First Amendment, (b) to

24

25  _____

26         [1] The exact number of Defendants is not clear, as two Defendants named in the complaint,
    the State of California and O'Malley & McKenna Law Office, do not appear in the parties' briefing.
27  Defendant O'Malley & McKenna did not file a motion to dismiss. However, both Dan O'Malley
    and Tom McKenna filed individual motions to dismiss, suggesting that O'Malley & McKenna may
28  no longer be in existence. *See* O'Malley Mot. to Dismiss, Docket No. 92; McKenna Mot. to
    Dismiss and to Strike, Docket No. 75.

United States District Court

For the Northern District of California

be free from unreasonable search and seizure under the Fourth Amendment, and (c)

to be free from arrest without probable cause under the Fourth Amendment;

- • (2) *Monell* violation of the same constitutional rights;

- • (3) malicious prosecution; and

- • (4) defamation.

*See* Second Am. Compl. ("SAC"), Docket No. 65, ¶¶ 77-104.

Before the Court are six related motions in this matter, through which Defendants seek to have every cause of action in Plaintiff's Second Amended Complaint dismissed.  In addition, two Defendants, Dan O'Malley and Tom McKenna, move to strike pursuant to California's anti-SLAPP statute, California Code of Civil Procedure section 425.16.  *See* McKenna Mot. to Dismiss and to Strike ("McKenna Mot."), Docket No. 75; O'Malley Mot. to Strike ("O'Malley Anti-SLAPP"), Docket No. 93.

For the reasons stated herein, Plaintiff's Second Amended Complaint suffers from the fatal flaw that it is overly conclusory on elements essential to his claims.  His § 1983 cause of action largely depends on the existence of a conspiracy involving all Defendants, yet he does not plead facts showing that many of the Defendants were part of a conspiracy, instead simply concluding that Defendants "conspired" to maliciously prosecute him and subject him to false arrest.  All of his causes of action rely on each Defendant having some degree of knowledge that Plaintiff did not commit rape, yet he largely does not plead facts suggesting they had such knowledge, instead simply concluding that all Defendants "knew" that the woman accusing him of rape had reason to lie.  Similarly, a number of his claims depend on the Defendants somehow causing his constitutional deprivations, yet Plaintiff does not plead facts establishing causation.  Under *Iqbal* and *Twombly*, such conclusory allegations are not enough to sustain Plaintiff's pleaded claims.

The Court **GRANTS** Defendants' motions to dismiss and **GRANTS IN PART** and **DENIES IN PART** O'Malley's and McKenna's anti-SLAPP motions.

///

///

///

United States District Court
For the Northern District of California

## II. FACTUAL & PROCEDURAL BACKGROUND

A.      Factual Background

        Plaintiff's Second Amended Complaint ("SAC") sets forth the facts underlying his claims. While lengthy, the SAC is replete with numerous conclusory statements, such as that Defendants "conspired" and knew that the charges against him were baseless. *See* SAC ¶¶ 12-76. The salient allegations, stripped of such conclusions, are as follows.

        1.      History with DA's Office

        Michael Gressett began working as a deputy district attorney ("DDA") at the DA's Office in June 1987. *Id.* ¶ 13. He unsuccessfully ran for Contra Costa DA in 1994, 1998, and 2002, and was repeatedly retaliated against by the successful candidate and supporters following these elections. *Id.* ¶¶ 14-20. In 2008, it was known that Gressett was going to support Mark Peterson's run for DA in 2010, while the DA at the time, Defendant Robert Kochly, was supporting Peterson's opponent, Defendant Daniel O'Malley. *Id.* ¶ 23.

        2.      Relationship with Harpham and Sexual Assault Allegations

        In around April or May 2008, Gressett had a brief consensual sexual relationship with a contract DDA, Holly Harpham. *Id.* ¶ 25. Unbeknownst to Gressett, Harpham falsely alleged that he had sexually assaulted her. *Id.* Harpham detailed her allegations in an interview recorded on September 26, 2008. *Id.* ¶ 29. According to Harpham, she and Plaintiff had engaged in consensual sexual activity a couple times in late April or early May 2008. *See* Contra Costa RJN Ex. D at 6-12. On May 8, 2008 Plaintiff and Harpham made plans to get lunch. *Id.* at 13. However, rather than take Harpham to lunch, Plaintiff drove her straight to his house. *Id.* at 13-14. Once Plaintiff and Harpham arrived at his house, they began engaging in consensual sexual activity. *See id.* at 20-21. However, at a certain point, Plaintiff forcefully grabbed Harpham and proceeded to engage in anal sex with her despite Harpham's repeated protestations. *See id.* at 21. At a certain point, Plaintiff put a gun to the back of Harpham's head. *See id.* at 24. Plaintiff handcuffed Harpham and then took ice and inserted it in her anus and vagina using an ice pick. *See id.* at 24-31. Plaintiff then instructed Harpham to get in the shower. *See id.* at 32. After Harpham showered, Plaintiff took her and forced

United States District Court

For the Northern District of California

her to engage in oral, vaginal, and anal sex. *See id.* at 36.  Plaintiff then returned Harpham to the office. *See id.* at 39.

According to the affidavit of probable cause submitted in support of Plaintiff's arrest warrant, Harpham spoke with both her sister, Debbie Climer, and a friend, Holly Mantle-Stransky, shortly after the alleged rape. *See* Contra Costa RJN Ex. C at 4-6.  Harpham called Mantle-Stransky the afternoon of the assault and told her details largely consistent with the account later given to investigators, including that she had gone to Plaintiff's house for lunch and began to engage in consensual sexual activity, but then Plaintiff "became very forceful from an anal sex stand point." *Id.* at 6.  According to the affidavit, Mantle-Stransky corroborated numerous other specific details provided by Harpham, including that Plaintiff used an ice pick, inserted ice into her vagina and rectum, and used a gun. *See id.*  Mantle-Stransky reported that Harpham was in pain, due to the entry, but did not want to report the assault, in part, because her job was threatened. *See id.*  Mantle-Stransky indicated that Harpham was "a wreck," hysterical, confused, and so upset that she could barely talk about the incident with Plaintiff. *See id.* at 5-6.  According to the affidavit, the next morning, Harpham contacted her sister and again provided corroborating details, including that Plaintiff took Harpham to his house during lunchtime, engaged in anal sex with Harpham without her consent, put a gun to her head, put ice cubes inside her anus, and used an ice pick on her. *See id.* at 4-5.  On the other hand, Harpham's sister indicated that Harpham said Plaintiff threatened to "shoot her in the head and fuck the hole," yet Harpham later said he never threatened to shoot her. *See id.* at 5; Contra Costa RJN Ex. D at 60.  Harpham's sister, who flew out to California to see Harpham that same night, indicated that, when she saw Harpham, she was "a completely different person" and "was completely devastated." *See id.* at 4-5.  Moreover, she "acted like something really bad happened to her" and was crying. *See id.* at 5.

Harpham is a family friend of O'Malley and spoke with him about her relationship with Gressett.  SAC ¶ 26.  O'Malley and his law partner, Defendant Tom McKenna, then called Defendant Paul Sequeira, an employee in the DA's Office, regarding Harpham's allegations, despite Harpham being adamant that she did not want to report them. *Id.* ¶ 27.  Sequeira and another employee in the DA's Office, Defendant Brian Baker, reported these allegations to DA Kochly in

United States District Court

For the Northern District of California

1   May 2008, yet the DA's Office took no action; in fact, the Office even placed Harpham in an office

2   near Plaintiff's. *Id.* ¶ 28.

3          In September 2008, two investigators from the Alameda County District Attorney's Office

4   and Defendant Jon Sylvia from the Martinez Police Department ("MPD") took a recorded statement

5   of Harpham at the Law Offices of O'Malley and McKenna. *Id.* ¶ 29.  Prior to the interview, the

6   Alameda County DA investigators had met with Sequeira and Defendant Gene Greenwald from the

7   Contra Costa DA's Office; Sequeira and Greenwald told them about Gressett's political history (in

8   running for the DA's Office), Harpham's unstable personality, and that Harpham could spin this

9   allegation as the reason she was not being hired permanently into the DA's Office. *Id.*  Similarly,

10  Sylvia of the MPD met with Sequeira and Baker, who presumably told him the same information.

11  *See id.* ¶ 34.  McKenna encouraged Harpham to participate in a criminal investigation and support a

12  prosecution even though she did not want to and told her that her story and credibility were beyond a

13  reasonable doubt. *Id.* ¶ 32.

14          3.      Arrest and Investigation

15          At some point, Kochly contacted Defendants Joyce Blair and Peter Flores of the AG's Office

16  and asked them to help investigate, arrest, and prosecute Plaintiff. *Id.* ¶ 31.  Blair is a former Contra

17  Costa DA.  *Id.*  In October 2008, Gressett was arrested and his apartment was searched by MPD and

18  the DA's Office. *Id.* ¶ 38.  The arrest warrant prepared by Sylvia referred to Gressett's multiple runs

19  for DA and, according to the complaint, contained false allegations that there was another victim of

20  Gressett and that a witness said Harpham was visibly in pain after her encounter with Gressett. *Id.* ¶

21  35.  In addition, Sylvia did not point out inconsistencies in the evidence against Gressett in the arrest

22  warrant or supporting affidavit. *Id.* ¶ 36.

23          The DA's Office was involved in the investigation of Plaintiff pursuant to a policy adopted

24  by Martinez known as the Protocol, which was developed to ensure thorough and fair investigations

25  of crimes involving law enforcement. *Id.* ¶ 46.  However, none of the safeguards contained in the

26  Protocol were followed, nor were any of the Contra Costa employees involved in Plaintiff's

27  investigation trained on how to conduct an investigation pursuant to the Protocol. *Id.*

28

United States District Court
For the Northern District of California

Following Plaintiff's arrest, the DA's Office continued to act as an investigative agency in conjunction with the AG's Office, including Blair and Flores. *Id.* ¶¶ 41-42. The AG's Office was aware of the political conflict of interest between Gressett and the DA, but requested that the DA's Office run the entire investigation. *Id.* ¶ 41. Blair had previously worked with Kochly in the DA's Office and had been on Harpham's hiring panel, yet did not recuse herself. *Id.* ¶ 43.

The DA Office's investigatory team was led by Defendants Sequeira, Baker, Greenwald, Paul Mulligan, and Darryl Jackson. *Id.* ¶ 50. They attempted to support an unsavory sexual characterization of Gressett, willfully failed to interview people that would support his exoneration, and willfully failed to follow up on inconsistencies in witness statements. *Id.* ¶ 52. After charges against Plaintiff had already been filed, O'Malley set up an interview with a prostitute who told the public Defendants that Gressett had engaged in sex acts with her in exchange for leniency in her boyfriend's case. *Id.* ¶¶ 59, 62. The prostitute later recanted this testimony.

4.      Charges and Exoneration

In November 2008, Gressett was charged with twelve felony counts of sexual assault and in July 2009 he was terminated from his position as DDA. *Id.* ¶¶ 59-60. O'Malley used the case against Gressett in his campaign against Peterson for the position of Contra Costa DA. *Id.* ¶ 61. Defendants Baker, Kochly, Sequeira, Greenwald, McKenna, Mulligan, and Tom Simonetti (Chief of Police for MPD) all contributed political and financial support to O'Malley's campaign. *Id.* ¶¶ 44, 63. Defendant MPD Chief Simonetti was later given a job with the Alameda County District Attorney's Office when O'Malley's sister became the Alameda County DA. *Id.* ¶ 65.

In February 2011, an arbitrator ordered Gressett reinstated, finding Gressett's allegations that his investigation was tainted with political animosity to be supported by the evidence. *Id.* ¶ 71. In October 2011, all criminal charges against Gressett were dismissed. *Id.* ¶ 72. In February 2012 the AG's office notified Gressett that it did not intend to refile charges against him. *Id.* ¶ 74.

B.      Procedural Posture

Gressett filed his initial complaint in this matter in the California Superior Court for Contra Costa County on May 30, 2012. *See* Compl., Docket No. 1-1. Defendants Contra Costa County, Kochly, Greenwald, Sequeira, Baker, Mulligan, and Jackson (the "Contra Costa Defendants") filed a

United States District Court

For the Northern District of California

notice of removal on July 20, 2012.  *See* Notice of Removal, Docket No. 2.  Following removal, Defendants filed motions to dismiss on July 26 and July 27, 2012.  *See* Mots. to Dismiss, Docket Nos. 7, 10, 11, 15, 21.  Rather than respond to Defendants' motions to dismiss, Plaintiff filed his First Amended Complaint in this matter on August 15, 2012, after which Defendants withdrew their first round of motions to dismiss.  *See* FAC, Docket No. 27; Withdrawals, Docket Nos. 28, 29, 30, 31, 32.  Defendants filed a second round of motions to dismiss on September 7, 2012.  *See* Mots. to Dismiss, Docket Nos. 36, 40, 42, 43, 46, 47.

Following an order from the Court requesting that the parties meet and confer to narrow their dispute, Plaintiff filed his Second Amended Complaint on December 6, 2012, after which Defendants filed the current round of motions to dismiss and to strike, their third, on January 24 and 25, 2013.  *See* SAC, Docket No. 65; Mots. to Dismiss and to Strike, Docket Nos. 73, 75, 79, 92, 93, 94.

### III.   REQUEST FOR JUDICIAL NOTICE

The Martinez Defendants and the Contra Costa Defendants filed requests for judicial notice in this matter.  *See* Martinez RJN, Docket No. 97; Contra Costa RJN, Docket No. 80.  The exhibits include:

- The search warrant for Plaintiff (Martinez RJN Ex. A; Contra Costa RJN Ex. A);
- The arrest warrant for Plaintiff (Martinez RJN Ex. C; Contra Costa RJN Ex. B);
- Sylvia's affidavit supporting Plaintiff's arrest and search warrants (Martinez RJN Ex. B; Contra Costa RJN Ex. C);
- The redacted transcript of an audio recording of Harpham's interview (Martinez RJN Ex. E; Contra Costa RJN Ex. D);
- The criminal complaint against Plaintiff (Contra Costa RJN Ex. E);
- A minute order in Plaintiff's criminal case (Martinez RJN Ex. F; Contra Costa RJN Ex. F);
- A decision on Plaintiff's motion to recuse in his criminal case (Contra Costa RJN Ex. G);

- Plaintiff's motion to dismiss the indictment in his criminal case (Contra Costa RJN Ex. H);

- The order dismissing Plaintiff's indictment (Martinez RJN Ex. G; Contra Costa RJN Ex. I); and

- A court order regarding the written transcript of an audio recording (Martinez RJN Ex. D).

A court may take judicial notice of "a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Judicial notice must be taken when a party requests it and supplies all necessary information. Fed. R. Evid. 201(c)(2). In ruling on a 12(b)(6) motion, a court may take judicial notice of matters of public record. *See U.S. v. Corinthian Colleges*, 655 F.3d 984, 999 (9th Cir. 2011). A court may also consider "evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the document." *Id.*

The Second Amended Complaint specifically refers to several of the documents for which the parties seek judicial notice, in particular the recorded statement of Harpham (SAC ¶ 29), the affidavit for the arrest and search warrants (*id.* ¶ 34), the arrest warrant (*id.* ¶ 35), the criminal complaint against Plaintiff (*id.* ¶ 59), and the order dismissing all charges against Plaintiff (*id.* ¶ 72). Plaintiff does not contest the authenticity of any of these documents and all are central to his claim. Thus, the Court takes judicial notice of these documents. *See Corinthian Colleges*, 655 F.3d at 999. The various other documents from Plaintiff's criminal case, including the search warrant, minute order, decision on his motion to recuse, motion to dismiss the indictment, and court order regarding the written transcript of an audio recording, are all matters of public record, and thus the Court takes judicial notice of them as well. *See id.* The court may take judicial notice of the fact that an assertion was made and of "nonadjudicative facts" in court records when they record some judicial action. *See id.*

///

///

# IV.   ANALYSIS

Plaintiff's Second Amended Complaint states claims for

- (1) § 1983 deprivation of Plaintiff's rights (a) to engage in political speech and the political process under the First Amendment, (b) to be free from unreasonable search and seizure under the Fourth Amendment, and (c) to be free from arrest without probable cause under the Fourth Amendment;

- (2) *Monell* violation of the same constitutional rights;

- (3) malicious prosecution; and

- (4) defamation.

