**United States District Court**
For the Northern District of California

1
2
3
4
5                     UNITED STATES DISTRICT COURT
6                   NORTHERN DISTRICT OF CALIFORNIA
7
8    MICHAEL GRESSETT,                        No. C-12-3798 EMC
9              Plaintiff,
                                             **ORDER GRANTING DEFENDANTS'**
10        v.                                 **MOTIONS TO DISMISS**
11   CONTRA COSTA COUNTY, *et al.*,          **(Docket Nos. 127, 128, 137)**
12             Defendants.
     _____/
13
14
15        Currently pending before the Court are multiple motions to dismiss and strike which
16   challenge the adequacy of the claims asserted in Plaintiff Michael Gressett's third amended
17   complaint ("TAC").  In this order, the Court addresses three of those motions, namely, the motions
18   to dismiss filed by (1) Defendant Joyce Blair, (2) Defendant Jon Sylvia, and (3) Defendant Tom
19   McKenna.  Having reviewed the parties' briefs and accompanying submissions with respect to these
20   motions, the Court finds the motions suitable for disposition without oral argument.  For the reasons
21   discussed below, the Court **GRANTS** each of the motions to dismiss.  The claims against Ms. Blair,
22   Mr. Sylvia, and Mr. McKenna are dismissed with prejudice.
23                    **I.    FACTUAL & PROCEDURAL BACKGROUND**
24        Mr. Gressett initiated this lawsuit in state court in May 2012.  *See* Docket No. 1 (Ex. A)
25   (complaint).  After the lawsuit was removed to federal court, the named defendants filed motions to
26   dismiss and strike challenging the adequacy of the claims as pled in the original complaint.  In
27   response to the motions, Mr. Gressett filed an amended complaint, *see* Docket No. 27 (first amended
28

**United States District Court**
For the Northern District of California

1   complaint or "FAC"), and, subsequently, the named defendants withdrew their motions to dismiss

2   and strike and replaced them with new motions.

3        In November 2012, the Court issued an order stating that the FAC was "riddled with

4   problems" and that Mr. Gressett had "assert[ed] numerous legally suspect claims."  Docket No. 62

5   (Order at 1-2).  It also noted, however, that Mr. Gressett had pled enough as to some of the named

6   defendants to be given leave to amend.  *See* Docket No. 62 (Order at 2).  The Court therefore

7   directed the parties "to meet and confer regarding the filing of a second amended complaint [SAC]

8   to narrow the claims asserted and expedite resolution of the legal issues genuinely in dispute."

9   Docket No. 62 (Order at 2).

10       Thereafter, Mr. Gressett filed a SAC, in which he asserted the following claims: (1) a § 1983

11  claim for "judicial deception"; (2) a § 1983 claim for malicious prosecution; (3) a claim for

12  malicious prosecution under California law; and (4) a claim for defamation.  *See* Docket No. 65

13  (SAC).  The SAC was met with a new round of motions to dismiss and strike.  In May 2013, the

14  Court issued an order granting the motions to dismiss and granting in part and denying in part the

15  motions to strike.  *See* Docket No. 118 (order).  For purposes of the pending motions to dismiss, the

16  Court highlights certain rulings that were made in that order.

17  •    The Court held that there were insufficient allegations to support Mr. Gressett's theory that

18       Ms. Blair, Mr. Sylvia, and/or Mr. McKenna were part of the conspiracy to maliciously

19       prosecute him.  *See* Docket No. 118 (Order at 25-26).

20  •    The Court held that there were insufficient allegations to support Mr. Gressett's theory that

21       any of the named defendants caused his arrest (on October 2, 2008).  *See* Docket No. 118

22       (Order at 15, 29).

23  •    The Court held that there were insufficient allegations to support Mr. Gressett's theory that

24       any of the named defendants proximately caused the filing of the charges against him (on

25       November 21, 2008) or proximately caused the grand jury to indict him (on October 19,

26       2009).  *See* Docket No. 118 (Order at 29-35).

27       Although the Court granted the motions to dismiss the SAC, it allowed Mr. Gressett to file a

28  third amended complaint ("TAC") within certain parameters.  *See* Docket No. 118 (Order at 55).

**United States District Court**

For the Northern District of California

Mr. Gressett did so.  In the TAC, Mr. Gressett no longer asserts a § 1983 judicial deception claim.  Rather, the only claims asserted are (1) § 1983 claim for malicious prosecution; (2) a claim for malicious prosecution under California law; and (3) a claim for defamation.  With respect to Ms. Blair and Mr. Sylvia, Mr. Gressett has asserted only a § 1983 claim for malicious prosecution.  With respect to Mr. McKenna, Mr. Gressett has asserted both a § 1983 claim for malicious prosecution and a claim for malicious prosecution under California law.  In their pending motions, Ms. Blair, Mr. Sylvia, and Mr. McKenna ask the Court to dismiss with prejudice all claims against them.

## II.   DISCUSSION

A.   Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss based on the failure to state a claim upon which relief may be granted.  *See* Fed. R. Civ. P. 12(b)(6).  A motion to dismiss based on Rule 12(b)(6) challenges the legal sufficiency of the claims alleged.  *See Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).  In considering such a motion, a court must take all allegations of material fact as true and construe them in the light most favorable to the nonmoving party, although "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal."  *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009).  While "a complaint need not contain detailed factual allegations . . . it must plead 'enough facts to state a claim to relief that is plausible on its face.'"  *Id.*  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than sheer possibility that a defendant acted unlawfully." *Iqbal*, 129 S. Ct. at 678.

In *Twombly*, the Supreme Court specifically addressed the plausibility standard in a conspiracy case.  Notably, the Court emphasized that, at the pleading stage, there must be allegations plausibly suggesting – and not merely consistent with – an agreement among the conspirators.  *See Twombly*, 550 U.S. at 557.  An allegation that the defendants have engaged in parallel conduct accompanied by a "bare assertion of conspiracy will not suffice." *Id.* at 556 (stating that, "when

United States District Court
For the Northern District of California

1   allegations of parallel conduct are set out in order to make a [Sherman Act] § 1 claim, they must be

2   placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct

3   that could just as well be independent action" on the part of the defendants).  Whether a plaintiff has

4   adequately pled facts from which the existence of a conspiracy may reasonably be inferred "is

5   generally a case-specific, fact-intensive inquiry.  Courts look to a variety of factors, such as whether

6   the plaintiff has set forth facts from which a motive can be inferred, facts showing acts taken in

7   furtherance of the conspiracy, and facts showing specific agreement to be part of a conspiracy."