*See* SAC ¶¶ 77-104.  As made clear by argument in the parties' briefs, Plaintiff's § 1983 claim boils down to two different sub-claims:  one, for malicious prosecution pursuant to the First and Fourth Amendments, and the other, for unreasonable search and seizure pursuant to the Fourth Amendment. Given that there was an arrest warrant in this case, Plaintiff's unreasonable search and seizure sub-claim is essentially a "judicial deception" claim, as recognized by the Ninth Circuit and explained below.

A.   Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss based on the failure to state a claim upon which relief may be granted.  *See* Fed. R. Civ. P. 12(b)(6).  A motion to dismiss based on Rule 12(b)(6) challenges the legal sufficiency of the claims alleged.  *See Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).  In considering such a motion, a court must take all allegations of material fact as true and construe them in the light most favorable to the nonmoving party, although "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal."  *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009).

While "a complaint need not contain detailed factual allegations . . . it must plead enough facts to state a claim to relief that is plausible on its face."  *Id.* (quotation marks and citation omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

9

United States District Court

For the Northern District of California

1    *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556

2    (2007).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more

3    than sheer possibility that a defendant acted unlawfully."  *Iqbal*, 556 U.S. at 678.  "*Iqbal* demands

4    more of plaintiffs than bare notice pleading, but it does not require [a court] to flyspeck complaints

5    looking for any gap in the facts."  *Lacey v. Maricopa County*, 693 F.3d 896, 924 (9th Cir. 2012) (en

6    banc) (citation omitted).  Where allegations of conspiracy are involved, "[a]sking for plausible

7    grounds to infer an agreement does not impose a probability requirement at the pleading stage; it

8    simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of

9    illegal agreement."  *See Twombly*, 550 U.S. at 556 (discussing necessary pleading for a conspiracy

10   claim under section 1 of the Sherman Act).  "A statement of parallel conduct, even conduct

11   consciously undertaken, needs some setting suggesting the agreement necessary to make out a

12   [conspiracy] claim; without that further circumstance pointing toward a meeting of the minds, an

13   account of a defendant's [actions] stays in neutral territory."  *See id.* (same).

14   B.    Section 1983 Judicial Deception

15         Plaintiff's first and second causes of action state Fourth Amendment sub-claims based on his

16   "right to be free from unreasonable searches and seizures."  SAC ¶¶ 78, 86.[2]  As discussed below,

17   these sub-claims boil down to a "judicial deception" claim based on Sylvia's preparation of the

18   arrest warrant and supporting affidavit, which resulted in the search of Plaintiff's apartment and his

19   arrest.  Thus, it is necessary to analyze Sylvia's liability first, from which the other Defendants'

20   liability follows.

21         1.    Statement of Law

22         The Fourth Amendment protects the right of individuals to be free from searches and

23   seizures without probable cause.  *See Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 624

24   (9th Cir. 1988).  Probable cause exists when "facts and circumstances within the officer's

25   _____

26         [2] Plaintiff also asserts that his Fourth Amendment "right to be free from arrest without
     probable cause" was violated.  SAC ¶¶ 78, 86.  However, this claim is analytically indistinguishable
27   from his claim based on his right to be free from unreasonable search and seizure.  *See Caballero v.
     City of Concord*, 956 F.2d 204, 206 (9th Cir. 1992) ("Arrest by police officers without probable
28   cause violates the Fourth Amendment's guarantee of security from unreasonable searches and
     seizures, giving rise to a claim for false arrest under § 1983.").

**United States District Court**
For the Northern District of California

knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). Numerous courts have recognized false arrest claims under § 1983 on the basis of an unlawfully issued arrest warrant. *See, e.g.*, *U.S. v. Stanert*, 762 F.2d 775, 781 (9th Cir. 1985) ("the Fourth Amendment mandates that a defendant be permitted to challenge a warrant affidavit valid on its face when it contains deliberate or reckless omissions of facts that tend to mislead"); *KRL v. Moore*, 384 F.3d 1105, 1117 (9th Cir. 2004) ("To support a § 1983 claim of judicial deception, a plaintiff must show that the defendant deliberately or recklessly made false statements or omissions that were material to the finding of probable cause."). As the theory of such a claim rests on the assertion that the affidavit misled the court into issuing a search warrant, the claim is referred to as a "judicial deception claim."

In such a "judicial deception" claim, a plaintiff "must establish both [1] a substantial showing of the deliberate falsity or reckless disregard of the truth of the statements in the affidavit and [2] the materiality of those statements to the ultimate determination of probable cause." *Hervey v. Estes*, 65 F.3d 784, 789 (9th Cir. 1995) (numerals added). The materiality determination is a question for the court and "requires the plaintiff to demonstrate that the magistrate would not have issued the warrant with false information redacted, or omitted information restored." *See Smith v. Almada*, 640 F.3d 931, 937 (9th Cir. 2011) (quotation marks and citation omitted).

For example, in *Smith*, the plaintiff contended that the magistrate would not have issued an arrest warrant if the warrant application had not included two false representations – that the victim independently recalled a dispute with the plaintiff and that the plaintiff's tearful apologies were a tacit admission to the crime – and information about several similar incidents, the other suspects, and the fact that the victim falsely claimed to have seen the plaintiff gloating at the scene of the crime. *Id.* at 937-38. Nevertheless, the Ninth Circuit held that the magistrate still would have had probable cause to issue the warrant based on a corrected application, as the report still had corroborating evidence, such as mail addressed to the plaintiff found at the scene of the crime and the plaintiff's own admission of a dispute with the victim. *Id.* at 938.

2.     Application

Here, Plaintiff identifies numerous improprieties in the affidavit prepared by Sylvia, including (1) inclusion of Plaintiff's political history; (2) failure to mention Harpham's mental instability and that she might spin these allegations as the reason she was not hired for a permanent position; (3) false allegations that there was another victim; (4) false allegations that a witness said Harpham was visibly in pain after her encounter with Gressett; and (5) failure to point out inconsistencies in the supporting evidence.  SAC ¶¶ 34-36.  Notably, Plaintiff does not allege that any other Defendants were involved in preparation of the arrest warrant or that any other Defendants were responsible for the improprieties in the arrest warrant.  Thus, before even analyzing Plaintiff's unlawful search and seizure sub-claim it is possible to dismiss the claim as against every other Defendant than Sylvia.

Reviewing the five alleged improprieties in the arrest warrant and supporting affidavit, the Court finds the first, third, and fifth to be irrelevant to evaluation of Plaintiff's judicial deception claim.  First, Plaintiff does not allege that the statement regarding his political history is false.  Thus, its inclusion in the arrest warrant does not support his judicial deception claim, which requires the information be *false*.  *See Hervey*, 65 F.3d at 789; *KRL*, 384 F.3d at 1117.

Second, as for the alleged false allegation that there was another victim, Plaintiff's complaint appears to be referring to one paragraph in the affidavit regarding a woman, Amber, who had previously dated Plaintiff, which states:

> After our recorded interview with Office[r] Winslett, he re-contacted me and said that he also recalled that he spoke with Amber in April of 2008.  At that time, Amber was extremely intoxicated and told him that she had been raped by a man, but she did not tell him who had raped her nor did she provide any additional information concerning the alleged sexual attack.  Officer Winslett added that he does not know if Amber was referring to Gressett when she made these statements.

Martinez RJN Ex. B at 11.

Where a court takes judicial notice of a document incorporated by reference in the complaint, such as when "the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim," the court "may assume that its contents are true for purposes of a motion to

United States District Court

For the Northern District of California

dismiss under Rule 12(b)(6)." *U.S. v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).  The complaint's characterization of the arrest warrant as alleging there was another victim is not supported by the evidence.  While the actual statement implies that Plaintiff *may* have raped Amber, it explicitly adds the caveat that Officer Winslett did not know if Amber was in fact referring to Gressett.  Plaintiff does not allege facts to suggest that this statement is false or that Sylvia would have had reason to believe it was false.  At best, Plaintiff can argue that Sylvia should have conducted further investigation before including this statement in his affidavit.  However, Plaintiff points to no case holding a § 1983 cause of action arises from the failure to complete a proper investigation before placing hearsay in an arrest warrant.  In any event, the shortcomings in this statement should have been readily apparent to the magistrate judge who issued the warrant; the judge could evaluate this allegation in light of the fact that it did not name Gressett as the rapist, was based on a statement made by Amber while intoxicated, and was double hearsay as relayed in the affidavit.  Thus, it is not material.

Third, the alleged failure to point out inconsistencies to the magistrate does not amount to "deliberate falsity or reckless disregard of the truth of the statements in the affidavit."  *See Hervey*, 65 F.3d at 789.  Plaintiff's complaint identifies two alleged inconsistencies:  (1) that Harpham told Sylvia there was no prior sex between her and Plaintiff, yet told a friend she and Plaintiff had kinky sex on three prior occasions; and (2) that Harpham told Sylvia there had been no threats with the gun yet told her sister that Plaintiff said "he would shoot her in the head and fuck the hole."  SAC ¶ 36.  These inconsistencies were in plain view for the magistrate.  Plaintiff has not pointed to any authority establishing that an officer has a duty to highlight inconsistencies in an affidavit.

The remaining two alleged improprieties – the failure to include information on Harpham's mental state and motive and the false allegation that a witness said Harpham was in pain – while speaking more directly to probable cause, are still insufficient for the Court to conclude "that the magistrate would not have issued the warrant with false information redacted [and] omitted information restored."  *See Smith*, 640 F.3d at 937.  The Court reaches this conclusion after considering the extent of evidence which supported a finding of probable cause to issue the warrant.  Harpham's recorded statement, attached to the affidavit, is particularly compelling.  Sylvia notes

13

United States District Court

For the Northern District of California

1    that "[i]t was obvious that she was upset about the event as she cried several times throughout the

2    interview."  Martinez RJN Ex. B at 2.  During the interview, Harpham provided intimate details

3    regarding the alleged rape, including that Plaintiff "took out . . . a .22 small hand gun" (Martinez

4    RJN Ex. E at 2), that Plaintiff drove a Subaru compact SUV (*id.* at 15), and a description of

5    Plaintiff's home (*id.* at 14, 16).  Sylvia subsequently confirmed Plaintiff owned a "Beretta handgun,

6    model 21A, semi-automatic pistol, .22 caliber" that appeared consistent with the gun described in

7    the interview (Martinez RJN Ex. B at 3), that a 2005 Subaru Impreza was registered to Plaintiff (*id.*),

8    and that the appearance of Plaintiff's home "matches the description of it given by [Harpham]" (*id.*

9    at 4).

10        Moreover, Sylvia obtained witness statements from Harpham's sister, Debbie Climer, and

11   friend, Holly Mantle-Stransky, that largely corroborated Harpham's version of events.  *Id.* at 4-6.

12   As noted above, both Climer and Mantle-Stransky indicated that Harpham told them shortly after the

13   incident that she was initially going to have lunch with Plaintiff on the day of the alleged assault

14   (Martinez RJN Ex. E at 2, 13; Martinez RJN Ex. B at 4, 6); that she had protested to Plaintiff that

15   she did not want to have anal sex (Martinez RJN Ex. E at 2, 21; Martinez RJN Ex. B at 5-6); that

16   Plaintiff pulled a gun on her (Martinez RJN Ex. E at 2-3, 22-23; Martinez RJN Ex. B at 5-6); and

17   that Plaintiff had used an ice pick and ice cubes on her (Martinez RJN Ex. E at 3, 26-31; Martinez

18   RJN Ex. B at 5-6).  Both Climer and Mantle-Stransky indicated that Harpham was distressed

19   following the alleged assault, with Climer stating that Harpham "was a completely different person

20   and . . . was completely devastated" and Mantle-Stransky stating that Harpham "was hysterical and

21   couldn't  think straight."  Martinez RJN Ex. B at 5-6.

22        The inclusion of information that Harpham was unstable and could spin her allegation as the

23   reason she was not hired by the DA's Office and the omission of the false statement that a witness

24   said Harpham was in pain would not have been sufficient to negate probable cause, particularly

25   when viewed in the context of other information in the affidavit.  First, even though Sylvia did not

26   include in the affidavit his suspicion that Harpham could spin these allegations as the reason she was

27   not hired by the DA's Office, the affidavit does state that Mantle-Stransky said that Harpham "did

28   not want to get fired" and that "[h]er job is threatened anyway because they (DAs Office) only pick

14

a certain number[] of attorneys." *Id.* at 6.  Thus, the magistrate could have inferred that Harpham's

allegation could have been part of a scheme to keep her job.  Second, even though the affidavit

contains false information that one witness said Harpham was visibly in pain after the incident, it

contains another statement that Harpham told Mantle-Stransky that she "was having a lot of pain,

due to the entry." *Id.* at 6.  Thus, the false statement was not the only corroborating information of

this fact.

      In sum, given the extensive corroborating evidence presented in the supporting affidavit

supporting probable cause and the limited exculpatory value of the information Plaintiff argues was

wrongfully withheld from that affidavit, the Court finds that Plaintiff cannot demonstrate "that the

magistrate would not have issued the warrant with false information redacted, or omitted

information restored," and thus Plaintiff's unreasonable search and seizure claim fails as pled.  *See

Smith*, 640 F.3d at 937.  As there must be an underlying violation in order for the *Monell*

Defendants, Contra Costa and Martinez, to be held liable, the judicial deception sub-claim also fails

as against them.  **Thus, the Court GRANTS Defendants' motions to dismiss Plaintiff's judicial

deception claims against all Defendants**

      **The dismissal is without prejudice and with leave to amend, with two exceptions:  this

claim is dismissed with prejudice as against O'Malley and McKenna due to the statute of

limitations.**  Under federal law, a claim for false arrest and imprisonment accrues when an

individual's imprisonment ends or when he becomes detained pursuant to legal process, such as

when he is arraigned on charges. *See Wallace v. Kato*, 549 U.S. 384, 388-90 (2007).  As alleged,

Plaintiff was charged with twelve felony counts of sexual assault on November 21, 2008.  SAC ¶ 59.

His statute of limitations expired no later than two years later, on November 21, 2010, well before

Plaintiff filed his complaint in May 2012.  However, the statute of limitations was tolled for the

public Defendants for the duration of Plaintiff's underlying criminal proceedings pursuant to

California Government Code section 945.3.  Thus, the statute of limitations for Plaintiff's judicial

deception sub-claim as against the public Defendants would have expired two years after Judge

Hastings's October 19, 2011 order dismissing the indictment.  Plaintiff's May 2012 filing date was

within the limitations period as extended.  However, that extension under California Government

1  Code section 945.3 does not apply to Plaintiff's claims against O'Malley and McKenna who were

2  not public Defendants.

3  C.     Section 1983 Malicious Prosecution

4         Plaintiff's malicious prosecution sub-claim is based on the theory that the charges against

5  him were baseless and brought pursuant to a conspiracy between all Defendants.  Defendants

6  challenge Plaintiff's § 1983 malicious prosecution claim on a variety of grounds, including:

7         •      that the underlying prosecution did not terminate in Plaintiff's favor,

8         •      that Defendants had probable cause to pursue Plaintiff's prosecution,

9         •      that Plaintiff has not pled sufficient facts to show that Defendants' conduct caused his

10               prosecution,

11        •      that absolute and qualified immunity apply, and

12        •      that the private Defendants were not acting under color of law, as required to set forth

13               a § 1983 claim.