8   Docket No. 118 (Order at 23) (citing *Lacey v. Maricopa*, 693 F.3d 896, 935 (9th Cir. 2012), and

9   *Sanchez v. Aviva Life & Annuity Co.*, No. C-09-1454 FCD, 2010 WL 2606670, at *4 (E.D. Cal. June

10  28, 2010)).

11  B.   Ms. Blair

12       During the relevant period, Ms. Blair was an employee of the AG's Office.  As noted above,

13  the only claim asserted against Ms. Blair in the TAC is a § 1983 claim for malicious prosecution.[1]

14  For Ms. Blair, there is nothing in the TAC to indicate that she had any involvement with Mr.

15  Gressett's arrest or the events leading thereto.  Therefore, the alleged liability of Ms. Blair turns on

16  post-arrest events.

17       Previously, the Court held that Ms. Blair's decision to prosecute Mr. Gressett was protected

18  by absolute immunity.  *See* Docket No. 118 (Order at 33).  Also protected were her actions of

19  presenting inadmissible evidence to the grand jury and withholding information from the grand jury.

20  *See* Docket No. 118 (Order at 33-34).

21       In light of the Court's order, Mr. Gressett now argues that Ms. Blair is liable because of her

22  role in the post-arrest investigation.  Mr. Gressett has two theories.  First, he asserts that Ms. Blair

23  can be held accountable for the acts of others in the post-arrest investigation because they were all

24  part of a conspiracy to maliciously prosecute him.  *See Lacey v. Maricopa*, 693 F.3d 896, 935 (9th

---

26  [1] In his TAC, Mr. Gressett indicates that he is suing Ms. Blair both in her individual capacity
27  and in her official capacity.  *See* TAC ¶ 6.  However, the reference to Ms. Blair's official capacity
    appears to have been an error as that would mean a suit against the state of California, which would
    be barred by Eleventh Amendment immunity.  *See Will v. Michigan Dep't of State Police*, 491 U.S.
28  58, 66 (1989) (concluding that "Congress, in passing § 1983, had no intention to disturb the States'
    Eleventh Amendment immunity").

1    Cir. 2012) (noting that a conspiracy may "enlarge the pool of responsible defendants by

2    demonstrating their causal connections to the violation; the fact of the conspiracy may make a party

3    liable for the unconstitutional actions of the party with whom he has conspired").  Second, he

4    contends that, even if there were no conspiracy, Ms. Blair essentially hired the County DA's Office

5    to be part of the investigatory team – in spite of its having a conflict of interest – and therefore is

6    liable for all of its actions as its supervisor.

7            1.    Conspiracy

8            The Court agrees with Ms. Blair that the allegations in the TAC do not plausibly state a

9    nonconclusory claim that she was part of a conspiracy against Mr. Gressett.

10           What is most damning to Mr. Gressett's position are the multiple allegations in the TAC –

11   which span approximately a dozen paragraphs – that the other members of the conspiracy, in

12   particular, the County Defendants, withheld material information from Ms. Blair.  TAC ¶ 71.  For

13   example, Mr. Gressett alleges:

14   •      All or some of the other conspirators withheld from Ms. Blair the fact that Mr. O'Malley

15          (Mr. Gressett's political "enemy") had a connection with Ms. Harpham and played a role in

16          bringing her rape charge to light.  *See* TAC ¶ 72.

17   •      All or some of the other conspirators withheld from Ms. Blair the interview of Ms.

18          Bravmann, a witness who provided critical exculpatory information.  According to Ms.

19          Bravmann, another witness (Ms. Smith) told her that Ms. Harpham said she had been

20          abducted and raped by strangers (*i.e.*, not Mr. Gressett).  *See* TAC ¶¶ 69, 75.

21   •      All or some of the other conspirators withheld from Ms. Blair interviews of several witnesses

22          (*e.g.*, Ms. Mead (a former DA and friend of Mr. Gressett), Ms. Falstad (a former girlfriend of

23          Mr. Gressett), and Ms. Thomas (a former DA), *see* TAC ¶¶ 55, 80) who also gave

24          exculpatory information about Mr. Gressett.  TAC ¶ 80.

25   •      All or some of the other conspirators withheld from Ms. Blair information about an

26          inconsistency in Ms. Harpham's story regarding the timing of the alleged sexual assault.  *See*

27          TAC ¶ 73.

28

United States District Court

For the Northern District of California

- All or some of the other conspirators withheld from Ms. Blair evidence that cast doubt on Ms. Harpham's credibility (*e.g.*, that Ms. Harpham (1) had previously engaged in anal sex, (2) had been having anal sex since the age of sixteen, and (3) had engaged in consensual anal sex with Mr. Gressett). *See* TAC ¶ 78.

- All or some of the other conspirators withheld from Ms. Blair the fact that a County Defendant coached Ms. Harpham before her interview in November 2008 so that "so that she would be able to explain [certain] inconsistencies [in her story]." TAC ¶ 79.

- All or some of the other conspirators withheld from Ms. Blair that "the DA investigators . . . were making it very clear that anyone who supported Gressett would be punished professionally." TAC ¶ 75.

- All or some of the other conspirators withheld from Ms. Blair that certain witnesses – *e.g.*, Ms. Smith and Ms. Henderson – were given "special privileges in order to befriend Harpham, to encourage her to continue participating in the criminal complaint and to give testimony that supported Harpham's credibility." TAC ¶ 81; *see also* TAC ¶ 75.

- All or some of the other conspirators withheld from Ms. Blair the fact that a witness who worked in the County DA's Office (Mr. Peck) and who had made a comment favorable to Mr. Gressett on a blog was intimidated during an interview in October 2008 (part of the criminal investigation) so that he would give inculpatory statements about Mr. Gressett. *See* TAC ¶ 76.

- All or some of the other conspirators withheld from Ms. Blair the fact that the allegations made by Ms. Deguzman against Mr. Gressett were false. Ms. Deguzman was a prostitute "who [had] accused Mr. Gressett of paying for sex with her in exchange for leniency in her boyfriend's case." TAC ¶ 61.