14        The Court need not reach Defendants' qualified immunity defense, as it finds Blair and

15  Flores are entitled to absolute immunity and Plaintiff has not pled sufficient facts to show any of the

16  other Defendants caused his prosecution.

17        1.     Statement of Law

18        Malicious prosecution claims under § 1983 are based on state law elements.  *See Usher v.*

19  *City of Los Angeles*, 828 F.2d 556, 562 (9th Cir. 1987).  In California, a plaintiff may demonstrate

20  malicious prosecution by establishing that the underlying prosecution

21              (1) was commenced by or at the direction of the defendant and was
                pursued to a legal termination in his, plaintiff's, favor; (2) was brought
22              without probable cause; and (3) was initiated with malice.

23  *Zamos v. Stroud*, 32 Cal. 4th 958, 965 (2004) (citations and quotation marks omitted, emphasis

24  removed).  Although most malicious prosecution claims focus on the conduct leading up to the

25  initiation of criminal charges, "state actors who are made aware of [new exculpatory] evidence but

26  then suppress it may be liable for malicious prosecution under § 1983" where such evidence negates

27  probable cause to continue a prosecution.  *See Haupt v. Dillard*, 17 F.3d 285, 290 n.5 (9th Cir. 1994)

28  (citing *Weg v. Macchiarola,* 995 F.2d 15, 17–18 (2d Cir.1993); *Jones v. City of Chicago*, 856 F.2d

985, 993–94 (7th Cir.1988)); *cf. Zamos*, 32 Cal. 4th at 969-70 (continuing to prosecute civil suit discovered to lack probable cause constitutes malicious prosecution).  Regardless of whether the alleged misconduct occurred before or after initiation of the prosecution, the plaintiff "must establish proximate or legal causation" between the misconduct and the initiation or continuation of the prosecution.  *See Arnold v. Internat'l Bus. Machs. Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981).

        2.   <u>Favorable Termination</u>

     "One element that must be alleged and proved in a malicious prosecution action is termination of the prior criminal proceeding in favor of the accused."  *Heck v. Humphrey*, 512 U.S. 477, 484 (1994); *see also Villa v. Cole*, 4 Cal. App. 4th 1327, 1335 (1992).  "If [the termination] is of such a nature as to indicate the innocence of the accused, it is a favorable termination" but, "[i]f, however, the dismissal is on technical grounds, for procedural reasons, or for any other reason not inconsistent with his guilt, it does not constitute a favorable termination."  *Jaffe v. Stone*, 18 Cal. 2d 146, 150 (1941).  It is not necessary that a dismissal proscribe future criminal proceedings in order for it to constitute a favorable termination.  *See id.* at 152.  When the underlying action is terminated in some manner other than by a judgment on the merits, a court must examine the record to see if the disposition reflects the opinion of the court or the prosecuting party that the action would not succeed.  *Oviedo v. Windsor Twelve Properties, LLC*, 212 Cal. App. 4th 97, 112 (2012) (citations omitted).

     In general, "a resolution of the underlying litigation that leaves some doubt as to the defendant's innocence or liability is *not* a favorable termination . . . ."  *Villa*, 4 Cal. App. 4th at 1335.  Instances in which courts have found sufficient doubt to deny the existence of a favorable termination include dismissals: (1) on statute of limitations grounds; (2) pursuant to a settlement; (3) on laches grounds; (4) for lack of jurisdiction; (5) for mootness; (6) for lack of standing; (7) for being premature; and (8) to avoid litigation expenses.  *JSJ Ltd. Partnership v. Mehrban*, 205 Cal. App. 4th 1512, 1525 (2012).

     On the other hand, there are other instances that do not result in full resolution on the merits in which courts have nevertheless found favorable terminations.  For example, a voluntary dismissal of the action by the prosecuting party and a dismissal for failure to prosecute are each presumed to

United States District Court
For the Northern District of California

17

1   be a favorable termination on the merits. *See Sycamore Ridge Apartments, LLC v. Naumann*, 157

2   Cal. App. 4th 1385, 1400 (2007); *Villa*, 4 Cal. App. 4th at 1335.  A dismissal because of a grant of

3   immunity from prosecution is also a favorable termination.  *Scannell v. County of Riverside*, 152

4   Cal. App. 3d 596, 611 (1984).  A dismissal of a criminal action by a magistrate for lack of probable

5   cause is a favorable termination even though the action may be recommenced by complaint or

6   indictment.  *Jaffe*, 18 Cal. 2d at 149-52.

7           Here, the dismissal of Gressett's criminal indictment straddles substantive and procedural

8   issues.  The dismissal order considered, in light of California Penal Code section 995, the Federal

9   Constitution, and the California Constitution, Plaintiff's argument that incompetent evidence was

10  wrongfully admitted before and that exculpatory evidence was wrongfully withheld from the Grand

11  Jury that returned his indictment.  *See* Martinez RJN Ex. G.  While the court did not find any

12  wrongfully admitted evidence to be determinative, it held that such evidence considered along with

13  information wrongfully withheld from the Grand Jury – *i.e.*, that Harpham had filed a charge with

14  the Department of Fair Employment and Housing alleging that she was denied a permanent position

15  in retaliation for reporting a sexual assault by a co-worker, that Harpham had reached a settlement

16  with Contra Costa regarding her retaliation claim, and that Harpham may have stated that she had

17  been abducted and raped by strangers – warranted dismissal.  The court stated:

18          there [was] such an equal balance of reasonable probabilities as to
            leave the court in serious doubt as to whether a properly informed
19          grand jury would have declined to find probable cause to indict had it
            known of [Harpham's] claim and settlement as well as her alleged
20          claim she was abducted and raped by strangers . . . .

21  *Id.* at 63; *see generally id.* at 18, 35-38, 44-47, 58-63 (discussion of impact of omitting exculpatory

22  information).

23          Thus, the state court's findings in dismissing the indictment were not purely procedural, but

24  hinged on the merits of the case against Gressett, and thus constituted a favorable termination.  *See*

25  *Stevenson v. Harmon*, No. C-10-2663 JLS, 2012 WL 2068726, at *5 (S.D. Cal. June 8, 2012)

26  (dismissal of indictment for failure to present to grand jury exculpatory evidence that tended to show

27  malicious prosecution plaintiff's innocence is favorable termination).  *But see Thomas v. Haw. Dep't*

28

United States District Court

For the Northern District of California

1   *of Pub. Safety*, No. C-07-0382 SOM, 2008 WL 2096872, at *7 (D. Haw. May 16, 2008)

2   (characterizing dismissal for failure to present exculpatory evidence to grand jury as procedural).

3           That the dismissal was a favorable termination is confirmed by the prosecution's decision not

4   to refile charges.  As alleged in the Second Amended Complaint, no rationale was given for the

5   decision not to refile charges against Plaintiff.  *See* SAC ¶ 74.  But, inferring the facts alleged in

6   Plaintiff's favor as required in the context of the 12(b)(6) motion, the decision not to refile is

7   indicative of the prosecution's conclusion that it could not convict Gressett on the merits.  *See*

8   *Sycamore Ridge Apartments*, 157 Cal. App. 4th at 1400.  Thus, Plaintiff has pled sufficient facts to

9   demonstrate that the underlying criminal prosecution terminated in his favor.

10          3.      <u>Probable Cause Issue Preclusion</u>

11          The parties dispute whether issue preclusion establishes the existence or not of probable

12  cause.  Defendants argue that the order dismissing the indictment against Plaintiff precludes a

13  finding of no probable cause existing.  On the other hand, Plaintiff argues that the arbitration award

14  overturning his termination precludes a finding of probable cause.

15                  a.      <u>Legal Standard</u>

16          "State law governs the application of collateral estoppel or issue preclusion to a state court

17  judgment in a federal civil rights action."  *Ayers v. City of Richmond*, 895 F.2d 1267, 1270 (9th Cir.

18  1990).  In California,

19                  [c]ollateral estoppel precludes the relitigation of an issue only if (1)
                    the issue is identical to an issue decided in a prior proceeding; (2) the
20                  issue was actually litigated; (3) the issue was necessarily decided; (4)
                    the decision in the prior proceeding is final and on the merits; and (5)
21                  the party against whom collateral estoppel is asserted was a party to
                    the prior proceeding or in privity with a party to the prior proceeding.
22

23  *Zevnik v. Super. Ct.*, 159 Cal. App. 4th 76, 82 (2008) (citing *Lucido v. Super. Ct.*, 51 Cal. 3d 335,

24  341 (1990)).

25                  b.      <u>Order Dismissing Indictment</u>

26          In considering the order dismissing the indictment against Plaintiff, the first question is

27  whether it found probable cause in the first place.  Although the state court mentioned that sufficient

28  probable cause to indict existed (*see, e.g.*, Martinez RJN Ex. G at 3, 17, 44), as noted above, it

United States District Court

For the Northern District of California

1  dismissed the indictment, stating it was "left with serious doubt as to whether a properly informed

2  grand jury would have found probable cause to indict had it known of Ms. [Harpham's] claim and

3  settlement as well as her claim she was abducted and raped by strangers." *Id.* at 57-58. Thus, the

4  state court did not clearly find that probable cause existed to indict Plaintiff.

5          Even if the state court had found that probable cause existed, but nevertheless dismissed the

6  indictment on other grounds, any finding of probable cause would not have preclusive effect because

7  it was not "necessarily decided," as required for collateral estoppel. "If a judgment does not depend

8  on a given determination, relitigation of that determination is not precluded." *Bobby v. Bies*, 556

9  U.S. 825, 834 (2009); *see also* 18 Wright & Miller, Fed. Prac. & Proc. Juris. § 4421 (2d ed.). "A

10  determination ranks as necessary or essential only when the final outcome hinges on it." *Bobby*, 556

11  U.S. at 835. Here, any finding of probable cause was not necessary to the court's decision to

12  dismiss the indictment. Thus, no preclusion applies.

13              c.    Arbitration Award

14          Plaintiff argues that the arbitrator's finding that "the allegation that Gressett had sexually

15  assaulted Holly Harpham had no factual basis and that [the] investigation against him was tainted

16  with political animosity" should be given preclusive effect. *See* Pl.'s Opp'n to Contra Costa Mot.

17  ("Pl.'s Contra Costa Opp'n"), Docket No. 102, at 20-25. This argument fails for the simple reason

18  that, of the Defendants, only Contra Costa was a party to Plaintiff's arbitration proceeding and there

19  is no privity between the other Defendants and Contra Costa. *See* Pl.'s RJN Ex. A, Docket No. 53 at

20  1;[3] *Zevnik*, 159 Cal. App. 4th at 82 (collateral estoppel only applies against a party to a prior

21  proceeding or someone in privity with a party to the prior proceeding). "The concept of 'privity' is

22  highly dependent upon the facts and circumstances in each case, but generally 'involves a person so

23  identified in interest with another that he represents the same legal right.'" *In re Conservatorship*

24  *and Estate of Buchenau*, 196 Cal. App. 4th 1031, 1041 (2011) (quoting *Zaragosa v. Craven*, 33 Cal.

25  2d 315, 318 (1949)). Here, even the individual Contra Costa Defendants cannot be said to be in

27          [3] Plaintiff cites the request for judicial notice he filed during the second round of motions to
dismiss, which he never withdrew. The Court takes judicial notice of the arbitration award attached
28  thereto, as the complaint refers to it, it is central to Plaintiff's claim, and no party contests its
authenticity. *See Corinthian Colleges*, 655 F.3d at 999; SAC ¶ 71.

1   privity with Contra Costa regarding Plaintiff's employment arbitration.  They had no legally

2   cognizable interest in whether or not Plaintiff kept his position.  Issue preclusion cannot be applied

3   to Defendants other than Contra Costa.

4       Even though Contra Costa was a party to Plaintiff's employment arbitration, collateral

5   estoppel is still not applicable.  Numerous courts have noted that arbitration awards are not to be

6   given preclusive effect in federal civil rights claims under § 1983.  In *McDonald v. City of West*

7   *Branch, Mich.*, 466 U.S. 284, 290 (1984), the Court held that "according preclusive effect to an

8   arbitration award in a subsequent § 1983 action would undermine that statute's efficacy in protecting

9   federal rights."  In reaching this conclusion, it noted that "[a]n arbitrator may not . . . therefore, have

10  the expertise required to resolve the complex legal questions that arise in § 1983 actions" and that

11  "arbitral factfinding is generally not equivalent to judicial factfinding," as "'[t]he record of the

12  arbitration proceedings is not as complete; the usual rules of evidence do not apply; and rights and

13  procedures common to civil trials, such as discovery, compulsory process, cross-examination, and

14  testimony under oath, are often severely limited or unavailable.'"  *Id.* at 290-91 (quoting *Alexander*

15  *v. Gardner-Denver*, 415 U.S. 36, 57-58 (1974)); *see also Dean Witter Reynolds, Inc. v. Byrd*, 470

16  U.S. 213, 222 (1985); *Brosterhous v. State Bar*, 12 Cal. 4th 315, 326 (1995) (recognizing "intent of

17  Congress that section 1983 claims be judicially resolved.").  Plaintiff's reliance on *Kelly v. Vons*

18  *Companies, Inc.*, 67 Cal. App. 4th 1329, 1337 (1998) for the contrary is misplaced.  *Kelly* found

19  preclusion in the context of a state fraud and negligence case only after distinguishing "federal law

20  and procedure"; the court reasoned that, while federal statutes provide minimum substantive

21  guarantees and contemplate access to the courts, there is no similar legislative dictate against

22  resolving common law claims by arbitration.  *Id.* at 1338.

23      Furthermore, although not raised by Defendants, even if an arbitration award were allowed to

24  have preclusive effect, collateral estoppel would nevertheless be inappropriate here because the

25  nature and burden of proof differed.  As discussed in the arbitration decision, the arbitrator

26  determined that Contra Costa County did not meet its burden of showing, by a preponderance of the

27  evidence, that the allegations against Plaintiff were true.  *See* Pl.'s RJN Ex. A at 9-10.  By way of

28  contrast, in this case Plaintiff will have the burden of proving lack of probable cause.  *See Foster v.*

1   *Banks*, 112 Cal. App. 622 (1931); *Beck v. City of Upland*, 527 F.3d 853, 863 (9th Cir. 2008).

2   Probable cause may exist even if the allegations are ultimately proven untrue.  "Failure of one party

3   to carry the burden of persuasion on an issue should not establish the issue in favor of an adversary

4   who otherwise would have the burden of persuasion on that issue in later litigation."  18 Wright &

5   Miller Fed. Prac. & Proc. Juris. § 4422 (2d ed.); *see also People v. Esmaili*, 213 Cal. App. 4th 1449,

6   1463 (2013).  Thus, collateral estoppel does not apply.

7           4.      Individual Liability

8           While determinations as to favorable termination and collateral estoppel do not serve to bar

9   Plaintiff's malicious prosecution sub-claim, he still must plead sufficient facts to hold each

10  individual Defendant liable for malicious prosecution.  *See Leer v. Murphy*, 844 F.2d 628, 633 (9th

11  Cir. 1988).

12                  a.      Existence of Conspiracy

13          To avoid issues of individual liability, Plaintiff alleges that all Defendants were part of a

14  conspiracy to maliciously prosecute him.

15              A civil conspiracy is a combination of two or more persons who, by
                some concerted action, intend to accomplish some unlawful objective
16              for the purpose of harming another which results in damage.  To prove
                a civil conspiracy, the plaintiff must show that the conspiring parties
17              reached a unity of purpose or a common design and understanding, or
                a meeting of the minds in an unlawful arrangement.  To be liable, each
18              participant in the conspiracy need not know the exact details of the
                plan, but each participant must at least share the common objective of
19              the conspiracy.  A defendant's knowledge of and participation in a
                conspiracy may be inferred from circumstantial evidence and from
20              evidence of the defendant's actions.