- All or some of the other conspirators withheld from Ms. Blair evidence of Ms. Harpham's physical condition immediately after the rape. *See* TAC ¶ 82.

- All or some of the other conspirators withheld from Ms. Blair the fact that there were unrecorded pre-interviews of Ms. Deguzman, Ms. Climer (Ms. Harpham's sister), and Mr. McSweeney (Ms. Harpham's former boyfriend). *See* TAC ¶ 79.

United States District Court

For the Northern District of California

- • All or some of the other conspirators withheld from Ms. Blair that "the Protocol did not apply when the AG was involved and as such the DA should not have been allowed to be involved in Gressett's case."  TAC ¶ 74.

- • All or some of the other conspirators withheld from Ms. Blair evidence of Ms. Harpham's settlement with the County.  *See* TAC ¶ 83.

The amount of information allegedly withheld from Ms. Blair and the breadth of that information is patently inconsistent with the assertion that she was part of the alleged conspiracy (which would require her agreement with other co-conspirators).  Arguably, Ms. Blair could still have been part of conspiracy if *some* information was withheld from her; but as demonstrated by the above, the picture painted by Mr. Gressett is that of substantial and significant information being withheld, and Mr. Gressett does not even attempt to provide an explanation as to why all of this information was withheld from Ms. Blair by her alleged co-conspirators if she were part of the conspiracy.  The Court thus concludes that it is implausible that Ms. Blair was a part of the conspiracy given the multiple allegations in the TAC related to the withholding of information from her.

The Court's conclusion is supported by the fact that Ms. Blair's alleged motive to be part of a the conspiracy is weak.  As noted in the Court's prior order, one factor in determining whether an adequate claim of conspiracy is stated is the existence of a motive to be a part of the conspiracy.  According to Mr. Gressett, Ms. Blair was motivated to be part of the conspiracy because:  (1) she is a long-time friend of Mr. Kochly (more than 30 years) and had previously worked with him at the County DA's Office, *see* TAC ¶ 67; (2) she supported Mr. O'Malley's campaign to become County DA, *see* TAC ¶ 24; and (3) she often used the County DA's Office (presumably, in her role at the AG's Office), was friendly with the existing power structure there, and wanted to continue to have influence in the County DA's Office which would not be possible if Mr. Peterson was elected instead of Mr. O'Malley because she had no relationship with Mr. Peterson.  *See* TAC ¶¶ 33, 46. But the mere fact that Ms. Blair is friends with Mr. Kochly and supported Mr. O'Malley campaign is of limited probative value.  A motive to violate the law and oath of office merely out of friendship, without more, is not plausible.  Mr. Gressett's assertion that Ms. Blair had something to gain professionally might provide a more plausible motivation, but the allegations in the TAC are

United States District Court

For the Northern District of California

1   inadequate.  Mr. Gressett fails to identify (1) what kind of influence Ms. Blair could have had under

2   the circumstances (*i.e.*, over the County DA given that she is an attorney for the AG's Office) or (2)

3   what influence she actually exercised.

4         Furthermore, the acts taken by Ms. Blair are not sufficient to plausibly establish the claim

5   that she was part of the conspiracy.  For example, according to Mr. Gressett, it is plausible that Ms.

6   Blair was part of the conspiracy because she agreed to prosecute him on the same day that he was

7   arrested – *i.e.*, she could not have done an independent evaluation of the case.  *See* TAC ¶ 47.  The

8   problem here is that there is, in fact, no allegation that *Ms. Blair* agreed to prosecute Mr. Gressett on

9   the same day that he was arrested.  The TAC simply states: "On or about October 2, 2008, the same

10  day Gressett was arrested and before any investigation into Harpham's allegations, Harpham was

11  told that the *AG* was filing the case and sent a text message to her friend to that effect."  TAC ¶ 47

12  (emphasis added).  Moreover, the fact that the charges against Ms. Gressett ultimately were not filed

13  until November 21, 2008, *see* TAC ¶ 1 – *i.e.*, more than a month and a half after the arrest – casts

14  significant doubt on Mr. Gressett's bare hearsay allegation that the AG immediately decided to

15  prosecute the same day he was arrested.

16        Mr. Gressett also contends that a conspiracy is plausible because Ms. Blair did not ask the

17  County DA's Office to recuse itself from the investigation, declined an offer of assistance from the

18  County Sheriff's Office in order to keep the County DA's Office involved, and included an AG

19  investigator (Ms. Doty) as part of the investigatory team even though she had no experience with

20  sexual assault cases.  *See* TAC ¶¶ 49-50 (alleging that Ms. Doty had previously investigated

21  MediCal fraud only).  Mr. Gressett asserts that Ms. Blair's actions here were in stark contrast to how

22  she ran another sexual assault case involving DeAnza College (*i.e.*, only one Santa Clara County DA

23  investigator was involved and otherwise there were experienced AG investigators).  *See* TAC ¶ 70.

24  Contrary to what Mr. Gressett argues, these allegations do not make out a plausible claim of

25  conspiracy.  Indeed, the TAC actually includes allegations as to why Ms. Blair kept the County

26  DA's Office involved – *i.e.*, because she believed that the Protocol was applicable and the fact that

27  the Protocol was not applicable was withheld from her by, *e.g.*, Mr. Kochly.  *See* TAC ¶ 53 (alleging

28  that "BLAIR repeatedly invoked the Protocol to explain the involvement of the DA's Office in the

United States District Court

For the Northern District of California

case" and that "MS. BLAIR was *unaware* that the Protocol did not apply to investigations that involved the Attorney General's office because that was *withheld* from her by KOCHLY and all other DEFENDANTS") (emphasis added).  Thus, the TAC itself establishes that Ms. Blair's decision to keep the DA's Office involved was not nefariously motivated by a conspiracy.  Furthermore, no specific allegation establishes that Ms. Blair's choice of the AG investigator was inappropriate; Mr. Gressett has failed to make out a case as to why any special expertise was needed in the investigation of his case.[2]