21  *Gilbrook v. City of Westminster*, 177 F.3d 839, 856-57 (9th Cir. 1999) (quotation marks and

22  citations omitted).  In the context of a § 1983 claim, "[c]onspiracy may . . . enlarge the pool of

23  responsible defendants by demonstrating their causal connections to the violation; the fact of the

24  conspiracy may make a party liable for the unconstitutional actions of the party with whom he has

25  conspired."  *Lacey v. Maricopa County*, 693 F.3d 896, 935 (9th Cir. 2012) (en banc).

26          After *Twombly* and *Iqbal*, a complaint may not simply conclude that a conspiracy existed,

27  but rather must plead facts from which the existence of a conspiracy may reasonably be inferred.

28  *See id.* at 937 ("The conclusory conspiracy allegations in the original complaint do not define the

United States District Court

For the Northern District of California

1    scope of any conspiracy involving [the defendant], what role he had, or when or how the conspiracy

2    operated."). Whether a plaintiff has alleged sufficient facts to show a conspiracy is generally a case-

3    specific, fact-intensive inquiry. Courts look to a variety of factors, such as whether the plaintiff has

4    set forth facts from which a motive can be inferred, facts showing acts taken in furtherance of the

5    conspiracy, and facts showing specific agreement to be part of a conspiracy. *See, e.g.*, *Lacey*, 693

6    F.3d at 935-36 (existence of conspiracy adequately alleged where, among other reasons, it

7    "detail[ed] reasons for why each [conspirator] had a motive"); *Sanchez v. Aviva Life & Annuity Co.*,

8    No. C-09-1454 FCD, 2010 WL 2606670, at *4 (E.D. Cal. June 28, 2010) (sufficient to proffer

9    "detailed allegations regarding the nature of the conspiracy, the communication and interaction

10   between [parties to the conspiracy], the nature and mechanics of the [acts taken in furtherance of the

11   conspiracy], and the motives of the allegedly conspiring parties.").

12                              (1)      The Contra Costa Defendants

13           Plaintiff alleges that all twelve individual Defendants were part of a conspiracy to

14   maliciously prosecute him and subject him to false arrest. Of the four groups of Defendants –

15   Contra Costa, Martinez, California, and private Defendants – the existence of a conspiracy is the

16   most plausible for the Contra Costa Defendants. Gressett had a history within the DA's Office as an

17   iconoclast who had rubbed up against the power structure within the DA's Office several times in

18   the past. *See* SAC ¶¶ 12-22. He had run against Kochly to be DA in the 2002 election. *See id.* ¶¶

19   20-21. Greenwald had actively supported Kochly's predecessor, another political opponent of

20   Gressett's, going so far as to investigate Gressett for misappropriation of campaign contributions

21   and to cover-up illicit campaign activity by Gressett's opponent. *See id.* ¶¶ 16-17. In the 2010

22   election, most of the Contra Costa Defendants lent support to the O'Malley campaign, while

23   Gressett was closely allied with O'Malley's opponent, Peterson. Kochly publicly campaigned for

24   O'Malley and contributed thousands of dollars to his campaign. *Id.* ¶ 23. Baker, Sequeira,

25   Greenwald, and Mulligan also contributed financial support to O'Malley's campaign. *See id.* ¶ 63.

26           Moreover, according to the complaint, a number of the Contra Costa Defendants took acts

27   suggestive of an agreement to go after Gressett, regardless of his guilt, because of their animosity to

28   his past and current political activity. Kochly requested that the AG's Office investigate and

                                                    23

United States District Court

For the Northern District of California

prosecute Gressett, yet withheld from them potential impeachment evidence against Harpham.  *See id.* ¶¶ 31, 73.  Sequeira intimidated witnesses that offered exculpatory evidence and declined to delve into known inconsistencies in witness interviews.  *See id.* ¶ 54.  Greenwald and Baker did not interview Harpham about inconsistencies between her allegations and Gressett's depiction of events.  *See id.* ¶ 57.

Given the specific facts alleged regarding these Defendants' animosity to Gressett (*i.e.*, motive), their acts consistent with a conspiracy to maliciously prosecute Gressett, and the fact that these Defendants worked together within the same office, which would have offered a heightened opportunity for collusion, **the claim of a conspiracy involving the Contra Costa Defendants is sufficiently plausible to satisfy *Twombly* and *Iqbal*.**

**However, of the six Contra Costa Defendants, Plaintiff's allegations fall short as to one: Jackson.**  Plaintiff does not allege any specific facts regarding a motive on Jackson's part.  Plaintiff does not allege a history of political animus against Plaintiff on Jackson's part.  *See id.* ¶¶ 12-22.  Unlike the other Contra Costa Defendants, Plaintiff does not allege that Jackson supported O'Malley's campaign, aside from his conclusory allegation that "[a]ll Defendants were supportive of DEFENDANT DAN O'MALLEY . . . ."  *Id.* ¶ 26.  Such conclusory allegations of fact are not entitled to be assumed true under Rule 12(b)(6).  *Iqbal*, 556 U.S. at 681.  The only allegations specific to Jackson are that he (1) "changed the line of questioning of witnesses whenever it took a turn towards exculpatory evidence"; (2) "spent many interviews trying to get witnesses to agree that Gressett should be prosecuted even if the sex acts alleged were consensual"; and (3) told witnesses there was medical evidence to support the allegations against Plaintiff.  *See SAC* ¶¶ 55, 68.  However, given the lack of factual allegations suggesting any motive or specific agreement involving Jackson, a more plausible explanation for these actions is that Jackson was simply an overzealous prosecutor, as opposed to a part of a larger conspiracy to prosecute Plaintiff, regardless of his guilt or innocence.  *See Iqbal*, 556 U.S. at 681-82 (factual allegations consistent with plaintiff's theory do not establish plausibility where obvious alternative explanation exists); *Twombly*, 550 U.S. at 556-57 ("when allegations of parallel conduct are set out . . ., they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct

that could just as well be independent action").  Plaintiff has not set forth facts from which the Court can reasonably infer that Jackson was part of a conspiracy to subject him to malicious prosecution or false arrest.

(2)    <u>The Martinez Defendants</u>

Unlike for the Contra Costa Defendants, Plaintiff has not alleged facts from which the Court can infer the existence of a conspiracy involving the two Martinez Defendants:  Sylvia and Simonetti.  First, Plaintiff alleges no motive on the part of Sylvia.  Plaintiff simply alleges that the Martinez Police Department contributed political and financial support to O'Malley's campaign.  *See* SAC ¶ 63.  Setting aside the question of how a government entity can contribute political and financial support to a political candidate, the Court cannot infer that Sylvia had a motive to conspire to arrest and prosecute Gressett in order to elevate O'Malley's campaign from the fact that Sylvia's employer supported O'Malley's campaign.  There is no allegation that Sylvia personally contributed to the campaign.  As for Simonetti, while Plaintiff does allege that he contributed political and financial support to O'Malley's campaign (*id.* ¶ 63) and thought Gressett was an "asshole" (*id.* ¶ 40), he does not allege any specific acts taken on Simonetti's part to suggest he was part of a conspiracy to arrest and prosecute Gressett.  At best, Plaintiff alleges that Simonetti did not adequately supervise MPD's investigation in Gressett's case.  However, this allegation, alone, is not enough for the Court to infer that he was part of a vast conspiracy to prosecute Gressett.  This is particularly so since Simonetti, along with Sylvia, did not work in the same office as the Contra Costa Defendants did.  The lack of proximity, weakness of any motive evidence, and the limited involvement of Simonetti in the alleged conduct as part of the putative conspiracy imply **there is no plausible claim that the Martinez Defendants agreed to join the conspiracy.**

(3)    <u>California Defendants</u>

As for the California Defendants, Plaintiff's complaint again falls short in establishing a plausible claim they participated in the putative conspiracy.  While Plaintiff does allege that Blair had worked closely with Kochly in the past (*id.* ¶ 31) and had been contacted by Kochly to participate in Gressett's investigation and prosecution (*id.*), he does not allege any actions on her part to further this prosecution.  He simply alleges she did nothing to ensure the Protocol was

1    followed throughout Gressett's investigation.  *See id.* ¶ 49.  Yet, the Protocol was adopted by MPD;

2    it is unclear why the AG's Office would have anything to do with it.  *See id.* ¶ 46.  As for Flores,

3    Plaintiff does not allege any facts suggestive of a motive to maliciously prosecute Plaintiff, nor does

4    he allege any specific actions on Flores's part suggestive of participation in a conspiracy.  Rather, as

5    with Blair, Plaintiff alleges that Flores neglected to ensure MPD's compliance with its own policy,

6    which is not enough to show his participation in the alleged conspiracy.  *Id.* ¶ 49.  Again, the lack of

7    proximity to the Contra Costa conspirators, motive, and affirmative overt acts further implies **there**

8    **is no plausible claim the California Defendants joined the putative conspiracy.**

9                           (4)    Private Defendants

10          **Lastly, as for the private Defendants, Plaintiff has alleged enough facts for O'Malley,**

11   **but not enough for McKenna.**  O'Malley clearly had a motive to go after Gressett, who was a

12   supporter of O'Malley's political opponent, Peterson.  In fact, O'Malley's campaign allegedly used

13   the investigation and prosecution of Gressett to smear Peterson throughout the 2010 race.  *See id.* ¶

14   61.  Moreover, O'Malley took concrete steps suggestive of his participation in a conspiracy, most

15   notably his setting up an interview with a prostitute to gin up false evidence against Plaintiff.  *See id.*

16   ¶ 62.

17          McKenna's participation in a conspiracy is less apparent.  While he was O'Malley's law

18   partner and a supporter of O'Malley's campaign, his alleged actions are not particularly indicative of

19   his participation in a conspiracy to prosecute Plaintiff.  McKenna interviewed Harpham regarding

20   her allegations (*id.* ¶ 26), contacted O'Malley and Sequeira regarding those allegations (*id.* ¶ 27),

21   encouraged Harpham to participate in Gressett's investigation and prosecution (*id.* ¶ 32), and told

22   Harpham her story and credibility were beyond a reasonable doubt (*id.* ¶ 32).  Unlike the other

23   conspirators, McKenna is not alleged to have deliberately withheld or avoided exculpatory evidence,

24   directly procured false evidence, or otherwise taken steps that skewed the investigation or

25   prosecution.  It is unclear how McKenna's actions were part of the conspiracy.  Thus, the conspiracy

26   charges against McKenna fail as alleged.

27

28

**United States District Court**
For the Northern District of California

b.     Causation

Next, the Court turns to whether Plaintiff has sufficiently set forth facts to show that Defendants' acts "caused" his prosecution, as required for any § 1983 claim.  As alleged, there are three key events along the course of Plaintiff's prosecution:  (1) his arrest on October 2, 2008 (SAC ¶ 38); (2) the filing of charges on November 21, 2008 (*id.* ¶ 59; Contra Costa RJN Ex. E); and (3) the Grand Jury indictment (SAC ¶¶ 72-73).  The events leading up to Plaintiff's arrest are addressed in the context of his judicial deception claim.  The remaining two events each present substantial hurdles for Plaintiff to demonstrate causation.

(1)     Statement of Law

Section 1983 provides that individuals may be held liable if they "subject[], or cause[] to be subjected" an individual to the deprivation of his constitutional rights.  This causation requirement of section 1983 "is not satisfied by a showing of mere causation in fact," but rather requires that the plaintiff also "establish proximate or legal causation."  *Arnold v. IBM Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981).  "The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation."  *Leer v. Murphy,* 844 F.2d 628, 633 (9th Cir. 1988).  The Ninth Circuit has characterized the causal connection required to sustain section 1983 liability as follows:

> A person 'subjects' another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made.  Moreover, personal participation is not the only predicate for section 1983 liability.  Anyone who 'causes' any citizen to be subjected to a constitutional deprivation is also liable.  The requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.

*Johnson v. Duffy,* 588 F.2d 740, 743-44 (9th Cir. 1978).  Proximate cause hinges on foreseeability: whether a defendant knew or should have known that the deprivation would likely result from his actions.  *Id.*; *see also Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,* 216 F.3d 764, 785 (9th Cir. 2000) ("It is well-established that foreseeability analysis is an appropriate part of

United States District Court
For the Northern District of California

proximate cause determinations in § 1983 actions."). "Traditional tort law defines intervening causes that break the chain of proximate causation" in § 1983 claims. *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 837 (9th Cir. 1996).

When the constitutional violation is a malicious criminal prosecution, there are particularly difficult issues of causation involved, as the decision to initiate and maintain a criminal prosecution is typically made by individuals entitled to absolute immunity, such as a prosecutor or members of a grand jury. *See Imbler v. Pachtman*, 424 U.S. 409, 438 (1976). Thus, a claim is typically brought against an individual who successfully induces prosecution rather than the individuals who effectuate the prosecution. *Cf. Hartman v. Moore*, 547 U.S. 250, 262 (2006).

In a malicious prosecution claim, even if a plaintiff is able to set forth a chain of causation between a section 1983 defendant's actions and a criminal prosecution, he must still overcome a presumption "that the prosecutor filing a criminal complaint exercised independent judgment in determining that probable cause for an accused's arrest existed, thereby breaking the chain of causation between an arrest and prosecution and immunizing investigating officers from damages suffered after the complaint was filed." *Beck v. City of Upland*, 527 F.3d 853, 862 (9th Cir. 2008) (quoting *Smiddy v. Varney*, 665 F.2d 261, 266-67 (9th Cir. 1981) ("*Smiddy I*")) (alterations and quotation marks removed). In a Fourth Amendment malicious prosecution claim, this "presumption may be rebutted if the plaintiff shows the independence of the prosecutor's judgment has been compromised," such as by showing "the prosecutor was pressured by police or was given false information, the police acted maliciously or with reckless disregard for the rights of an arrested person, the prosecutor relied on the police investigation and arrest when he filed the complaint instead of making an independent judgment on the existence of probable cause for the arrest, or the officers otherwise engaged in wrongful or bad faith conduct that was actively instrumental in causing the initiation of legal proceedings." *Id.* at 862-63 (alterations, quotation marks, and internal citations omitted) (citing *Smiddy I*, 665 F.2d at 266-67; *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004)).

In *Hartman v. Moore*, 547 U.S. 250 (2006), the Supreme Court articulated a slightly different standard for overcoming the presumption of prosecutorial regularity in First Amendment retaliatory

United States District Court
For the Northern District of California

1   prosecution claims.  Rather than needing to demonstrate specific facts showing that the

2   independence of the prosecutor's judgment has been compromised, a plaintiff in a First Amendment

3   retaliatory prosecution claim need only show "a retaliatory motive on the part of an official urging

4   prosecution combined with an absence of probable cause supporting the prosecutor's decision to go

5   forward" in order to support "a prima facie inference that the unconstitutionally motivated

6   inducement infected the prosecutor's decision to bring the charge."  *Id.* at 265.  In other words, in a

7   First Amendment retaliatory prosecution claim, if the prosecutor lacked probable cause to initiate

8   criminal proceedings, courts will afford the decision to prosecute no deference, and a plaintiff need

9   only show that the defendant caused the prosecutor to file charges.

10          Just like a prosecutor's decision to file charges may serve as an intervening cause to cut off a

11   section 1983 defendant's liability, so too may a grand jury indictment.  "[A]bsent any specific

12   allegation, such as the presentation of false evidence or the withholding of evidence, the grand jury

13   indictment breaks any chain of causation" between an individual's actions and a criminal

14   defendant's prosecution pursuant to indictment.  *See Ames v. U.S.*, 600 F.2d 183, 185 (8th Cir.

15   1979); *see also Campbell v. City of Bakersfield*, No. C-04-5585 AWI, 2006 WL 2054072, at *19

16   (E.D. Cal. July 21, 2006).