Mr. Gressett further contends that a conspiracy is plausible because of how Ms. Blair dealt with Mr. Vega, a witness in the case.  Several days after the alleged sexual assault, Ms. Harpham told Mr. Vega (another County DDA) about the incident.  *See* TAC ¶ 62.  Mr. Vega was apparently interviewed as a witness at some point.  Ms. Blair had Mr. Vega re-interviewed on November 5, 2008 (*i.e.*, shortly before charges were filed against Mr. Gressett).  *See* TAC ¶ 62.  Although Ms. Blair knew that (1) Ms. Harpham had had a sexual relationship with Mr. Vega, and that (2) Ms. Harpham had been angry with Mr. Vega for having a sexual relationship with another DDA (shortly before the incident with Mr. Gressett) and "wanted to get back at him for it," Ms. Blair did not have Mr. Vega re-interviewed on these topics (and possibly others – the TAC is not entirely clear).  TAC ¶ 62.  Furthermore, during the grand jury proceedings, Ms. Blair did not have Mr. Vega reveal his sexual relationship with Ms. Harpham to the grand jury.  *See* TAC ¶ 62.  Finally, when Ms. Blair had Mr. Vega re-interviewed a second time (after the grand jury had indicted Mr. Gressett), he still was not asked about his sexual relationship with Ms. Harpham.  *See* TAC ¶ 62.

Contrary to what Mr. Gressett argues, the allegations regarding Mr. Vega do not give rise to a plausible inference that Ms. Blair was part of the putative conspiracy.  If Ms. Blair already knew that Mr. Vega had a sexual relationship with Ms. Harpham, it is not clear why she needed to question him about it during the re-interviews.  As for the failure to disclose the sexual relationship to the grand jury, Ms. Blair may well not have delved into the sexual relationship between Mr. Vega

---

[2] In her reply brief, Ms. Blair also argues that her staffing decision is protected by absolute immunity.  *See* Reply at 4 (citing *Lacey*, 693 F.3d at 931).  The Court need not address this argument in light of the above.

United States District Court

For the Northern District of California

1    and Ms. Harpham during the grand jury proceedings because of evidentiary rules that control such

2    proceedings.  *See* Cal. Evid. Code § 1103(c)(1) (providing that "evidence of specific instances of the

3    complaint witness' sexual conduct . . . is not admissible by the defendant in order to prove consent

4    by the complaining witness"); Cal. Evid. Code § 352 (providing that a court has discretion to

5    "exclude evidence if its probative value is substantially outweighed by the probability that its

6    admission will . . . create substantial danger of undue prejudice"); Cal. Evid. Code § 782(a)

7    (providing that a certain procedure is to be followed "if evidence of sexual conduct of the

8    complaining witness is offered to attack the credibility of the complaining witness under Section

9    780"); *see also People v. Byars*, 188 Cal. App. 2d 794, 795-96 (1961) (noting that evidence to

10   support an indictment – including evidence received before a grand jury to support an indictment –

11   must be competent and admissible); Cal. Pen. Code § 939.6(b) (providing that "the grand jury shall

12   not receive any evidence except that which would be admissible over objection at the trial of a

13   criminal action").

14        Mr. Gressett also points out that the AG's Office did not file a criminal action against Mr.

15   Gressett after a prostitute (Ms. Deguzman) accused him of paying for sex with her in exchange for

16   leniency on her boyfriend's case.  *See* TAC ¶ 61.  The prostitute was a client of Mr. O'Malley.  *See*

17   TAC ¶ 61.  Ms. Gressett maintains that the AG's Office did not file a criminal action because, if it

18   had, then it would have had to disclose the Deguzman situation to Mr. Gressett's defense team,

19   which would make "the conspiracy abundantly clear" – *i.e.*, "[j]ust as O'MALLEY had arranged for

20   Harpham to . . . come forward with her accusations through his partner, TOM MCKENNA, he also

21   arranged for Deguzman to come forward with her allegations against Mr. Gressett through his new

22   partner, Tom O'Conner."  TAC ¶ 61.  There are several problems with Mr. Gressett's theory.  First,

23   there are no allegations to support his suggestion that the decision to prosecute rested with Ms. Blair.

24   Second, even if it did, there are no allegations to suggest that the case was strong enough such that

25   charges should have been filed against him.  If Ms. Blair made the decision not to prosecute, it was

26   likely because the claim against Mr. Gressett as made by the prostitute was a weak one; there is no

27   suggestion that the prosecutors had corroborative evidence to substantiate Mr. Deguzman's claims.

28

United States District Court

For the Northern District of California

1    Finally, Mr. Gressett suggests Ms. Blair knew that Ms. Harpham was motivated to lie to keep

2  her job.  This argument lacks merit.  That Ms. Harpham may have had a motive to lie to keep her job

3  might have put her credibility at issue, but it would not be enough to entirely negate her credibility

4  and undermine the case.

5    For the foregoing reasons, the Court finds that Mr. Gressett's allegations do not give rise to a

6  plausible claim that Ms. Blair was part of the purported conspiracy.  The Court emphasizes that,

7  although it has evaluated Ms. Blair's alleged motive and actions individually, it has also considered

8  the allegations collectively and finds that, even when taken together, they are not enough to push the

9  claim of conspiracy into the realm of plausibility.  This is particularly true because, as noted above,

10 there are multiple allegations in the TAC that information was actually *withheld* from Ms. Blair.

11 The fact that information was allegedly withheld from Ms. Blair on multiple occasions, is

12 inconsistent with the assertion that she was part of the alleged conspiracy.

13    2.    <u>Supervisory Liability</u>

14    Because there are insufficient allegations to support the theory that Ms. Blair was part of the

15 conspiracy, the Court must evaluate whether there is a viable claim of malicious prosecution based

16 on Ms. Blair's actions alone (and not the actions of the alleged co-conspirators).

17    As noted above, Mr. Gressett has argued that Ms. Blair can still be held accountable for

18 malicious prosecution because she was the supervisor of the County DA's Office in its investigatory

19 role.  To the extent Mr. Gressett suggests that a supervisor can be held liable on a respondeat

20 superior theory under § 1983, he is not correct.  As Ms. Blair correctly notes, there is no respondeat

21 superior liability under § 1983.  *See Iqbal*, 556 U.S. at 676 (stating that "[g]overnment officials may

22 not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat*

23 *superior*").

24    Under § 1983, a supervisor may be held liable only "when culpable action, or inaction, is

25 *directly* attributed to them."  *Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011) (emphasis added).