17          As charges against Plaintiff were filed by the AG's Office (*see* Contra Costa RJN Ex. E) and

18   the AG prosecutors are entitled to absolute immunity for their decision to file charges (*see Imbler*,

19   424 U.S. at 438), Plaintiff would need to allege facts showing how each non-AG Defendant's

20   actions were the proximate cause of his prosecution.  In addition, as a Grand Jury decided to indict

21   Plaintiff, Plaintiff would need to allege facts showing how each Defendant's actions were the

22   proximate cause of his indictment notwithstanding the Grand Jury's decision to indict.

23                            (2)      Filing Charges

24          As discussed above, Plaintiff must plead facts establishing that each Defendant's actions

25   were the proximate cause of the malicious prosecution against him.  As discussed above in the

26   context of Plaintiff's judicial deception sub-claim, there *was* probable cause for Plaintiff's

27   prosecution at the time of his arrest.  Thus, Plaintiff would need to plead facts showing that some

28   action by Defendants was the proximate cause of:  (1) the decision to file charges against him

United States District Court

For the Northern District of California

1    following his arrest, and/or (2) the return of the indictment.  As to the former, given that charges

2    filed by a prosecutor are given a presumption of regularity, Plaintiff must either plead facts showing

3    that the independence of the prosecutors' judgment was compromised in order to proceed with his

4    Fourth Amendment claim or plead facts showing that the non-AG Defendants "secured his . . .

5    prosecution without probable cause" in order to proceed with his First Amendment claim.  *See Beck*,

6    527 F.3d at 862-64.

7           Plaintiff discusses at length the investigation of his case following his arrest and prior to

8    charges being filed (*see* SAC ¶¶ 41-58); yet the bulk of his allegations focus on the Defendants'

9    investigatory techniques, not how their actions played a causative role in the decision to file charges.

10   For example, Plaintiff states that the DA's Office did not recuse itself, that the investigators did not

11   follow the Protocol, and that a variety of the Defendants engaged in abusive interview tactics, such

12   as changing the line of questioning whenever an interview turned towards exculpatory evidence.

13   *See id.*  However, Plaintiff does not identify what exculpatory evidence (which would have altered

14   the prosecutor's decision to file charges) was missed as a result of improper investigative and

15   interviewing techniques, failure of conflicted parties to recuse themselves from the investigation,

16   and failure to follow the Protocol.  When pressed at the hearing, Plaintiff's counsel could not

17   identify a single item of exculpatory evidence that was overlooked or missed by these errors.

18   Rather, Plaintiff conclusorily alleges there would not have been probable cause to prosecute him,

19   simply stating that, "[h]ad the Protocol been properly followed, the investigation of Mr. Gressett

20   would have revealed serious inconsistencies that seriously negated any finding of probable cause to

21   arrest and search Mr. Gressett."  *Id.* ¶ 47.  As pled, Plaintiff's argument that these alleged

22   improprieties in the investigation were the proximate cause of his prosecution is speculative.

23          Aside from these alleged investigative improprieties, the only potential link between the non-

24   prosecutor Defendants' conduct and Plaintiff's prosecution (in the filing of the criminal complaint)

25   is a handful of potentially exculpatory inconsistencies in the evidence, including that Harpham had

26   claimed (1) to have been abducted and raped by strangers, (2) to have suffered permanent

27   reproductive injuries, (3) to have previously engaged in anal sex, (4) to have wanted to engage in the

28   exact sex acts she alleges occurred between her and Gressett, and (5) to have sustained injuries that

United States District Court

For the Northern District of California

investigators knew she had not in fact sustained, as well as (6) the fact that Harpham was mentally and emotionally unstable.  *See id.* ¶¶ 46, 57-58.  The only specific allegation Plaintiff makes suggesting any individual Defendant was even aware of these inconsistencies is that Greenwald and Baker were aware from their interview with Plaintiff that Harpham had previously engaged in anal sex.  *See id.* ¶ 57.  Yet, Plaintiff does not allege any causal connection between knowledge of this fact and the prosecutors' decision to file charges.  Plaintiff does not allege or demonstrate that Greenwald and Baker withheld this information from the prosecutors or that, had the prosecutors known of this information, they likely would not have filed charges.[4]

For the remaining exculpatory evidence, it is impossible to attribute blame and causation to any individual Defendant, as Plaintiff does not allege how each Defendant's actions bore a causal relationship with Plaintiff's ultimate prosecution.  *See Leer*, 844 F.2d at 633 (inquiry into causation requires individualized analysis of each defendant).  For example, Plaintiff alleges that the DA's Office did not investigate "real and material inconsistencies in the accuser's false version of events, including that she was abducted and raped by strangers," yet does not articulate who in the DA's Office knew of this inconsistency or who bore any responsibility for the failure to investigate this inconsistency.  *See* SAC ¶ 46.

More fundamentally, there is no chain of proximate cause between the non-prosecutors' alleged misconduct and the filing of charges against Plaintiff.  Plaintiff's theory of the case asserts that the prosecutors knew of the inconsistencies in the evidence; he claims that "[t]he Attorney General's Office knew there was not probable cause to prosecute Mr. Gressett, that the evidence against him was fabricated and designed to chill his political speech" (SAC ¶ 42), that "[t]he Attorney Generals were aware of these failures and malicious tactics in the investigation and

---

[4] The Court notes that Judge Hastings's order on Plaintiff's motion to dismiss the indictment in his criminal case suggests that, for the most part, this information was not withheld from prosecutors.  For example, information regarding Harpham's previous engagement in anal sex was redacted from a statement presented to the Grand Jury, including that "the two times in her previous history when she had tried anal sex she did not enjoy it . . . ."  Contra Costa RJN Ex. I at 30.  Presumably, the prosecutors were responsible for redacting this statement.  In addition, Judge Hastings's order notes that Harpham's claims about permanent reproductive injuries and to have suffered injuries she had not sustained were presented to the Grand Jury by the prosecution, again demonstrating that this information was not withheld by the non-prosecuting Defendants herein.  *See id.* at 27.

United States District Court
For the Northern District of California

actively participated in them" (*id.* ¶ 54), and that "all Defendants were aware of Ms. Harpham's strong motivation to lie in this case" (*id.* ¶ 73).  Plaintiff does not allege the AG prosecutors were unaware of these inconsistencies.

To be sure, the Court notes that Judge Hastings found that the prosecutors were not aware of potentially exculpatory evidence that Harpham had allegedly said she was kidnapped and raped by strangers.  *See* Contra Costa RJN Ex. I at 35-36.  However, this evidence came to light during a meeting at which one of the prosecutors' agents, Special Agent Ramirez-Doty of the AG's office, was present.  *See id.*  Plaintiff has not established that Defendants were obligated to disclose to prosecutors evidence of which the AG's office (through its own agent) was already aware.  *See Kelly v. Curtis*, 21 F.3d 1544, 1552 (11th Cir. 1994) (no "duty on the part of a law enforcement officer to inform the prosecutor's office of exculpatory evidence that the officer has reason to believe is already known to that office.").

If the AG prosecutors office was aware of exculpatory evidence (as Plaintiff alleges), yet nevertheless proceeded to file charges against Plaintiff, then there is no chain of proximate cause between the non-prosecutor Defendants' actions and Plaintiff's prosecution.  The presumptively independent and informed decision of the prosecutors to file criminal charges breaks the chain of proximate cause.  *Beck*, 527 F.3d at 862, *Smiddy I*, 665 F.2d at 266-67.  In alleging the AG prosecutors office was aware of the exculpatory evidence, Plaintiff has failed to rebut the presumption of regularity.[5]

In sum, Plaintiff has not alleged facts from which the Court can infer that the acts of the non-prosecutor Defendants, *i.e.*, those other than Blair or Flores (of the California's AG's office), were the proximate cause of the decision to file charges.  Blair and Flores, on the other hand, are entitled

---

[5]  The Court notes, however, had Plaintiff set forth sufficient facts to implicate Blair and Flores in a conspiracy to maliciously prosecute Plaintiff, the analysis of intervening cause might differ.  *Cf. Thomas v. Sams*, 734 F.2d 185, 191 (5th Cir. 1984) (where defendant presents complaint to an intermediary that is not impartial, i.e. himself, the decision to proceed is not an intervening cause); *Zahrey v. Coffey*, 221 F.3d 342, 350-55 (2d Cir. 2000) (a subsequent immunized act of a single official does not break the chain of causation traceable to his initial misconduct occurring in another capacity).  Plaintiff has alleged forth such facts.

to absolute immunity for their decision to prosecute Plaintiff.[6]  **Thus, the Court GRANTS Defendants' motions to dismiss Plaintiff's malicious prosecution sub-claim to the extent it is based on the decision to file charges.  The Court dismisses this claim without prejudice and with leave to amend.**

(3)   <u>Grand Jury Indictment</u>

The Court next turns to the Grand Jury indictment.  The complaint identifies several improprieties with respect to the Grand Jury proceedings:  (1) that the Attorney General "introduced inadmissible evidence to the grand jury" and "failed to inform the jury of the limited admissibility of such evidence," (2) that the Attorney General "failed to inform the grand jury of exculpatory evidence that Ms. Harpham had told people that she was raped by strangers," and (3) that the Attorney General "failed to inform the grand jury of exculpatory evidence . . . that [Harpham] had settled claims of sex discrimination and retaliation against the Contra Costa County District Attorney's Office for $450,000."  *See* SAC ¶ 72.

As for the introduction of inadmissible evidence, the prosecutors' decision to present inadmissible evidence to the Grand Jury is entitled to absolute immunity, which insulates prosecutorial liability based on "the lawyerly functions of . . . presenting evidence and analysis to the courts and grand juries on behalf of the government . . . ."  *See Lacey v. Maricopa County*, 693 F.3d 896, 913 (9th Cir. 2012) (en banc).  Furthermore, there is no indication that any such inadmissible evidence played a material role in the Grand Jury's decision to indict, particularly in light of the substantial evidence supporting probable cause.

As for the exculpatory evidence that Harpham had told people that she was raped by strangers, Plaintiff again has not alleged facts showing proximate cause between the conduct of any non-prosecuting Defendant and the Grand Jury's indictment.  As discussed above, Ramirez-Doty, the AG's agent, was present at the interview where this information surfaced, thus negating any proximate cause between the non-prosecutor Defendants' conduct and the AG's presentation to the Grand Jury (and thus the Grand Jury's decision to indict).  To the extent Plaintiff's complaint

---

[6]  Were Blair or Flores found to be part of the conspiracy with the non-prosecuting Defendants, it is possible that liability based on the conspiracy might obtain apart from the act of filing charges, as noted in footnote 5, *supra*.

suggests that Blair and Flores were knowledgeable of this fact but intentionally withheld this information from the Grand Jury, their acts are entitled to absolute immunity. *See Lacey*, 693 F.3d at 913.[7]

As for Harpham's DFEH charge and settlement, Plaintiff *does* allege that Kochly "knew of the claim and the settlement at the time and yet . . . intentionally withheld this information from the state prosecutors." SAC ¶ 73.[8] Plaintiff alleges that this information both evidenced Harpham's "strong motivation to be untruthful in this case" and contradicted her testimony in front of the Grand Jury, as,

> [o]n the same day Ms. Harpham's settlement against the DA's office was finalized, she was asked by the Grand Jury why she was not hired. She said nothing about her allegations of retaliation or discrimination based on the alleged assault. Instead she replied that it was because of budget cuts.

*See id.* ¶¶ 72-73.

Nevertheless, the Court finds that Kochly's withholding this information was not, on its own, material to the Grand Jury's indictment of Plaintiff. First, although the DFEH charge and settlement could be indicative of Harpham's motivation to lie, they could also be indicative of the truth of her rape allegation, as she consistently alleged in two separate fora that she was subjected to sexual assault by Plaintiff. Second, Plaintiff does not allege any sort of temporal nexus between Harpham's allegation of rape and her DFEH charge and settlement that would suggest they were part of an overall scheme on her part. Rather, the complaint alleges she first told other people about the alleged rape in May 2008, which, absent an allegation to the contrary, likely occurred *before* her

---

[7]  As discussed above, if Plaintiff were to set forth sufficient facts to implicate Blair and Flores in a conspiracy to maliciously prosecute Plaintiff, the analysis of chain of causation may change. *Cf. Thomas*, 734 F.2d at 191; *Zahrey*, 221 F.3d at 350-55.

[8]  The complaint also generally avers that "all Defendants were aware of Ms. Harpham's strong motivation to lie in this case," yet this evidence was not revealed to the Grand Jury. *See id.* This allegation is conclusory and does not identify who, including the prosecutor, was responsible for not presenting this evidence to the Grand Jury. In any event, if all Defendants were aware of this information, then the prosecutors would be responsible for the decision whether or not to present it to the Grand Jury, which decision would be entitled to absolute immunity. *See Lacey*, 693 F.3d at 913.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    DFEH charge and settlement.[9]  *See* SAC ¶¶ 25-28.  The information thus had no or limited probative

2    value in proving Harpham's lack of credibility.

3          Finally, proximate cause requires that Kochly must either have known or should have known

4    his conduct would result in Plaintiff's indictment.  *See Johnson*, 588 F.2d at 743-44.  It is not

5    plausible that the DFEH charge and settlement would have foreseeably tipped the balance in the

6    Grand Jury's decision to indict.  Similarly, to the extent Plaintiff's theory is based on Harpham

7    giving inconsistent testimony regarding the reason for her termination, Plaintiff has not pled facts

8    from which it can be inferred that Kochly either knew or should have known she would give

9    inconsistent testimony, thus putting him on notice that he should disclose her potentially

10   contradictory DFEH charge.[10]

11         Plaintiff has not alleged facts from which it can be inferred that any of the non-AG

12   Defendants' actions was a proximate cause of the Grand Jury indictment.  The AG prosecuting

13   Defendants have immunity.  **Thus, the Court GRANTS Defendants' motion to dismiss Plaintiff's**

14   **malicious prosecution sub-claim to the extent it is based on the Grand Jury indictment.  This**

15   **dismissal is without prejudice and with leave to amend.**

16         5.    Color of Law (Defendants McKenna and O'Malley)

17         In order to be liable under § 1983, a Defendant must act "under color of" state law. *See* 42

18   U.S.C. § 1983.  Private citizens may be held liable for cooperative activity with state officials.  *See*

19   *Dennis v. Sparks*, 449 U.S. 24, 27-28 (1980).  While there are a number of different tests for

20   demonstrating state action by private citizens, Plaintiff asserts that McKenna and O'Malley are

21   subject to the "joint action" test.  *See* Pl.'s O'Malley Opp'n 12-17.  In order to show that private

---

22   ⁹ Judge Hastings's order on Plaintiff's motion to dismiss the indictment in his criminal case
23   indicates that Harpham did not initiate her DFEH charge until April 2009, nearly a year after she
     first began to tell people that Plaintiff had raped her. *See* Contra Costa RJN Ex. I at 66-67.  This
24   distance in time further diminishes the probative value of Harpham's DFEH charge and settlement.