26 A "supervisor's participation could include [her] 'own culpable action or inaction in the training,

27 supervision, or control of [her] subordinates,' [her] acquiescence in the constitutional deprivations of

28

United States District Court
For the Northern District of California

1   which the complaint is made,' or 'conduct that showed a reckless or callous indifference to the rights

2   of others.'" *Id.* at 1205-06.

3        Mr. Gressett seems to argue that Ms. Blair has supervisory liability because she showed

4   reckless indifference when she hired the County DA's Office to be part of the investigation even

5   though it had a conflict of interest. *See* Opp'n at 28. The reckless indifference theory is not

6   plausible for several reasons. First, as noted above, the TAC on its face indicates that Ms. Blair

7   included the County DA's Office not out of reckless indifference but rather because she felt

8   obligated to under the Protocol. *See* TAC ¶ 53 (alleging that "BLAIR repeatedly invoked the

9   Protocol to explain the involvement of the DA's Office in the case"). The TAC expressly alleges

10   that "MS. BLAIR was *unaware* that the Protocol did not apply to investigations that involved the

11   Attorney General's office because that was *withheld* from her by KOCHLY and all other

12   DEFENDANTS." TAC ¶ 53 (emphasis added).

13        Second, in order for Ms. Blair's actions to plausibly constitute reckless indifference, the

14   conflict of interest in having the County DA's Office involved should have been relatively obvious

15   and/or severe such that the hiring by Ms. Blair was more than negligence. Here, Mr. Gressett has

16   not alleged with any specificity why it was necessarily wrong for the County DA's Office to be

17   involved. For example, Mr. Gressett has not made any allegation that Ms. Blair was actually aware

18   that any specific individual who was involved in the investigation was so biased as to prevent a fair

19   and adequate criminal investigation.

20        Finally, as the TAC contains alleges, there was at least one investigator involved (*i.e.*, Ms.

21   Doty) who was not with the County DA's Office. Mr. Gressett does not suggest Ms. Doty was in on

22   the conspiracy, only that she was inexperienced with sexual assault cases, but, as noted above, it is

23   not clear that any special expertise was needed in Mr. Gressett's case.

24        3.   <u>Summary</u>

25        Accordingly, the Court dismisses the § 1983 malicious prosecution claim against Ms. Blair.

26   The dismissal is with prejudice as Mr. Gressett has already been given an opportunity to amend with

27   respect to Ms. Blair.

28   ///

12

United States District Court
For the Northern District of California

C.      Mr. Sylvia

During the relevant period, Mr. Sylvia was an employee of the Martinez Police Department. As noted above, the only claim asserted against Mr. Sylvia in the TAC is a § 1983 claim for malicious prosecution.[3]

Similar to above, Mr. Gressett contends that Mr. Sylvia should be held liable for the conduct of others because he was part of a conspiracy to maliciously prosecute Mr. Gressett.  Mr. Gressett also argues that, even if Mr. Sylvia was not part of a conspiracy, he can still be held liable for malicious prosecution based on his own acts.

1.      Conspiracy

The TAC does not plausibly state a claim that Mr. Sylvia was part of a conspiracy against Mr. Gressett.

First, Mr. Gressett's claim that Mr. Sylvia had a motive to be part of the conspiracy is very weak.  According to Mr. Gressett, Mr. Sylvia was motivated to be part of the conspiracy because he supported Mr. O'Malley's campaign to become County DA and he knew that he would be promoted if he helped Mr. O'Malley get elected.  *See* TAC ¶¶ 24, 66.  But, as Mr. Sylvia points out, there are no concrete allegations that the County DA's Office has any say (formal or informal) as to who gets promotions within the Martinez Police Department, an entity that is part of the City of Martinez and not the County.  While Mr. Gressett alleges that the County DA's Office and the Martinez Police Department work together closely, *see* TAC ¶ 66, that is insufficient to assert control or influence by the County DA's Office over the Martinez Police Department.  In addition, while Mr. Gressett alleges that the Martinez Police Department contributed financially to Mr. O'Malley's campaign, *see* TAC ¶ 64, (1) the TAC does not explain how a police department as a whole can make a financial contribution to a political campaign, and (2) even if it had, that does not establish how or why Mr. Sylvia would be motivated to join the putative conspiracy.  There is no allegation, *e.g.*, that

---

[3] In his TAC, Mr. Gressett indicates that he is suing Mr. Sylvia both in his individual capacity and in his official capacity.  *See* TAC ¶ 5.  Presumably, the reference to official capacity was an error as this would mean a suit against the City of Martinez, and there are no allegations to support any theory of municipal liability on the part of Martinez.

United States District Court

For the Northern District of California

1   persons with decisionmaking authority on hiring in the Martinez Police Department contributed

2   financially to Mr. O'Malley's campaign and pressured Mr. Sylvia to conspire against Mr. Gressett.

3       Second, in addition to the lack of a motive, Mr. Gressett's contention that a conspiracy may

4   plausibly be inferred based on Mr. Sylvia's actions is without merit.

5       For example, Mr. Gressett asserts that Mr. Kochly assigned Mr. Hole, an employee of the

6   County DA's Office and a supporter of Mr. O'Malley, to assist Mr. Sylvia with preparation of the

7   arrest warrant.  *See* TAC ¶ 42.  While such an allegation might support Mr. Kochly's being part of

8   the conspiracy, it says nothing about Mr. Sylvia's participating in the conspiracy.

9       Mr. Gressett also points out that, in the arrest warrant Mr. Sylvia prepared, he noted that Mr.

10   Gressett had run for County DA three times.  *See* TAC ¶ 44.  According to Mr. Gressett, this

11   establishes that the "arrest warrant is tainted with . . . political motivations."  TAC ¶ 44.  This

12   argument is unpersuasive.  Mr. Sylvia likely made note of that fact to alert the state court judge that

13   there were political overtones to the case.  Moreover, if Mr. Sylvia's preparation of the arrest

14   warrant was in fact infected by political motivations, then it is much more likely he would have

15   taken care *not* to disclose the fact that Mr. Gressett had run for County DA three times.  Disclosing

16   this fact to the judge hardly suggests Mr. Sylvia joined the conspiracy.