25   ¹⁰ Judge Hastings found that Harpham's testimony that she was terminated because of
     budget reasons was neither false nor misleading in light of her DFEH charge and settlement. *See*
26   Contra Costa RJN Ex. I at 64-65.  As noted in his opinion on Plaintiff's motion to dismiss the
     indictment, Harpham explained to the Grand Jury that she was not hired because of the budget and
27   because she did not rank in the top two or three of the candidates eligible for hire.  *See id.*  She was
     not asked why she believed she was ranked the way she was and later disclosed after the Grand
28   Jury's indictment at an evidentiary hearing that she believed the way she was ranked was in part
     influenced by the fact she had reported being raped by a colleague.  *See id.*

United States District Court

For the Northern District of California

defendants acted under color of state law pursuant to the joint action test, a plaintiff must show "a substantial degree of cooperative activity." *Collins v. Womancare*, 878 F.2d 1145, 1154 (9th Cir. 1989). "One way to establish joint action is to demonstrate a conspiracy." *Id.* However, "merely complaining to the police does not convert a private party into a state actor." *Id.* at 1155. "To state a Section 1983 claim predicated upon a conspiracy theory, a complaint must contain *plausible* factual allegations that could demonstrate that: (1) a state actor and a private individual 'reached an understanding to deprive the plaintiff of [her] constitutional rights'; and (2) the private individual was a willful participant in joint activity with the state actor." *Tanasecu v. State Bar of Cal.*, (C.D. Cal. Mar. 26, 2012) (quoting *Fries v. Helper*, 146 F.3d 452, 457 (7th Cir. 1998)). For example, in *Sloman v. Tadlock*, 21 F.3d 1462, 1473-74 (9th Cir. 1994), the court found that a private defendant was engaged in joint action with law enforcement when he signed a citizen's complaint form regarding the plaintiff, who was expressing views the defendant opposed, and spoke with law enforcement officers to "conceiv[e] of a crime for which [the plaintiff] could be arrested."

As discussed above in analyzing whether McKenna was part of a conspiracy to prosecute Plaintiff, Plaintiff's complaint contains primarily conclusory allegations that McKenna conspired with the public Defendants to ensure Plaintiff would be maliciously prosecuted. *See, e.g.*, SAC ¶¶ 7, 26-27. The sum total of non-conclusory statements specific to McKenna are that he (1) met with Harpham on May 12, 2008 at the law firm O'Malley & McKenna (SAC ¶ 26); (2) informed Sequeira about Ms. Harpham's allegations despite the fact Ms. Harpham was adamant she did not want to report the alleged rape (SAC ¶ 27); (3) "set[] up the interview with Ms. Harpham" (SAC ¶ 32); (4) "encouraged Ms. Harpham to participate in the criminal investigation and support a criminal prosecution of Mr. Gressett despite the fact that Ms. Harpham was adamant that she did not want to participate in a criminal investigation and did not want to make a statement" (*id.*); and (5) "told Ms. Harpham that her story and her credibility were beyond a reasonable doubt" (*id.*).

The only actions alleged that tend to show any sort of interaction between McKenna and state actors are that he informed Sequeira about Ms. Harpham's allegations and set up the interview with Ms. Harpham. *See* SAC ¶¶ 27, 32. The first instance does not demonstrate joint action, as "merely complaining to the police does not convert a private party into a state actor." *See Collins*,

878 F.2d. at 1155. Solely setting up an interview with Ms. Harpham does not show a meeting of the minds with the public Defendants to subject Plaintiff to malicious prosecution or false arrest. Rather, it is akin to "complaining to the police," which is not enough. *See id.* **Thus, Plaintiff has not alleged facts from which it can be inferred that McKenna operated under color of law, providing additional grounds to grant McKenna's motion to dismiss Plaintiff's § 1983 malicious prosecution sub-claim.[11] This dismissal is without prejudice and with leave to amend.**

**On the other hand, as discussed above in the section on conspiracy, Plaintiff has pled sufficient facts for the Court to infer that O'Malley was part of a conspiracy, thus satisfying the color of law requirement for O'Malley. *See Collins*, 878 F.2d at 1154. However, the malicious prosecution sub-claim is dismissed without prejudice because of lack of proximate cause.**

### 6. *Monell* Liability

Plaintiff's second cause of action alleges a *Monell* claim against Contra Costa County and the City of Martinez under 42 U.S.C. § 1983 based on the conduct alleged in his first cause of action. *See* FAC ¶¶ 81-88.

///

///

///

///

///

///

///

---

[11] McKenna also asserts the statute of limitations as a defense. However, malicious prosecution claims brought under § 1983 have a two year statute of limitations and accrue upon favorable termination of the underlying criminal proceeding. *See Maldonado v. Harris*, 370 F.3d 945, 954-55 (9th Cir. 2004); *Cabrera v. City of Huntington Park*, 159 F.3d 374, 382 (9th Cir. 1998). Plaintiff's underlying prosecution terminated favorably on February 8, 2012, when the AG's Office notified Plaintiff it did not intend to refile charges against him after the state court dismissed his indictment on October 19, 2011. SAC ¶¶ 72, 74. Plaintiff filed his complaint in state court on May 30, 2012, well within the two-year statute of limitations for § 1983 claims. *See* Notice of Removal, Docket No. 1, Ex. A.

**United States District Court**
For the Northern District of California

a.      Statement of Law

In order to hold Contra Costa and Martinez[12] liable for his malicious prosecution claim, Plaintiffs must show, pursuant to *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 691 (1978), that (1) an "employee committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity"; (2) "the individual who committed the constitutional tort was an official with final policy-making authority"; or (3) "an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." *See Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992) (internal citations and quotation marks omitted). Plaintiffs "must also demonstrate that, through its deliberate (or deliberately indifferent) conduct, the municipality was the 'moving force' behind the injury alleged." *See Board of County Comm'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 404 (1997). In other words, Plaintiffs must (1) "show that the municipal action was taken with the requisite degree of culpability"; and (2) "demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.*

Regarding the degree of culpability, "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824 (1985). "[W]here the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *Id.*

---

[12] Plaintiff also names Simonetti, Kochly, and Sequeira as Defendants in his *Monell* claim. *See* FAC ¶ 82. Presumably, he simply intended to name them in their official capacity, in which case a claim against them is indistinguishable from a claim against their respective employers. *See Monell*, 436 U.S. at 690 n.55. Perhaps he named them in his *Monell* claim in order to identify them as the individuals with final policy-making authority necessary for municipal liability under two different theories of *Monell* liability. *See Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992). Regardless, their inclusion is superfluous and the Court strikes them from the second cause of action *sua sponte*.

United States District Court

For the Northern District of California

b.   Contra Costa

Plaintiff argues that the constitutional violation was both the result of a Contra Costa policy and that it was the result of Kochly's conduct.  *See* Pl.'s Contra Costa Opp'n 31-32.  First, Plaintiff invokes the Protocol, a longstanding policy for law enforcement-involved crimes, as an avenue for Contra Costa's *Monell* liability.  *See* Pl.'s Contra Costa Opp'n 31-32.  However, the gist of his complaint is not that the Protocol resulted in his malicious prosecution, but rather that *failure* to follow the Protocol resulted in his malicious prosecution.  *See* FAC ¶¶ 46 ("none of the safeguards of the Protocol were followed"), 47 ("none of the County's employees and/or district attorneys of DA investigators were trained on how to conduct an investigation pursuant to the Protocol"), 48 ("[t]he search of Mr. Gressett's home did not follow the Protocol"), 49 ("MS. BLAIR and MR. FLORES did nothing to ensure the Protocol was followed throughout the investigation of Mr. Gressett"), 53 ("none of the investigators discussed the testimony of witnesses to determine inconsistencies as required by [] the Protocol").  In fact, Plaintiff alleges that, "[h]ad the Protocol been properly followed, the investigation of Mr. Gressett would have revealed serious inconsistencies that seriously negated any finding of probable cause to arrest and search Mr. Gressett."  *Id.* ¶ 47.  These allegations undermine any argument that the Protocol was the moving force behind Plaintiff's malicious prosecution.

In fact, the only allegation that supports the Protocol being a source of municipal liability is the fact that it was invoked to bring Contra Costa into this investigation.  *See id.* ¶ 46.  However, even assuming that invoking the Protocol to investigate Plaintiff was the moving force behind violation of his constitutional rights, Plaintiff would need to show either that the Protocol was unconstitutional or that it had been similarly invoked to violate constitutional rights in the past, as "where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *Tuttle*, 471 U.S. at 824.  Plaintiff has not done so, and thus liability may not lie as against Contra Costa on the basis of the Protocol.

United States District Court

For the Northern District of California

1  Second, Plaintiff argues that Kochly "failed to supervise his subordinates with respect to the

2  investigation and with respect to the Protocol"; "did everything he could to ensure the involvement

3  of the DA's Office in the investigation of Mr. Gressett"; and "withheld exculpatory information

4  from the prosecution team which directly contributed to the grand jury returning an indictment of

5  Mr. Gressett." Pl.'s Contra Costa Opp'n 32. However, even if Kochly would be deemed a final

6  decision-maker for purposes of *Monell* in this case, as discussed above, Plaintiff has not pled

7  sufficient facts to show that any individual Defendant's actions (including those of Kochly) caused a

8  constitutional deprivation. Thus, the Court finds Kochly's actions may not serve as grounds for

9  *Monell* liability.

10  Moreover, as to other Defendants who were clearly not final decision-makers, Plaintiff does

11  not allege they acted pursuant to a policy or practice which extended beyond Plaintiff's case.

12  **Given that Plaintiff has not set forth any viable grounds for *Monell* liability, the Court**

13  **GRANTS Contra Costa's motion to dismiss Plaintiff's malicious prosecution sub-claim as**

14  **against Contra Costa. This dismissal is without prejudice and with leave to amend.**

15  c.  Martinez

16  Plaintiff's *Monell* claim against Martinez is similarly based on the Protocol and the alleged

17  actions of an individual with final policy-making authority, Simonetti. *See* Pl.'s Martinez Opp'n 19-

18  21. For the same reason the Protocol does not serve as a basis for Contra Costa's liability, it does

19  not serve as a basis for Martinez's liability. As discussed above, the gist of Plaintiff's complaint is

20  that the Protocol was *not* followed and that such failure to follow the Protocol resulted in the alleged

21  constitutional violation. Plaintiff has not pled facts to show that the Protocol is unconstitutional or

22  has been invoked in an unconstitutional manner in the past. Thus, this basis for *Monell* liability

23  fails.

24  As discussed above, Plaintiff has not alleged facts from which the Court may infer that any

25  of the non-prosecutor Defendants, including Simonetti, were the proximate cause of Plaintiff's

26  prosecution.

27

28

40

**United States District Court**
For the Northern District of California

**As neither the Protocol nor the acts of Simonetti establish *Monell* liability, the Court GRANTS Martinez's motion to dismiss Plaintiff's malicious prosecution sub-claim as against Martinez.  This dismissal is without prejudice and with leave to amend.**

D.      California Malicious Prosecution

Plaintiff's third cause of action states claims against O'Malley and McKenna for malicious prosecution under state law.[13]  SAC ¶¶ 89-94.  O'Malley and McKenna oppose this cause of action on the grounds that Plaintiff has failed to sufficiently allege lack of probable cause and causation.[14]  In addition, McKenna argues Plaintiff has not sufficiently pled facts showing malice.  Malicious prosecution claims under state law contain the same causation requirement as under § 1983, whereby "[t]he test is whether a defendant in such an action was actively instrumental or was the proximate cause of maliciously putting the law in motion."  *Sandoval v. S. Cal. Enters.*, 98 Cal. App. 2d 240, 248 (1950).  "[A] person who merely alerts law enforcement to a possible crime and a possible criminal is not liable if, law enforcement, on its own, after an independent investigation, decides to prosecute."  *Williams v. Hartford Ins. Co.*, 147 Cal. App. 3d 893, 898 (1983).  The standard for probable cause is whether "it was objectively reasonable for the defendant . . . to suspect the plaintiff . . . had committed a crime."  *Ecker v. Raging Waters Group, Inc.*, 87 Cal. App. 4th 1320, 1330 (2001).

Here, as noted above, McKenna is alleged to have spoken with Harpham regarding her allegations, informed Sequeira about Harpham's allegations, encouraged Harpham, against her desire, to participate in a criminal investigation and prosecution, and set up an interview with prosecutors.  SAC ¶¶ 26-27, 32.  To establish the lack of probable cause, Plaintiff must show it was not objectively reasonable for McKenna to suspect Plaintiff had raped Harpham.  However, the only factual allegation suggesting McKenna would have had reason to question Harpham's credibility is

---

[13]  Plaintiff's third cause of action also states a claim against O'Malley & McKenna Law Offices, which entity these motions to dismiss do not address.

[14]  McKenna also argues that all of Plaintiff's claims should be dismissed because they are time-barred.  As discussed above, the statute of limitations for a malicious prosecution claim is two years under California law.  Like under federal law, the cause of action accrues at the time of favorable termination of the criminal proceedings.  *See Bob Baker Enters., Inc. v. Chrysler Corp.*, 30 Cal. App. 4th 678, 683 (1994).  Thus, like his § 1983 malicious prosecution sub-claim, Plaintiff's state law malicious prosecution claim is timely.

**United States District Court**
For the Northern District of California

1   her insistence that McKenna not report her allegations.  A rape victim might not want the rape

2   reported for any number of reasons, including concerns about privacy as well as retaliation at work

3   where the alleged perpetrator is a co-worker.  Given the lack of other specific allegations suggesting

4   McKenna would have had reason to know Harpham was lying, it was objectively reasonable for

5   McKenna to "suspect [Gressett] . . . had committed a crime."  *See Ecker*, 87 Cal. App. 4th at 1330.

6   Thus, Plaintiff has not met the probable cause element as applied to McKenna.

7         As for causation, the investigation into Plaintiff was initiated after McKenna reported Ms.

8   Harpham's allegations to Sequeira against her wishes.  However, according to Plaintiff, his

9   prosecution was not initiated on the basis of McKenna's report, but rather an investigation

10   conducted by various public Defendants, including a subsequent interview of Harpham and

11   interviews with numerous witnesses.  *See* SAC ¶¶ 29-58.  Thus, according to Plaintiff, law

12   enforcement did conduct an independent investigation upon which it decided to prosecute Plaintiff,

13   thereby cutting off any causation and hence liability for McKenna's reporting of the alleged rape.

14   *See Williams*, 147 Cal. App. 3d at 898.

15         Hence, even assuming McKenna was motivated by malice, given that Plaintiff has not pled

16   sufficient facts from which the Court can infer that McKenna lacked probable cause or caused

17   Plaintiff's prosecution, **the Court GRANTS McKenna's motion to dismiss Plaintiff's third cause**

18   **of action for malicious prosecution under state law.  This dismissal is without prejudice and**

19   **with leave to amend.**

20         Nor has Plaintiff pled sufficient facts from which the Court may infer that O'Malley was the

21   proximate cause behind Plaintiff's prosecution.  As with McKenna, O'Malley's reporting

22   Harpham's allegations to law enforcement was not the proximate cause of Plaintiff's prosecution, as

23   law enforcement conducted an independent investigation following this report.  *See Williams*, 147

24   Cal. App. 3d at 898.  Plaintiff alleges that O'Malley set up a meeting with a prostitute in January

25   2009 to procure false testimony against Plaintiff, but does not allege how this meeting proximately

26   caused his prosecution.  *See* SAC ¶ 62.  The interview took place *after* charges had already been

27   filed in November 2008.  *See id.* ¶ 59.  Plaintiff does not allege that information provided during this

28   interview was used to procure his Grand Jury indictment or otherwise prolong his prosecution.

**United States District Court**
For the Northern District of California

1    Furthermore, to the extent O'Malley was part of an alleged conspiracy to maliciously prosecute

2    Plaintiff, this claim also fails, as Plaintiff has not alleged facts from which it can be inferred that any

3    member of the alleged conspiracy was the proximate cause of his prosecution, as discussed above.

4            **Thus, the Court GRANTS O'Malley's motion to dismiss Plaintiff's third cause of action**

5    **for malicious prosecution.  This dismissal is without prejudice and with leave to amend.**

6    E.       Defamation

7            Plaintiff asserts his fourth cause of action for defamation against all individual Defendants.

8    *See* SAC ¶¶ 95-104.