17       Mr. Gressett further asserts that Mr. Sylvia omitted from the arrest warrant the fact that he

18   had been told (by some of the County Defendants, *i.e.*, Mr. Sequeira, Mr. Baker, and Mr.

19   Greenwald) that Ms. Harpham was manic, unstable, and willing to spin her allegations as a reason

20   why she was not hired for a permanent position in the County DA's Office.  *See* TAC ¶¶ 39, 44.

21   However, it is not surprising that Mr. Sylvia did not include any such statement because these were

22   characterizations of Ms. Harpham that were not supported by any underlying facts – the TAC says

23   nothing about Mr. Sylvia being told *why* the individuals above believed Ms. Harpham to be manic

24   and unstable.  As for Mr. Sylvia's omission that Ms. Harpham was willing to spin her allegations,

25   that is not significant because (as the Court noted in its prior order) it was implicit in the probable

26   cause statement prepared by Mr. Sylvia that Ms. Harpham had a motive to lie in order to keep her

27   job.  *See, e.g.*, Docket No. 140 (RJN, Ex. B) (Prob. Cause St. at 6, 8) (noting that Ms. Harpham's

28   friend stated that Ms. Harpham "did not want to get fired" and "[h]er job is threatened anyway

United States District Court

For the Northern District of California

because they (DAs Office) only pick a certain number of attorneys"; also noting, in "Opinion" section, that "I believe it is obvious from her interview she was aware that having someone terminated could result in retaliation"); Docket No. 118 (Order at 14-15) (noting that "the magistrate could have inferred that Harpham's allegation could have been part of a scheme to keep her job").

According to Mr. Gressett, Mr. Sylvia also failed to investigate inconsistencies between (1) Ms. Harpham's statement to him and (2) statements that Ms. Harpham's friend and her sister made to him. For instance, Ms. Harpham told Mr. Sylvia that she had no prior sex with Mr. Gressett, but, according to Ms. Harpham's friend, Ms. Harpham said that she and Mr. Gressett had sex on three prior occasions and that the two had had kinky sex. Also, Ms. Harpham told Mr. Sylvia that Mr. Gressett had not specifically threatened her with a gun, but, according to Ms. Harpham's sister, Ms. Harpham said that Mr. Gressett had said "'he would shoot her in the head and fuck the hole.'" TAC ¶ 44. This argument in support of conspiracy, like those above, is not compelling, particularly because the inconsistencies were not so stark such that a further investigation would have been warranted. For example, although Ms. Harpham did not state to Mr. Sylvia that she had sex with Mr. Gressett on three prior occasions or that she had had kinky sex with him, she did state to Mr. Sylvia that she did have other prior sexual encounters with Mr. Gressett – notably, one which involved an attempt to have sex. *See* Docket No. 140 (RJN, Ex. E) (Interview at 2, 12). Also, although Ms. Harpham did not state to Mr. Sylvia that Mr. Gressett had specifically threatened to "'shoot her in the head and fuck the hole,'" TAC ¶ 44, (in fact, she told Mr. Sylvia that "[h]e didn't say anything like I'll shoot you or anything like that," Docket No. 140 (RJN, Ex. E) (Interview at 60)), Ms. Harpham did tell Mr. Sylvia that Mr. Gressett had put a gun to her head. *See* Docket No. 140 (RJN, Ex. E) (Interview at 2-3, 23-24). This statement was consistent with what she had told her friend and sister. *See* Docket No. 140 (RJN, Ex. B) (Prob. Cause St. at 5-6). (Mr. Gressett's former girlfriend also claimed that he had threatened her with a gun. *See* Docket No. 140 (RJN, Ex. B) (Prob. Cause St. at 11).) Also, Ms. Harpham did tell Mr. Sylvia that Mr. Gressett had made a similarly gruesome comment that he would kill her and that "my body would still be warm for 15 minutes so he'd be able to cum." Docket No. 140 (RJN, Ex. E at 4, 47-48).

United States District Court

For the Northern District of California

1    Mr. Gressett further contends that, in the arrest warrant, Mr. Sylvia omitted the above

2  inconsistencies between (1) Ms. Harpham's statement to him and (2) the statements that Ms.

3  Harpham's friend and sister made to him.  *See* TAC ¶ 44.  But, as the Court noted in its prior order,

4  "[t]hese inconsistencies were in plain view for the magistrate" and Mr. Gressett "has not pointed to

5  any authority establishing that an officer has a duty to highlight inconsistencies in an affidavit."

6  Docket No. 118 (Order at 13).  The Court also notes that there were facts that corroborated Ms.

7  Harpham's story – *e.g.*, Ms. Harpham told both her friend and her sister about the use of an ice pick

8  and a gun, which was also consistent with what she told Mr. Sylvia, *see* Docket No. 140 (RJN, Ex.

9  B) (Prob. Cause St. at 4-6); Ms. Harpham's sister with whom she is close was so concerned about

10  her that the sister flew out to see her the same day as their conversation, *see* Docket No. 140 (RJN,

11  Ex. B) (Prob. Cause St. at 5); and Ms. Harpham took time off after the alleged sexual assault.  *See*

12  Docket No. 140 (RJN, Ex. B) (Prob. Cause St. at 4).  Ms. Harpham's story was credible and specific

13  enough to support Mr. Sylvia's belief there was probable cause to support the warrant.

14    Mr. Gressett also asserts that, before he was arrested, Mr. Sylvia did not interview two

15  people who had seen Ms. Harpham on the day of the alleged rape – *i.e.*, Officer Pate and Ms.

16  Harpham's father.  In addition, in support of the arrest warrant, Mr. Sylvia obtained an affidavit

17  from an experienced sexual assault investigator, Mike Jackson, but Mr. Sylvia withheld from Mr.