9            1.       Statement of Law

10           To sustain a cause of action for defamation, a plaintiff must demonstrate the intentional

11   publication of a statement of fact which is false, unprivileged, and has a natural tendency to injure or

12   which causes special damage."  *Ringler Assocs. Inc. v. Md. Cas. Co.*, 80 Cal. App. 4th 1165, 1179

13   (2000).  Public figure plaintiffs must also prove that the defendant acted with actual malice, meaning

14   that the defendant uttered the statement with knowledge that it was false or with reckless disregard

15   for whether it was false or not.  *See Nguyen-Lam v. Cao*, 171 Cal. App. 4th 858, 867 (2009) (citing

16   *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964)).  Malice requires "plaintiffs to show

17   that defendant had 'a high degree of awareness of probable falsity,' and 'in fact entertained serious

18   doubts as to the truth of his publication,' such that defendant had a 'subjective awareness of

19   probable falsity.'"  *Barger v. Playboy Enters.*, 564 F. Supp. 1151, 1156 (N.D. Cal. 1983) (quoting

20   *Garrison v. La.*, 379 U.S. 64, 74-79 (1964); *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968); *Gertz*

21   *v. Robert Welch, Inc.*, 418 U.S. 323, 335 n.6 (1974)).  "[M]otive in publishing a [defamatory

22   statement] . . . cannot provide a sufficient basis for finding actual malice."  *Harte-Hanks Comms. v.*

23   *Connaughton*, 491 U.S. 657, 665 (1989).  Here, Defendants argue, and Plaintiff does not contest,

24   that Plaintiff is a public figure.  *See, e.g.*, Contra Costa Mot. 34:8-11, n.4; Pl.'s Contra Costa Opp'n

25   33-34.

26           California Government Code section 821.6 ("section 821.6") provides a defense to a claim of

27   defamation, providing that "[a] public employee is not liable for injury caused by his instituting or

28   prosecuting any judicial or administrative proceeding within the scope of his employment, even if he

United States District Court

For the Northern District of California

acts maliciously and without probable cause." This immunity also extends to public entities. *See* Cal. Gov. Code § 815.2(b); *Dawson v. Martin*, 150 Cal. App. 2d 379, 381-82 (1957). Section 821.6 prohibits defamation claims based on covered statements. *Ingram v. Flippo*, 74 Cal. App. 4th 1280, 1291-93 (1999). "California courts construe section 821.6 broadly in furtherance of its purpose to protect public employees in the performance of their prosecutorial duties from the threat of harassment through civil suits." *Gillan v. City of San Marino*, 147 Cal. App. 4th 1033, 1048 (2007). Thus, "[a]n investigation before the institution of a judicial proceeding is part of the prosecution of a judicial proceeding for purposes of the statute, even if the authorities later decide not to file charges." *Id.* If a plaintiff properly pleads that statements are not in furtherance of the investigation, the statements may not be subject to section 821.6 immunity. *See Catsouras v. Dep't of Cal. Highway Patrol*, 181 Cal. App. 4th 856, 889-90 (2010); *Blankenhorn v. City of Orange*, 485 F.3d 463, 488 (9th Cir. 2007).

### 2.   Liability of Individual Defendants

Plaintiff makes the general allegation that "all of the co-conspirators . . . made false statements, including but not limited to statements that Mr. Gressett committed a heinous felony, had other victims, and was a sexual deviant . . . ." SAC ¶ 66. Although this allegation shows the content of the statements, it does not identify who made which statements or when they made each such statement, thus lacking the specificity required by *Iqbal* and *Twombly*. *See, e.g.*, *Telles v. City of Waterford*, No. C-10-0982 AWI, 2010 WL 5314360, at *5 (E.D. Cal. Dec. 20, 2010) (noting failure to identify who published false facts, when publications occurred, or content of allegedly false publications rendered defamation claim insufficient).

While Plaintiff's complaint does contain allegations that O'Malley's campaign used the charges against Gressett over the course of the election, such as by sending out fliers accusing O'Malley's opponent of allowing a sexual assault to happen in his unit and of being close friends with someone facing rape charges, Plaintiff has expressly disavowed these statements as a basis for his defamation claim against O'Malley. *See* SAC ¶ 61; Pl.'s O'Malley Opp'n 20:14-16 ("O'MALLEY'S liability in this lawsuit arises not from his . . . using this material in his

United States District Court

For the Northern District of California

campaign . . . .").  Plaintiff makes more specific allegations for only a few of the individual Defendants:  Sequeira, Jackson, Simonetti, and McKenna.  *See* SAC ¶¶ 40, 67-69.  These are discussed below.

**The Court GRANTS Defendants' motions to dismiss Plaintiff's defamation claim against the other individual Defendants:  Kochly, Baker, Greenwald, Mulligan, Sylvia, Blair, Flores, and O'Malley.**  The Court already noted in its November 1, 2012 order requiring the parties to meet and confer that such a general averment was insufficient.  *See* Docket No. 62, at 1:26-2:1. Yet, Plaintiff did not rectify this problem as to these Defendants, leading the Court to conclude that Plaintiff is unable to set forth a defamation claim against them.  **Thus, this dismissal is, as to these Defendants, with prejudice and without leave to amend.**

          a.      <u>Sequeira</u>

Plaintiff indicates that Sequeira "repeatedly referred to Gressett as a sexual deviant and a rapist outside of the context of the investigation."  SAC ¶ 67.  Contra Costa asserts that this allegation does not suffice because Plaintiff has not alleged actual malice.  *See* Contra Costa Mot. 34.  In order for such a statement to have been made with malice, Sequeira would need to know it was false or have made it with reckless disregard for its truth.  *See Nguyen-Lam*, 171 Cal. App. 4th at 867.  Plaintiff has not pled specific facts from which the Court may reasonably infer that Sequeira spoke with reckless disregard for the truth when he made these statements, as necessary to show actual malice.  **Thus, the Court GRANTS Contra Costa's motion to dismiss the defamation claim against Sequeira.  It dismisses without prejudice.**[15]

          b.      <u>Jackson</u>

As for Jackson, Plaintiff alleges that he "told one witness after her interview with him that there was medical evidence to support the allegations and that Ms. Harpham's anus was badly injured" and that he "told another witness that Gressett had committed the crimes alleged against

---

[15]  The Court notes that Judge Hastings's order on the motion to dismiss the indictment indicates that Sequeira was present at an interview where a witness stated that Harpham claimed to have been abducted and raped by strangers.  *See* Martinez RJN Ex. G at 35-36.  Based on this, Sequeira might have believed Harpham was not credible and thus her allegations were not true. Thus, if Plaintiff were to amend his complaint to include this allegation, he could conceivably plead sufficient facts to show actual malice on the part of Sequeira.

him." SAC ¶ 68.  Plaintiff does not specifically allege that either statement was made outside of the context of his investigation.  He does allege that the statements that there was medical evidence to support the allegations against Plaintiff and that Ms. Harpham's anus was badly injured were made *after* an interview.  SAC ¶ 68.  However, courts broadly interpret section 821.6.  *See Gillan*, 147 Cal. App. 4th at 1048.  Thus, a statement regarding the subject of an interview immediately following the interview would appear to be still within the context of the investigation.  *See Amylou R. v. County of Riverside*, 28 Cal. App. 4th 1205 (1994) (police officers were immune for statements made in the course of a similar criminal investigation).  Moreover, Plaintiff has not pled facts from which it may be inferred that Jackson made these comments with reckless disregard for their truth; particularly in view of Sylvia's affidavit in support of the arrest warrant which noted that one witness stated Harpham "was having a lot of pain, due to the entry," and provided various evidence suggesting Plaintiff had, in fact, committed the crimes alleged against him.  *See* Contra Costa RJN Ex. C at 6.  **Thus, the Court GRANTS Contra Costa's motion to dismiss Plaintiff's defamation claim against Jackson.  This dismissal is without prejudice and with leave to amend.**

> c.   Simonetti

Plaintiff only alleges that Simonetti said Plaintiff "was an asshole anyway."  *See* SAC ¶ 40. This statement is clearly a statement of opinion, and thus does not give rise to a defamation claim. *See Ringler*, 80 Cal. App. 4th at 1181 ("It is an essential element of defamation that the publication be of a false statement of *fact* rather than opinion.").

**Thus, the Court GRANTS Martinez's motion to dismiss Plaintiff's defamation claim against Simonetti.  This dismissal is without prejudice and with leave to amend.**

> d.   McKenna

Plaintiff alleges that McKenna "discussed Ms. Harpham's allegations against Mr. Gressett with another DDA, Joe Motta," and "told Mr. Motta that Mr. Gressett has committed a heinous felony and referred to Mr. Gressett as a rapist in that conversation . . . ."  SAC ¶ 69.  However,

United States District Court

For the Northern District of California

1    Plaintiff's defamation claim on the basis of this allegation fails, as Plaintiff has not pled sufficient

2    facts to establish actual malice; also, these claims are subject to the statute of limitations.[16]

3                              (1)    Actual Malice

4            In order to prove actual malice, Plaintiff must demonstrate that McKenna knew these

5    statements were false or exhibited a reckless disregard for their truth.  *Nguyen-Lam*, 171 Cal. App.

6    4th at 867.  Plaintiff alleges that "Mr. McKenna knew these statements were not true."  SAC ¶ 69.

7    However, conclusory allegations of knowledge are not sufficient to demonstrate malice in a

8    defamation claim.  *See, e.g.*, *Barger v. Playboy Enters.*, 564 F. Supp. 1151, 1156-57 (N.D. Cal.

9    1983).  Plaintiff makes only a couple allegations regarding McKenna that implicate his knowledge

10   of the truth or falsity of these statements, including (1) "that Ms. Harpham was adamant she did not

11   want to report the alleged rape" (SAC ¶¶ 27, 32); and (2) that McKenna "told Ms. Harpham that her

12   story and her credibility were beyond a reasonable doubt" (*id.* ¶ 32).

13           Even drawing all reasonable inferences in Plaintiff's favor, the first allegation does not

14   suggest that McKenna had "a high degree of awareness of [the] probable falsity" of Harpham's

15   allegations.  *See Garrison*, 379 U.S. at 74.  As noted above, one cannot reasonably infer solely from

16   the fact that a rape victim insists she does not want to report the alleged rape that she is lying.

17           The second allegation actually cuts against a finding of malice; if anything, it suggests

18   McKenna's subjective belief in the truth of Harpham's allegations.  Thus, it does not serve to show

19   malice.[17]

20                             (2)    Statute of Limitations

21           A defamation action must be brought within one year of the date of publication.  *See* Cal.

22   Code Civ. Proc. § 340; *Campbell v. Jewish Comm. for Personal Serv.*, 125 Cal. App. 2d 771, 774

23   (1954).  However, the discovery rule can apply to actions for defamation, such that the cause of

24           [16]   McKenna also argues that these statements are subject to the litigation privilege found at
25   California Civil Code section 47(b) ("section 47(b)").  *See* McKenna Mot. 20-21.  However,
     Plaintiff does not allege facts from which it can be inferred that these statements were made within
26   the context of litigation, either ongoing or anticipated; Plaintiff in fact alleges that McKenna did not
     represent Harpham.  *See* SAC ¶¶ 29, 69.  Section 47(b) is thus inapposite.

27           [17]   Section 47(b) does not insulate the comment to Motta because it was not made within the
28   context of litigation as is discussed further below in the anti-SLAPP section based on McKenna's
     and Motta's testimony in Plaintiff's arbitration.

United States District Court

For the Northern District of California

1   action does not accrue until the plaintiff discovered or reasonably should have discovered the factual

2   basis for his claim.  *Hebrew Acad. of San Francisco v. Goldman*, 42 Cal. 4th 883, 893 (2007).

3      From the text of the complaint, it is unclear when McKenna made the alleged statement to

4   Motta or when Plaintiff learned of this statement.  However, in a request for judicial notice filed in

5   the second round of motions to dismiss, Plaintiff submitted the August 2010 testimony of McKenna

6   and Motta in his arbitration action that appears to discuss this conversation and identifies it as

7   having taken place in 2008.  *See* Pl.'s RJN Ex. B, Ex. C.  The Court takes judicial notice of this

8   testimony for the fact that Plaintiff, who examined both witnesses at his arbitration, was on notice of

9   this statement by August 2010, at the latest.  The statute of limitations expired no later than one year

10  later in August 2011, well before Plaintiff filed his complaint in this matter on May 30, 2012.

11     Plaintiff has not pled sufficient facts to demonstrate actual malice on the part of McKenna.

12  Moreover, the statute of limitations for a defamation claim expired before Plaintiff filed his initial

13  complaint in this matter.

14     **The Court thus GRANTS McKenna's motion to dismiss Plaintiff's defamation claim.**

15  **This dismissal is with prejudice and without leave to amend.**

16  F.  <u>Anti-SLAPP</u>

17     Both McKenna and O'Malley move to strike Plaintiff's state law causes of action pursuant to

18  California's anti-SLAPP statute.  *See* McKenna Mot. 21-24; O'Malley Anti-SLAPP Mot., Docket

19  No. 93.

20     1.  <u>Statement of Law</u>

21     California Code of Civil Procedure section 425.16 permits a defendant to bring a special

22  motion to strike state law claims based on protected speech.  This statute "was enacted to allow early

23  dismissal of meritless first amendment cases aimed at chilling expression through costly, time-

24  consuming litigation."  *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 839 (9th Cir. 2001).

25  Evaluation of an anti-SLAPP motion entails a burden-shifting approach.  First, the burden is on the

26  moving party to make a prima facie showing that the statute applies.  *See Equilon Enters. v.*

27  *Consumer Cause, Inc.*, 29 Cal. 4th 53, 67-68 (2002).  The plaintiff must "demonstrate that the act or

28  acts of which the plaintiff complains were taken 'in furtherance of the [defendant]'s right of petition

48

or free speech under the United States or California Constitution in connection with a public issue,'
as defined in the statute." *Id.* at 67 (quoting Cal. Code Civ. Proc. § 425.16); *Dwight R. v. Christy B.*,
212 Cal. App. 4th 697, 710 (2013).  The anti-SLAPP statute broadly defines what acts are covered,
including

> (1) any written or oral statement or writing made before a legislative,
> executive, or judicial proceeding, or any other official proceeding
> authorized by law, (2) any written or oral statement or writing made in
> connection with an issue under consideration or review by a
> legislative, executive, or judicial body, or any other official
> proceeding authorized by law, (3) any written or oral statement or
> writing made in a place open to the public or a public forum in
> connection with an issue of public interest, or (4) any other conduct in
> furtherance of the exercise of the constitutional right of petition or the
> constitutional right of free speech in connection with a public issue or
> an issue of public interest.

Reporting crime to law enforcement officials constitutes protected activity within the meaning of
California's anti-SLAPP statute.  *See Wang v. Hartunian*, 111 Cal. App. 4th 744, 748 (2003).

If the court finds the anti-SLAPP movant has established covered conduct, the burden shifts
to the Plaintiff to demonstrate "a probability of prevailing on the claim." *Equilon Enters.*, 29 Cal.
4th at 67.

> In order to establish a probability of prevailing on the claim, a plaintiff
> responding to an anti-SLAPP motion must state *and* substantiate a
> legally sufficient claim.  Put another way, the plaintiff must
> demonstrate that the complaint is both legally sufficient *and* supported
> by a sufficient prima facie showing of facts to sustain a favorable
> judgment if the evidence submitted by the plaintiff is credited.

*Wilson v. Parker, Covert & Chidester*, 28 Cal. 4th 811, 821 (2002) (quotation marks, alterations, and
citations omitted) (emphasis added).  "In denying a motion to strike on the ground that the plaintiff
has established the requisite probability of success, therefore, the trial court necessarily concludes
that the plaintiff has substantiated a legally tenable claim through a facially sufficient evidentiary
showing and that the defendant's contrary showing, if any, does not defeat the plaintiff's as a matter
of law." *Id.*; *see also Levy v. City of Santa Monica*, 114 Cal. App. 4th 1252, 1262 (2004) (granting
anti-SLAPP motion where claim based on general allegations of "an ongoing pattern of
intervention" made on information and belief without admissible supporting evidence); *Dowling v.
Zimmerman*, 85 Cal. App. 4th 1400, 1421 (2001) (complaint for defamation based on conclusory

United States District Court
For the Northern District of California

1   allegations that defendant's unspecified "words and actions" and unspecified "false allegations" had

2   "lowered" plaintiff's reputation insufficient to show probability of success).