18  Jackson that he did not interview Officer Pate and Mr. Harpham.  However, it is likely that Mr.

19  Sylvia did not interview Officer Pate and the father (or tell Mr. Jackson about them) because Ms.

20  Harpham had already indicated during her interview with Mr. Sylvia that no one noticed or likely

21  would have noticed anything wrong with her.  *See* Docket No. 140 (RJN, Ex. E) (Interview at 40-41)

22  (Ms. Harpham stating that, when she returned to the office after the alleged sexual assault, nobody

23  noticed and "I remember thinking that this was just so bizarre that no – how can no one know"; also

24  stating that had dinner at her father's later that night and that she could not get out of it because, if

25

26

27

28

16

1  she did, then he "would know something was wrong"; adding that, in any event, her father was "not

2  the most observant" and that, if "you're not crying, everything is ok").[4]

3        Finally, Mr. Gressett contends that Mr. Sylvia's participation in the conspiracy is plausible

4  because he "withheld from the AG that the Protocol did not apply when the AG was involved and as

5  such the DA should not have been allowed to be involved in Gressett's case." TAC ¶ 74.  But there

6  is nothing in the TAC to indicate that Mr. Sylvia had any role with respect to the AG Office's

7  investigation and/or prosecution of Mr. Gressett – *i.e.*, there is nothing in the TAC to suggest that he

8  continued to have involvement with the Gressett case after preparing the arrest warrant.  Moreover,

9  even if Mr. Sylvia could have had some obligation to inform the AG's Office (in spite of his lack of

10 involvement post-arrest), the TAC simply states that, where the AG's Office (a non-party to the

11 Protocol) is involved, "there is *likely* a recusal on the part of a conflicted agency that is part of the

12 Protocol." TAC ¶ 74 (emphasis added).  The use of the word "likely" indicates that that is not

13 always the case.  Thus, even if Mr. Sylvia were involved, it would not necessarily have been obvious

14 to him that the Protocol was not applicable.

15        The Court emphasizes that, although it has evaluated each of the above allegations regarding

16 conspiracy individually, it has also taken the allegations into account collectively – and even

17 collectively, an inference of conspiracy still is not plausible.

18        2.    Own Acts

19        Without a plausible conspiracy, Mr. Sylvia may be liable only if his own acts – and not the

20 acts of others – caused the alleged malicious prosecution.

21        Here, the Court begins by noting that, based on the TAC, Mr. Sylvia had a role with respect

22 to Mr. Gressett's arrest only – *i.e.*, there is nothing in the TAC to indicate that Mr. Sylvia had any

23 role with respect to the AG Office's investigation and/or prosecution of Mr. Gressett.

24        As to Mr. Sylvia's actions that were related to Mr. Gressett's arrest, there is a break in the

25 chain of causation such that Mr. Sylvia's actions cannot be said to be the proximate cause of Mr.

26

27        [4] During the interview with Mr. Sylvia, Ms. Harpham was adamant that she did not want her

28 father to know about what had happened, *see* Docket No. 140 (RJN, Ex. E at 49), and therefore she
   would have had an incentive to behave normally at the dinner with her father.

United States District Court

For the Northern District of California

1    Gressett's injury.  More specifically, as the Court held in its prior order, the break in the chain of

2    causation is the magistrate's order which found probable cause for the arrest.  *See* Docket No. 118

3    (Order at 15,29) (stating that "there *was* probable cause for Plaintiff's prosecution at the time of his

4    arrest" and that "Plaintiff cannot demonstrate 'that the magistrate would not have issued the warrant

5    with false information redacted, or omitted information restored'") (emphasis in original).

6         Although Mr. Gressett appears to still assert that there was no probable cause for the arrest,

7    *see* Docket No. 48 (Opp'n at 37-38), that contention is unsupported.  Nothing suggests, for example,

8    that Mr. Sylvia did not independently investigate the charge of rape (*e.g.*, he interviewed persons

9    other than Ms. Harpham and he confirmed that parts of Ms. Harpham's account were true – *e.g.*,

10    facts related to Mr. Gressett's possession of a gun, where he lives, and what kind of car he drives).

11    Furthermore, while Ms. Harpham's credibility was put into some doubt because she had a motive to

12    lie, that fact alone did not entirely negate her credibility, particularly in light of other corroborating

13    evidence supporting her claim.

14         3.    <u>Summary</u>

15         Accordingly, the Court dismisses the § 1983 claim for malicious prosecution against Mr.

16    Sylvia.  As above, the dismissal is with prejudice because the Court previously gave Mr. Gressett an

17    opportunity to amend.

18    D.    <u>Mr. McKenna</u>

19         During at least part of the relevant period, Mr. McKenna was a partner of Mr. O'Malley.

20    Mr. Gressett has asserted a § 1983 claim for malicious prosecution against Mr. McKenna as well as

21    a claim for malicious prosecution under California law.

22         Similar to above, Mr. Gressett paints a picture of a conspiracy involving Mr. McKenna so

23    that Mr. McKenna may be held liable for the actions of others.[5]  Mr. Gressett also suggests that,

24    even without a conspiracy, Mr. McKenna's actions on his own could be a basis for liability.

25

26         [5] Furthermore, for the § 1983 claim, a conspiracy involving Mr. McKenna is a necessary

27    predicate because, generally, a private actor cannot be held liable under § 1983 absent, *e.g.*, a
conspiracy or joint action with state actors.  *See, e.g.*, *Crowe v. County of San Diego*, 608 F.3d 406,

28    440 (9th Cir. 2010) (stating that "'[a] private individual may be liable under § 1983 if she conspired
or entered joint action with a state actor'").

United States District Court

For the Northern District of California

1.   <u>Conspiracy</u>

According to Mr. Gressett, Mr. McKenna was motivated to be part of the conspiracy because, for at least part of the time, he was Mr. O'Malley's law partner and because he supported Mr. O'Malley's campaign to be County DA.  But the Court has already indicated in its prior order that such motive in and of itself is weak evidence of conspiracy.  *See* Docket No. 118 (Order at 26) (noting that, "[u]nlike the other conspirators, McKenna is not alleged to have deliberately withheld or avoided exculpatory evidence, directly procured false evidence, or otherwise taken steps that skewed the investigation or prosecution").

As to actions taken by Mr. McKenna which purportedly give rise to a plausible inference that he was part of the conspiracy, they do not.  For example, Mr. Gressett alleges:

- Mr. O'Malley sent Ms. Harpham to Mr. McKenna to tell him about her allegations of sexual assault.  *See* TAC ¶ 27.  This allegation says nothing about Mr. McKenna being part of the conspiracy.

- Mr. McKenna encouraged Ms. Harpham to participate in the criminal investigation and support a criminal prosecution of Mr. Gressett even though Ms. Harpham was adamant that she did not want to.  *See* TAC ¶ 41.  Encouraging a possible rape victim to come forward is hardly evidence of a conspiracy.