3        Notably, a court must consider an anti-SLAPP motion even if it dismisses the underlying

4   claim without leave to amend, as a successful anti-SLAPP motion results in the award of fees.  *See*

5   *White v. Lieberman*, 103 Cal. App. 4th 210, 220 (2002); *Collins v. Allstate Indem. Co.*, 428 Fed.

6   Appx. 688, 690 (9th Cir. 2011).

7        2.   <u>Malicious Prosecution</u>

8           a.   <u>O'Malley</u>

9        As discussed above, Plaintiff's complaint contains the following non-conclusory facts

10  regarding O'Malley's participation in his malicious prosecution:  he (1) spoke with Ms. Harpham, a

11  family friend, about her sexual relationship with Mr. Gressett (SAC ¶ 26); (2) informed Sequeira

12  about Ms. Harpham's allegations despite the fact that Ms. Harpham was adamant she did not want to

13  report the alleged rape (*id* ¶ 27); (3) set up the interview with Ms. Harpham (*id.* ¶ 32); and (4) in or

14  around January 2009 "participated in setting up an interview with [a] prostitute, Jessie Deguzman,

15  wherein Ms. Deguzman told the public Defendants that Mr. Gressett had engaged in sex acts with

16  her in exchange for leniency on her boyfriend's case" (*id.* ¶ 62).

17       While speaking with Ms. Harpham does not fall under the anti-SLAPP statute, as it is not an

18  act in furtherance of O'Malley's right to petition, clearly the second action of reporting Ms.

19  Harpham's allegations to Sequeira, a law enforcement officer, falls within the ambit of the anti-

20  SLAPP statute.[18]  *See Wang*, 111 Cal. App. 4th at 748; *Daniels v. Robbins*, 182 Cal. App. 4th 204,

21  215 (2010) ("[E]very claim of malicious prosecution is a cause of action arising from protected

22  activity because every such claim necessarily depends upon written and oral statements in a prior

23  judicial proceeding.").  O'Malley's actions in setting up the interviews with Ms. Harpham and Ms.

24  Deguzman also arguably fall within the ambit of the anti-SLAPP statute.

---

25       [18]  Plaintiff attempts to disavow O'Malley's report to law enforcement as grounds for his
malicious prosecution claim, noting that "Defendant O'MALLEY's liability in this lawsuit arises not

26  from his report of the rape allegation to the District Attorney . . . but from his participation in the
conspiracy to maliciously prosecute Mr. Gressett."  *See* Pl.'s O'Malley Opp'n 20:14-16.  However,

27  the report to law enforcement was an act in furtherance of the alleged conspiracy to maliciously
prosecute Plaintiff.  Plaintiff cannot base his case on a broad conspiracy theory and then retreat

28  when certain components of the conspiracy implicate anti-SLAPP liability.

United States District Court

For the Northern District of California

1    In *Dwight R.*, the court considered a similar fact pattern, in which "[t]he core injury-

2  producing conduct underlying the section 1983 claims against [the defendant was] her alleged

3  conspiracy with social workers and others to falsify evidence that [the plaintiff] was sexually

4  molesting [the victim], [the defendant's] improper coaching of [the victim] to draw illicit pictures of

5  herself and [the plaintiff], and [the defendant's] mandated report to child protective services of [the

6  defendant's] allegedly false suspicion that [the plaintiff] was sexually abusing [the victim]." 212

7  Cal. App. 4th at 710-11.  The court determined that, even setting aside the mandatory report to law

8  enforcement, the "acts of conspiring . . . to fabricate evidence that [the plaintiff] was sexually

9  abusing [the victim] and 'coaching' [the victim] to draw illicit pictures of herself and [the plaintiff]

10  nonetheless constitute protected activities in anticipation of official proceedings." *Id.* at 711.  Here,

11  like in *Dwight R.*, O'Malley's act of setting up the meeting between investigators and Harpham was

12  an activity in anticipation of official proceedings.  Moreover, his act of setting up the meeting with a

13  prostitute to gin up evidence against Plaintiff was clearly an activity "made in connection with . . .

14  [an] official proceeding authorized by law," and thus covered by the anti-SLAPP statute.

15    As O'Malley's actions fall within the anti-SLAPP statute, Plaintiff needs to demonstrate a

16  probability of prevailing on his malicious prosecution claim as against O'Malley in order to survive

17  O'Malley's anti-SLAPP motion.  Unlike with the motion to dismiss, with the anti-SLAPP motion

18  Plaintiff could have submitted affidavits stating the facts upon which O'Malley's liability is

19  premised. *See* Cal. Code Civ. Proc. § 425.16.  Yet, Plaintiff has not even attempted to do so, instead

20  relying solely on the allegations in the complaint.  In order to defeat an anti-SLAPP motion, a

21  plaintiff must make a prima facie showing of fact as to the merits of the claim.  Here, not only has

22  Plaintiff, as discussed above, failed to allege a legally sufficient malicious prosecution claim, he has

23  not even attempted to meet the requirement of submitting evidence to support a *prima facie* case.

24    **Thus, the Court GRANTS O'Malley's anti-SLAPP motion as against Plaintiff's**

25  **malicious prosecution claim.  Upon amending his complaint, Plaintiff may continue to assert a**

26  **state law malicious prosecution claim, but is cautioned that he may be subjected to a further**

27  **anti-SLAPP motion by O'Malley.** *See Verizon Del. Inc. v. Covad Comms. Co.*, 377 F.3d 1081,

28  1091 (9th Cir. 2004) (granting anti-SLAPP motion without leave to amend would collide with

United States District Court

For the Northern District of California

1    Federal Rule of Civil Procedure 15(a)'s policy favoring liberal amendment, but, "[i]f the offending

2    claims remain in the first amended complaint, the anti-SLAPP remedies remain available to

3    defendants.").

4          b.    <u>McKenna</u>

5          As with O'Malley, the malicious prosecution claim against McKenna largely derives from

6    certain protected activity, namely, his reporting Ms. Harpham's story to Sequeira, a law enforcement

7    officer.  *See* SAC ¶ 27.  Plaintiff has neither pled a legally sufficient malicious prosecution claim

8    against McKenna nor submitted any evidence to substantiate a *prima facie* claim of malicious

9    prosecution against McKenna.  Thus, McKenna has set forth grounds for granting his anti-SLAPP

10   motion.

11         However, unlike with O'Malley, Plaintiff requests that determination of McKenna's anti-

12   SLAPP motion to strike his malicious prosecution claim be continued so he can conduct discovery

13   "to establish the existence of the conspiracy . . . ."  Pl.'s McKenna Opp'n 21:4-7.  Plaintiff invokes

14   California Code of Civil Procedure section 425.16(g) ("section 425.16(g)"), which provides that,

15   while all discovery proceedings are stayed upon notice of an anti-SLAPP motion, "[t]he court, on

16   noticed motion and for good cause shown, may order that specified discovery be conducted

17   notwithstanding this subdivision."  Some courts, analogizing anti-SLAPP motions to motions for

18   summary judgment under the Federal Rules of Civil Procedure, have suggested that section

19   425.16(g) is inapplicable to anti-SLAPP motions brought in federal court, instead applying Federal

20   Rule of Civil Procedure 56(d), which allows courts to delay consideration of a summary judgment

21   motion and permit additional discovery "[i]f a nonmovant shows by affidavit or declaration that, for

22   specified reasons, it cannot present facts essential to justify its opposition."  *See, e.g.*, *Price v.*

23   *Stossel*, 590 F. Supp. 2d 1262, 1267-70 (C.D. Cal. 2008).

24         Regardless of whether the Court applies Rule 56 or section 425.16(g), additional discovery is

25   not merited.  Plaintiff clearly does not meet the technical requirements of Rule 56.  "Rule 56[(d)]

26   requires affidavits setting forth the particular facts expected from the movant's discovery."  *Brae*

27   *Transp., Inc. v. Coopers & Lybrand*, 790 F.2d 1439, 1443 (9th Cir. 1986).  Here, Plaintiff has not

28   submitted any affidavit or declaration in support of his request to delay O'Malley and McKenna's

1   anti-SLAPP motions.  Thus, any request under Rule 56 is insufficient.  Under section 425.16(g),

2   "good cause" is shown "when evidence to establish a prima facie case is reasonably shown to be

3   held, or known, by defendant or its agents and employees."  *Lafayette Morehouse, Inc. v. Chronicle*

4   *Publishing Co.*, 37 Cal. App. 4th 855, 868 (1995).  "The showing should include some explanation

5   of what additional facts plaintiff expects to uncover."  *1-800 Contacts, Inc. v. Steinberg*, 107 Cal.

6   App. 4th 568, 593 (2003) (quotation marks, citation, and alteration omitted).  Here, any evidence of

7   a conspiracy involving McKenna would most likely be entirely within his possession.  However,

8   Plaintiff does not identify what facts he would hope to uncover.  As discussed above, Plaintiff has

9   not alleged sufficient facts showing McKenna to be a participant in a conspiracy.

10       **Thus, the Court GRANTS McKenna's anti-SLAPP motion as against Plaintiff's**

11   **malicious prosecution claim and DENIES Plaintiff's request to conduct additional discovery.**

12   **As with O'Malley, Plaintiff may reassert his state law malicious prosecution claim against**

13   **McKenna upon amending his complaint, but McKenna may file an additional anti-SLAPP**

14   **motion if Plaintiff does so.**  *See Verizon Del.*, 377 F.3d at 1091.

15       3.   <u>Defamation</u>

16           a.   <u>O'Malley</u>

17       As discussed above, Plaintiff's complaint does not make any specific allegations regarding

18   defamatory statements made by O'Malley.  Given this lack of specificity, it is impossible for

19   O'Malley to meet his burden of showing that "the act or acts of which the plaintiff complains were

20   taken 'in furtherance of [O'Malley]'s right of petition or free speech under the United States or

21   California Constitution in connection with a public issue,' as defined in the statute."  *Equilon*

22   *Enters.*, 29 Cal. 4th at 67 (quoting Cal. Code Civ. Proc. § 425.16).

23       **Thus, the Court DENIES O'Malley's anti-SLAPP motion to strike Plaintiff's**

24   **defamation claim.  Plaintiff's request to conduct discovery to support his defamation claim**

25   **against O'Malley is moot.**

26           b.   <u>McKenna</u>

27       As discussed above, Plaintiff alleges that McKenna "discussed Ms. Harpham's allegations

28   against Mr. Gressett with another DDA, Joe Motta," and "told Mr. Motta that Mr. Gressett has

United States District Court

For the Northern District of California

committed a heinous felony and referred to Mr. Gressett as a rapist in that conversation . . . ."  SAC ¶ 69.  First, the Court must determine whether McKenna has met his burden of demonstrating these statements fall within the ambit of the anti-SLAPP statute.  To support his burden, McKenna cites to portions of McKenna's and Motta's testimony in Plaintiff's employment arbitration.  In this testimony, McKenna indicates that he spoke with Motta in August 2008 because "he has dealt with a lot of victims, and, [McKenna did not, he] deal[t] with the defendants.  And it was just, 'You know, hey, did I do the right thing?  Should I have done anything else? . . .  As in like get her into counseling immediately or something like that."  Pl.'s RJN Ex. B at 1068:2-4, 1081:25-1082:21.  McKenna testified he spoke to Motta because of his expertise as a lawyer and a former prosecutor of the Domestic Violence Unit.  *Id.* at 1105:21-1106:5.  Motta testified that McKenna spoke to him regarding Harpham's allegations and that it was not in the matter of gossip, but rather to seek Motta's legal opinion and expertise.  Pl.'s RJN Ex. C at 1020, 1028.

At this time, there was not yet any active prosecution taking place against Plaintiff.  As alleged, Harpham was not interviewed by investigators until September 2008, a month after this conversation took place.  SAC ¶ 29.  However, "communications preparatory to or in anticipation of the bringing of an action or other official proceeding are . . . entitled to the benefits of section 425.16."  *Briggs v. Eden Council for Hope & Opportunity*, 19 Cal. 4th 1106, 1115 (1999) (alterations and citations omitted).  "[P]relitigation communication is privileged only if it 'relates to litigation that is contemplated in good faith and under serious consideration.'"  *Digerati Holdings, LLC v. Young Money Entertainment, LLC*, 194 Cal. App. 4th 873, 887 (2011) (quoting *Action Apartment Assn., Inc. v. City of Santa Monica*, 41 Cal.4th 1232, 1251 (2007)).  "Good faith" refers to a good faith intention to file a lawsuit.  *Id.*

While McKenna's comments to Motta could arguably have been made in preparation for good faith litigation, McKenna has not submitted any evidence that Harpham was considering such litigation.  McKenna is a private criminal defense attorney.  Thus, it is unclear how he would be involved in any contemplated civil or criminal litigation.  At best, McKenna may have been advising Harpham regarding the initiation of prosecution against Plaintiff.  However, the connection between Harpham's conversation with Motta and the initiation of such prosecution against Plaintiff is

United States District Court

For the Northern District of California

1  tenuous, especially considering that McKenna has proffered no evidence that he was actually

2  retained by Harpham to represent her or demonstrated how his consultation with Motta impacted the

3  ultimate prosecution of Plaintiff.

4      As McKenna has not established any connection between his consultation with Motta and

5  any contemplated civil action or the conduct of any prosecution, the Court finds that McKenna's

6  conversation with Motta is not subject to anti-SLAPP protection.  **The Court DENIES McKenna's**

7  **anti-SLAPP motion with respect to Plaintiff's defamation claim against McKenna.  Plaintiff's**

8  **request to conduct discovery to support his defamation claim against McKenna is moot.**

9                          **V.    CONCLUSION**

10     In sum, the Court **GRANTS** Defendants' motions to dismiss.

11     The following claims are dismissed with prejudice:

12          •   Plaintiff's judicial deception sub-claim against O'Malley and McKenna

13          •   Plaintiff's defamation claim against Kochly, Baker, Greenwald, Mulligan,

14              Sylvia, Blair, Flores, O'Malley, and McKenna.

15     The following claims are dismissed without prejudice and with leave to amend:

16          •   Plaintiff's § 1983 judicial deception sub-claim against Kochly, Sequeira,

17              Baker, Greenwald, Jackson, Mulligan, Simonetti, Sylvia, Blair, Flores, Contra

18              Costa, and Martinez.

19          •   Plaintiff's § 1983 malicious prosecution sub-claim.

20          •   Plaintiff's state law malicious prosecution claim.

21          •   Plaintiff's defamation claim against Sequeira, Jackson, and Simonetti.

22     In addition, the Court **GRANTS** O'Malley's and McKenna's anti-SLAPP motions to strike

23  Plaintiff's state law malicious prosecution claim.  Plaintiff may reassert these claims in an amended

24  complaint, but O'Malley and McKenna may file additional anti-SLAPP motions if Plaintiff does so.

25  The Court **DENIES** O'Malley's and McKenna's anti-SLAPP motions to strike Plaintiff's

26  defamation claim.

27     Plaintiff is advised that, in amending his complaint, he should not re-assert the claims

28  dismissed without prejudice unless he has a basis for doing so consistent with Federal Rule of Civil

Procedure 11.  In addition, Plaintiff may not add additional claims not addressed by this Order without seeking prior leave of Court.  Plaintiff may amend his complaint within thirty days of the date of this order if he so chooses, otherwise the Court will dismiss with prejudice those claims dismissed without prejudice herein.

This order disposes of Docket Nos. 73, 75, 79, 92, 93, and 94.

IT IS SO ORDERED.

Dated:  May 17, 2013

_____
EDWARD M. CHEN
United States District Judge

United States District Court

For the Northern District of California