- Mr. McKenna told Ms. Harpham that her story and credibility were beyond reasonable doubt.  *See* TAC ¶ 41.  Again, any such encouragement of the putative victim does not suggest a sinister motive, unless Mr. McKenna knew the rape allegation was false.

- Although Mr. McKenna learned about Ms. Harpham's sexual assault allegations in May 2008, he and other co-conspirators agreed to delay bringing up the allegations to law enforcement – *i.e.*, until September 2008 – (1) so as to prejudice Mr. Gressett's ability to defend himself and (2) in order to bring up the allegations at a time that would be most useful to Mr. O'Malley and his campaign.  *See* TAC ¶¶ 32, 34.  Although Mr. Gressett has alleged that Mr. McKenna agreed to delay, that allegation is essentially a conclusory one.  Mr. Gressett offers no factual allegation substantiating this claim.  While it is true that Mr. McKenna met with Ms. Harpham in May 2008 but she made no statement to the police until

September 2008, the three-month delay could be attributable to Ms. Harpham rather than to any covert agreement among co-conspirators.  Even in her September 2008 interview, she was adamant (as even Mr. Gressett concedes in his TAC) that she did not want to participate in the investigation and/or prosecution.  There are no facts suggesting Mr. McKenna engineered the delay by Ms. Harpham in order to prejudice Mr. Gressett.

- Mr. McKenna assured Mr. Sequeira, Mr. Kochly, and Mr. Baker that Ms. Harpham would eventually cooperate in the case against Mr. Gressett.  *See* TAC ¶ 34.  This allegation is of little probative value regarding conspiracy; there is no suggestion, for example, that Mr. McKenna made this statement because he was pressuring Ms. Harpham to cooperate.

- Mr. McKenna knew that Mr. Sequeira was offering Ms. Harpham a job in exchange for her testimony against Mr. Gressett.  *See* TAC ¶ 36.  Again, this is simply a conclusory allegation.  There is no factual basis for the allegation that Mr. McKenna knew that purported fact.

- Mr. McKenna told the AG's Office and other County DA investigators that the story Ms. Harpham told in September 2008 was consistent with the story she had told him back in May 2008 (when they first met); but in fact that was not the case.  During the September 2008 interview, Ms. Harpham stated that the alleged sexual assault took place at lunchtime.  But, apparently, she informed Mr. McKenna back in May 2008 that the alleged rape took place at nighttime – at least, that is what Mr. McKenna told the campaign finance manager for Mr. O'Malley.  *See* TAC ¶ 41.  However, the timing of the alleged rape was not particularly significant.  As Mr. McKenna notes, even Mr. Gressett did not dispute that he had a sexual encounter with Ms. Harpham on the day at issue.  While the inconsistency in timing may have cast some doubt on Ms. Harpham's credibility, it hardly negated her credibility in its entirety.  Again, as noted above, her claims was corroborated.

- Mr. McKenna said that he thought the case against Mr. Gressett would be resolved as a misdemeanor.  *See* TAC ¶ 41.  According to Mr. Gressett, if Mr. McKenna really believed Ms. Harpham's account of what had taken place, then there is no way that he would have thought that the case would be resolved as something so minor.  *See* TAC ¶ 41.  But simply because Mr. McKenna stated that he thought the case would be resolved as a misdemeanor

United States District Court

For the Northern District of California

1    does not necessarily establish that he did not believe Ms. Harpham.  Rather, his belief that

2    the case would be resolved as such could have been informed by multiple considerations,

3    including, *e.g.*, the fact that there was no dispute that there was a sexual encounter and the

4    only question was whether Ms. Harpham consented, making prosecution potentially

5    problematic.

6         2.    Own Acts

7         Without a plausible conspiracy, Mr. McKenna may be liable only if his own acts – and not

8    the acts of others – caused the alleged malicious prosecution.

9         Here, the Court begins by noting that, based on the TAC, Mr. McKenna's actions largely

10   took place in conjunction with Mr. Gressett's arrest.  Again, there is a proximate causation problem

11   – *i.e.*, Mr. McKenna cannot be said to be the proximate cause of Mr. Gressett's arrest because the

12   magistrate's order which found probable cause for the arrest broke the chain of causation.

13        As for Mr. McKenna's post-arrest actions, at best, Mr. Gressett has suggested that, post-

14   arrest, Mr. McKenna should have told the AG's Office about the inconsistency in Ms. Harpham's

15   story regarding the timing of the alleged rape.[6]  But here, there is another proximate cause problem

16   for Mr. Gressett.  As alleged in the TAC, the AG's Office eventually obtained documents (the notes

17   of an Alameda County investigator) that exposed this inconsistency, *see* TAC ¶ 73 (alleging that the

18   notes were hidden from the AG's Office until after the criminal complaint was filed against Mr.

19   Gressett), and yet, in spite of this inconsistency, the AG's Office still pursued an indictment against

20   Mr. Gressett.  This fact indicates that the inconsistency would not have affected the AG's Office to

21   file criminal charges against Mr. Gressett.

22   ///

23   ///

24   ///

25

26   ───────────────────

27        [6] In his opposition, Mr. Gressett also suggests that, post-arrest, Mr. McKenna withheld from the AG's Office that Ms. Harpham had concocted a story as to how she got in touch with him (*i.e.*, in order to avoid mentioning Mr. O'Malley).  *See* Opp'n at 35.  But the TAC does not actually charge Mr. McKenna with withholding this information.  Rather, it charges Mr. Kochly, Mr.

28   Sequeira, and Mr. Baker with withholding the information.  *See* TAC ¶ 72.

3.      Summary

Accordingly, for the reasons discussed above, the Court dismisses both the federal and state malicious prosecution claims against Mr. McKenna.  The dismissal is with prejudice because the Court previously gave Mr. Gressett an opportunity to amend.

### III.      CONCLUSION

The motions to dismiss filed by Ms. Blair, Mr. Sylvia, and Mr. McKenna are granted.  The dismissal of the claims against these three defendants is with prejudice.

This order disposes of Docket Nos. 127, 128, and 137.


IT IS SO ORDERED.


Dated:  December 5, 2013

_____
EDWARD M. CHEN
United States District Judge