**United States District Court**
For the Northern District of California

1
2
3
4
5              UNITED STATES DISTRICT COURT
6              NORTHERN DISTRICT OF CALIFORNIA
7
8    MICHAEL GRESSETT,                        No. C-12-3798 EMC
9              Plaintiff,
10        v.                                  **ORDER GRANTING DEFENDANTS'**
                                              **MOTION FOR SUMMARY JUDGMENT**
11   CONTRA COSTA COUNTY, *et al.*,           **(Docket No. 203)**
12             Defendants.
     _____/
13
14
15        Plaintiff Michael Gressett initiated this lawsuit – now primarily one for malicious
16   prosecution – against multiple government entities, government employees, and private individuals.
17   After the Court ruled on several rounds of motions to dismiss, and after Mr. Gressett settled with
18   some of the defendants, the defendants remaining in the case are all affiliated with Contra Costa
19   County ("County").  The remaining defendants (collectively, "Defendants") are as follows:
20   (1)     The County;
21   (2)     Robert Kochly (during the relevant period, the County District Attorney ("DA"));
22   (3)     Brian Baker (during the relevant period, Mr. Kochly's Chief Deputy DA, the "Number 2"
23           position in the DA's Office);
24   (4)     Paul Sequeira (during the relevant period, Mr. Kochly's Assistant Chief Deputy DA, the
25           "Number 3" position in the DA's Office);
26   (5)     Gene Greenwald (during the relevant period, the Chief of Inspectors at the DA's Office);
27   (6)     Daryl Jackson (during the relevant period, an investigator at the DA's Office); and
28

United States District Court

For the Northern District of California

1    (7)    Paul Mulligan (during the relevant period, an investigator at the DA's Office who reported to

2            Mr. Jackson).

3            Currently pending before the Court is Defendants' motion for summary judgment or, in the

4    alternative, for partial summary judgment.  Having considered the parties' briefs and accompanying

5    submissions, as well as all evidence of record, the Court hereby **GRANTS** Defendants' motion.

6                        **I.    FACTUAL & PROCEDURAL BACKGROUND**

7            Mr. Gressett is a County Deputy District Attorney ("DA").  *See* Gressett Decl. ¶ 1.  In 1994

8    and 1998, he ran unsuccessfully for County DA against Gary Yancey.  Mr. Kochly was Mr.

9    Yancey's Chief Deputy during that time.  *See* Gressett Decl. ¶ 2.

10           In 2002, Mr. Gressett ran for the DA position again, this time against Mr. Kochly.  Mr.

11   Gressett was unsuccessful once again.  *See* Gressett Decl. ¶ 3-4.  Mr. Kochly continued to be the DA

12   during the period relevant to this lawsuit.

13           On or about March 8, 2008, the alleged rape of Ms. Doe occurred.  *See* Boley Decl., Ex. H at

14   2 (felony complaint); Sylvia Decl., Ex. C at M17 (police report).

15           On March 12, 2008, Ms. Doe talked to a private attorney, Thomas McKenna, about the

16   alleged rape.  *See* Sylvia Decl., Ex. C at M20 (police report).  Mr. McKenna was at the time in a

17   partnership with Daniel O'Malley.  Mr. O'Malley eventually ran against Mark Peterson, a friend of

18   Mr. Gressett, for the DA position in 2010.

19           On or about the same day that Ms. Doe alerted him, Mr. McKenna contacted Mr. Sequeira,

20   the "Number 3" position in the DA's Office, about the alleged rape.  *See* Sylvia Decl., Ex. C at M21

21   (police report).  Mr. Sequeira was Ms. Doe's immediate supervisor.  *See* Boley Decl., Ex. P at 118

22   (Kochly deposition).  Shortly thereafter, Mr. Kochly (the DA) was told about the alleged rape.  *See*

23   Boley Decl., Ex. P at 271 (Kochly deposition).

24           On or about March 19, 2008, Ms. Doe met with Mr. McKenna and Mr. Sequeira.  According

25   to Defendants, details of the alleged rape were not discussed; rather, the discussion focused on what

26   would happen if Ms. Doe came forward with an administrative (not criminal) complaint against Mr.

27   Gressett.  *See, e.g.*, Boley Decl., Ex. N at 705-06 (testimony of Mr. Sequeira during grand jury

28   proceeding).

**United States District Court**
For the Northern District of California

1    Around this same time, Mr. Kochly contacted an attorney, Marty Mayer, to get his "informal

2 thoughts" about the situation.  Boley Decl., Ex. P at 212 (Kochly deposition).

3    Subsequently, nothing material seems to have happened for several months.

4    After several months, in July 2008, Mr. Kochly contacted Mr. Meyer again and this time

5 asked for an opinion letter as to what the obligations of the DA's Office were.  *See* Boley Decl., Ex.

6 P at 292 (Kochly deposition).

7    On August 12, 2008, Mr. Mayer provided the opinion letter to Mr. Kochly.  *See* Boley Decl.,

8 Ex. Z (letter).  In the letter, Mr. Mayer opined, *inter alia*, that an investigation into the alleged rape

9 was required pursuant to both Title VII and FEHA.  Mr. Mayer advised that an appropriate

10 investigator be retained and an investigation be initiated as quickly as possible.  Mr. Mayer added,

11 however, that there was "no legal duty imposed upon the employer . . . to report this matter to the

12 local police."  Boley Decl., Ex. Z at 5 (letter).[1]

13    In or about September 2008, Ms. Doe agreed to be interviewed about the alleged rape.  The

14 interview took place on September 26, 2008.  *See* Sylvia Decl., Ex. C at M15 (police report).

15 Persons present at the interview were Jon Sylvia of the Martinez Police Department ("MPD"); Bob

16 Conner and Cynthia Hall, investigators with the Alameda County DA's Office; and Mr. McKenna.

17 *See* Flores Decl., Ex. A at A11 (statement of probable cause by Mr. Sylvia).

18    After conducting some additional investigation (*e.g.*, interviewing Ms. Doe's sister and

19 friend, both of whom spoke with Ms. Doe shortly after the alleged rape), Mr. Sylvia obtained search

20 and arrest warrants from a state court judge in early October 2008.  *See* Sylvia Decl., Ex. C at M25

21 (police report); Flores Decl., Ex. A at A5, A8 (search and arrest warrants).  Mr. Gressett was

22 arrested on October 2, 2008.

23    At or about the same time, the DA's Office contacted the Attorney General's ("AG") Office,

24 asking it to take over the investigation and – if appropriate – the prosecution of Mr. Gressett.  *See*

25 Flores Decl. ¶ 3.  Peter Flores, a Deputy AG, was assigned to be the lead attorney in the case.  *See*

26

27

28    [1] Although the Court previously granted Defendants' motion for the opinion letter to be filed
under seal, the Court finds that these specific portions of the letter need not be sealed.

United States District Court

For the Northern District of California

1   Flores Decl. ¶ 7.  The AG's investigation was conducted under the terms of a County investigative

2   protocol that has been in place for nearly 25 years.  The protocol

3           governs joint criminal investigations of specified categories of
            incidents which involve conduct by law enforcement agency
4           employees or operations and activities of law enforcement agencies.
            That investigative Protocol provides for involvement by the law
5           enforcement agency in whose jurisdiction the crime occurred (in this
            case, the Martinez Police Department [MPD]), the agency employing
6           the suspect (the Contra Costa County District Attorney's Office), and
            the prosecuting agency (the California Attorney General's Office).

7

8   Flores Decl. ¶ 6.

9           Ultimately, the AG's Office used some of the investigators from the County DA's Office for

10  the investigation of Mr. Gressett; this included Mr. Jackson and Mr. Mulligan.  *See, e.g.*, Flores

11  Decl. ¶ 10.  The AG's Office also used one of its own investigators, Imelda Ramirez-Doty, for the

12  investigation.  *See* Flores Decl. ¶ 10.  Mr. Sequeira (Assistant Chief Deputy DA) participated in

13  some of the witness interviews that were conducted (*e.g.*, interviews of Deputy DAs).  It is not clear

14  whether Mr. Sequeira was participating as part of the administrative investigation by the County, the

15  criminal investigation by the AG, or both.

16          Many witness interviews took place after Mr. Gressett was arrested, including a second

17  interview of Ms. Doe in early November 2008.  *See* Flores Decl. ¶ 18.  Notably, a number of third-

18  party witnesses provided testimony that was helpful to Mr. Gressett.  *See generally* Flores Decl., Ex.

19  B (probable cause statement by Ms. Ramirez-Doty).  For example, Amber Barrick, a former

20  girlfriend of Mr. Gressett, testified that she and Mr. Gressett always had consensual sex.  *See* Flores

21  Decl., Ex. B at A475 (probable cause statement by Ms. Ramirez-Doty).  Many Deputy DAs stated

22  that Mr. Gressett was credible and/or indicated Ms. Doe was not or might not be.  *See, e.g.*, Flores

23  Decl., Ex. B at A476-80 (probable cause statement by Ms. Ramirez-Doty).  Another Deputy DA,

24  Courtenay Bravmann (now Patterson) stated that she was told by another Deputy DA (Melissa

25  Smith) that was Ms. Doe was abducted and raped by a stranger.  *See* Boley Decl., Ex. FF at 2

26  (interview of Ms. Bravmann in October 2008).

27          Subsequently, on November 21, 2008, Mr. Gressett was charged with a twelve-count felony

28  complaint.  *See* Boley Decl., Ex. H (felony complaint).

United States District Court

For the Northern District of California

1    In April 2009, Ms. Doe filed a complaint against the County with the California Department

2  of Fair Employment and Housing ("DFEH"), asserting that the County had delayed in acting on her

3  claim of sexual assault by Mr. Gressett and that, by not hiring her, the County had retaliated against

4  her for making the claim.  *See* Walker Decl., Ex. G (Exhibit 3 to Kochly deposition) (DFEH

5  complaint).

6    In July 2009, Mr. Gressett was terminated from his position as a Deputy DA.  *See* TAC ¶ 86.

7    In September 2009, a mediation took place with respect to Ms. Doe's claim against the

8  County.  *See* Walker Decl., Ex. A at 152 (deposition of Mr. Baker).

9    On October 5, 2009, grand jury proceedings against Mr. Gressett began.  *See* Boley Decl.,

10  Ex. K at 37 (state court order).

11    On October 6, 2009, the County Board of Supervisors, in a closed session, approved of a

12  settlement ($450,000) with Ms. Doe.  *See* Walker Decl., Ex. G (Exhibit 4 to Kochly deposition)

13  (closed session order).

14    During grand jury proceedings that took place thereafter, the grand jury was not informed of

15  either Ms. Doe's claim against the County or the settlement.  On October 19, 2009, the grand jury

16  indictment issued.  *See* Boley Decl., Ex. K at 37 (state court order).  The AG's Office did not learn

17  about either Ms. Doe's claim or the settlement until several months after the grand jury proceedings

18  had concluded.  *See* Flores Decl. ¶ 31.

19    In January 2011, Mr. Gressett moved to dismiss the indictment.  *See* Boley Decl., Ex. J

20  (motion).

21    In February 2011, Mr. Gressett was reinstated to his job pursuant to a decision by an

22  arbitrator.  *See* Walker Decl., Ex. X (arbitration award).

23    On October 19, 2011, the state court granted Mr. Gressett's motion to dismiss the indictment.

24  *See* Boley Decl., Ex. K (state court order).  The state court acknowledged that "there was sufficient

25  probable cause to indict."  Boley Decl., Ex. K at 17 (state court order).  Indeed, it indicated that Ms.

26  Doe's testimony in and of itself "provided compelling evidence sufficient to support a finding of

27  probable cause."  Boley Decl., Ex. K at 44 (state court order).  However, the state court went on to

28  conclude that Mr. Gressett's due process rights under the California Constitution had been violated –

United States District Court

For the Northern District of California

thus warranting dismissal of the indictment – because (1) certain inadmissible evidence had been

offered for the grand jury's consideration (*e.g.*, Mr. McKenna's opinion that Ms. Doe was credible

beyond a reasonable doubt and evidence of Mr. Gressett's "bad character") *and* (2) the grand jury

had not been told about (a) Ms. Doe's DFEH claim against and settlement with the County and (b)

Ms. Doe's alleged statement that she had been raped by strangers.  *See* Boley Decl., Ex. K at 17-18

(state court order); *see also* Boley Decl., Ex. K at 3 (state court order).

Thus, according to the state court:

> even though there was sufficient probable cause to indict the
> defendant, because of the extent and nature of inadmissible evidence
> introduced to the grand jury, coupled with the prosecutor's failure to
> advise of its limited admissibility, when combined with the
> prosecutor's failure to disclose to the grand jury Ms. Doe's claim and
> settlement along with her alleged statement that she was raped by
> strangers was such that these cumulative errors violated defendant's
> right to due process under the State Constitution to not be indicted in
> the absence of a determination of probable cause by a grand jury
> acting independently and impartially.

Boley Decl., Ex. K at 3 (state court order).

Regarding probable cause and the potential impact of the due process violation resulting

from non-disclosure of the DFEH claim and settlement and Ms. Doe's alleged statement about a

rape by a stranger, the state court also stated:

> Here the court finds that there is such *an equal balance of
> reasonable probabilities* as to leave the court in serious doubt as to
> whether a properly informed grand jury would have declined to find
> probable cause to indict had it known of Ms. Doe's claim and
> settlement as well as her alleged claim she was abducted and raped by
> strangers evidence.  Having evaluated the record as a whole, taking
> into consideration all relevant factors, including the strength and
> nature of both the undisclosed exculpatory evidence and the probable
> cause evidence that was presented, it may be concluded that had the
> grand jury had knowledge of the omitted evidence there is a
> reasonable probability that they would not have returned an
> indictment.

Boley Decl., Ex. K at 63 (state court order) (emphasis added); *cf. People v. Mower*, 28 Cal. 4th 457,

484 (2002) (stating that, under the California law harmless error test, "[t]here is a reasonable

probability of a more favorable result . . . when there exists 'at least such an equal balance of

1    reasonable probabilities as to leave the court in serious doubt as to whether the error affected the

2    result'").

3         On or about February 8, 2012, the AG's Office notified Mr. Gressett that it did not intend to

4    refile charges against him. *See* Gressett Decl. ¶ 8.

5    A.   Claims

6         Mr. Gressett has asserted the following claims against Defendants:

7    (1)  A claim for malicious prosecution in violation of his First Amendment rights – against all

8         individual defendants. *See* 42 U.S.C. § 1983.

9    (2)  A claim for malicious prosecution in violation of his First Amendment rights – against the

10        County (with Mr. Kochly being identified as the final policymaker). *See id.*

11   (3)  A claim for defamation – against Mr. Sequeira (Assistant Chief Deputy DA) and Mr. Jackson

12        (investigator).

13        In his malicious prosecution claims, Mr. Gressett basically asserts that he was prosecuted

14   because of political animosity – he had previously opposed Mr. Yancey and Mr. Kochly in several

15   DA races and, for the 2010 DA race, he supported Mr. Peterson over Mr. O'Malley. *See* Opp'n at

16   28 (arguing that "Defendants were motivated to discredit Gressett for his past political participation

17   and deter his future political participation"). For his defamation claims, Mr. Gressett maintains that

18   Mr. Sequeira and Mr. Jackson made defamatory statements about him outside the context of the

19   criminal investigation.

20                              **II.   DISCUSSION**

21   A.   Legal Standard

22        Under Federal Rule of Civil Procedure 56(a), a party may seek summary judgment on a

23   claim or even part of a claim. "The court shall grant summary judgment if the movant shows that

24   there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

25   of law." Fed. R. Civ. P. 56(a).

26              The moving party has the burden of establishing the absence of a
                genuine dispute of material fact. The court must view the evidence in
27              the light most favorable to the non-movant and draw all reasonable
                inferences in the non-movant's favor. Although "[c]redibility
28              determinations, the weighing of the evidence, and the drawing of

United States District Court

For the Northern District of California

1
2
3
4

> legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient. . . ." "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."

5 *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049-50 (9th Cir. 2014).

6   B.   Malicious Prosecution

7       Mr. Gressett has asserted malicious prosecution claims under the rubric of the First

8   Amendment against all Defendants (*i.e.*, both the individual defendants and the County). As this

9   Court noted in one of its prior orders,

10
11
12
13
14
15
16
17

> "malicious prosecution claims under § 1983 are based on state law elements," and, under California law, a plaintiff may demonstrate malicious prosecution by establishing that the underlying prosecution ""(1) was commenced by or at the direction of the defendant and was pursued to a legal termination in his, plaintiff's favor; (2) was brought without probable cause; and (3) was initiated with malice.'" A malicious prosecution claim may also be based on the theory that, after the commencement of the prosecution, the defendant is made aware of new exculpatory evidence that negates probable cause to continue the prosecution but the defendant suppresses that evidence. Importantly, "whether the alleged misconduct occurred before or after initiation of the prosecution, the plaintiff 'must establish proximate or legal causation' between the misconduct and the initiation or continuation of the prosecution."

18   Docket No. 165, at 2-3 (order). The burden of proving each of these elements rests with Mr.

19   Gressett. *See Roberts v. McAfee, Inc.*, 660 F.3d 1156, 1163 (9th Cir. 2011); *Jackson v. Beckham*,

20   217 Cal. App. 2d 264, 267 (1964).

21       Defendants argue that they are entitled to summary judgment on the malicious prosecution

22   claims because: (1) there was no legal termination in Mr. Gressett's favor; (2) there was probable

23   cause to support the legal proceedings against Mr. Gressett; (3) their actions were not the proximate

24   cause of Mr. Gressett's claimed injuries as the AG's decision to file charges and/or the grand jury's

25   decision to return an indictment were intervening causes; and (4) Defendants are entitled to qualified

26   immunity for their actions. As discussed below, the Court agrees with Defendants on their first two

27   arguments.

28

8

United States District Court

For the Northern District of California

1.     <u>Favorable Termination</u>

A favorable termination is one that "indicate[s] the innocence of the accused." *Jaffe v. Stone*, 18 Cal. 2d 146, 150 (1941).   That is, "'the termination must reflect the merits of the action and the plaintiff's innocence of the misconduct alleged in the lawsuit.'" *Casa Herrera, Inc. v. Beydoun*, 32 Cal. 4th 336, 342 (2004).  If a dismissal is based "on technical grounds, for procedural reasons, or for any other reason not inconsistent with his guilt, it does not constitute a favorable termination." *Jaffe*, 18 Cal. 2d at 150.  Whether there was a favorable termination is a legal issue for the Court to decide.  *See Sierra Club Found. v. Graham*, 72 Cal. App. 4th 1135, 1149 (1999). However, if there is a genuine dispute of material fact with regard to the underlying factual circumstances, then summary judgment is not appropriate.  *See Daniels v. Robbins*, 182 Cal. App. 4th 204, 217 (2010) (stating that, "[i]f the evidence of the circumstances of the termination is conflicted, the determination of the reasons underlying the dismissal is a question of fact") (internal quotation marks omitted).

Here, Mr. Gressett contends that there was a termination in his favor based on (1) the state court's order dismissing the indictment against him and (2) the AG's decision not to refile charges. The Court does not find either argument persuasive.

a.     <u>State Court's Order Dismissing the Indictment</u>

The Court acknowledges that it previously found, in the context of a Rule 12(b)(6) motion, that the state court's order dismissing the indictment could be the basis of a favorable termination. The Court explained its reasoning as follows: "[T]he state court's findings in dismissing the indictment were not purely procedural, but hinged on the merits of the case against [Mr.] Gressett, and thus constituted a favorable termination."  Docket No. 118, at 18 (order).  Now that this case has reached the summary judgment phase, the Court has re-evaluated the state court's order.  Taking the totality of that order into consideration, the Court concludes that the state court's order, as a matter of law, was not a favorable termination.  In reaching this conclusion, the Court has reconsidered and reexamined two aspects of its earlier ruling.  First, it has applied a closer reading of the case law which defines favorable termination.  Second, it has reassessed and closely reviewed the Superior Court's order dismissing the indictment.  The Court's analysis follows.

United States District Court
For the Northern District of California

As to the case law on favorable termination, the California Supreme Court has at times used broad terminology, stating that, for a dismissal to be a favorable termination it must "tend[] to indicate the innocence of the accused." *Siebel v. Mittlesteadt*, 41 Cal. 4th 735, 741 (2007) (internal quotation marks omitted); *see also Jaffe*, 18 Cal. 2d at 150. State appellate courts have articulated a seemingly more rigorous standard, noting that a resolution which "leaves some doubt as to the defendant's innocence" is not a favorable termination. *Villa v. Cole*, 4 Cal. App. 4th 1327, 1335 (1992); *see also Pattiz v. Minye*, 61 Cal. App. 4th 822, 827 (1998) (stating that, "[i]f the resolution of the underlying action leaves some doubt concerning the plaintiff's innocence or liability, it is not a favorable termination . . . "). This apparent disparity in approach is less than it appears when the broader language in *Jaffe* and *Siebel* is viewed in context. In *Jaffe*, the California Supreme Court indicated that the key in determining whether there was a favorable termination is whether "'the termination of the proceeding [was] of such a character as *establishes or fairly implies*, lack of a reasonable ground for [the plaintiff's] prosecution.'" *Jaffe*, 18 Cal. 2d at 152 (emphasis added). This language implies that a termination that simply has *some* bearing on the merits is not enough; a closer relation is required. This is consistent with the Supreme Court's directive that "'the termination must reflect the merits of the action and the plaintiff's innocence of the misconduct alleged in the lawsuit,'" *Casa Herrera*, 32 Cal. at 342, and that "the judgment as a whole in the prior action" must be considered. *Siebel*, 41 Cal. 4th at 741 (internal quotation marks omitted). In accordance with these requisites, the California Courts of Appeal have held that the reasons underlying the termination must "'reflect[] the opinion of either the court or the prosecuting party that the action *would not succeed*.'" *Pattiz*, 61 Cal. App. 4th at 827 (emphasis added) (quoting *Pender v. Radin*, 23 Cal. App. 4th 1807, 1814 (1994) (emphasis added); *accord Awabdy v. City of Adelato*, 368 F.3d 1062, 1068 (9th Cir. 2004) (accord). Hence, the "tends to indicate the innocence of the accused" language of *Jaffe* was only a generalization; what controls is the more specific formulations of the favorable termination test found in *Jaffe* itself as well as other California Supreme Court and Court of Appeal decisions.

Consistent with the more rigorous test of the favorable termination is the fact that in the reported cases in which favorable termination has been found, there is a clear reflection of the

10

United States District Court

For the Northern District of California

accused's innocence in the prior dismissal.  For instance, favorable termination has been found

where there was a dismissal:  by a magistrate based on lack of evidence (*Jaffe*, 18 Cal. 2d at 149); by

the district attorney for lack of evidence (*Jackson*, 217 Cal. App. 2d at 269); for failure to prosecute

where there is a clear inference that the claim was abandoned (*Minasian v. Sapse*, 80 Cal. App. 3d,

823, 827-28 (1978)); or based on the parol evidence rule which has been deemed a substantive, not a

procedural or technical ground (*Herrera v. Beydown*, 32 Cal. 4th 336, 345-46 (2004)).  On the other

hand, termination on grounds of statute of limitations (*Lackner v. LaCroix*, 25 Cal. 3d 747, 751

(1980)), statute of fraud (*Herrera*, 32 Cal. 4th at 345), failure to comply with discovery obligations

(*Pattiz*, 61 Cal. App. 4th at 827), or by settlement (*Ferreira v. Gray, Cary, Ware & Freidenrich*, 87

Cal. App. 4th 409, 413 (2001)), has been held not to reflect to innocence of the accused and hence

does not constitute a favorable termination.  In those instances, the dismissal does not reflect the

"opinion of either the Court or the prosecuting party that the action would not succeed."  *Pattiz*, 61

Cal. App. 4th at 827; *see also Awabdy*, 368 F.3d at 1068.

       With this understanding, the Court now turns to the state court's dismissal of the indictment.

In the underlying criminal case against Mr. Gressett, the state court did not dismiss the indictment

because it found Mr. Gressett was innocent of the alleged rape or that there was a lack of reasonable

ground for the prosecution as required by *Jaffe* and *Casa Herrera*.  Indeed, as noted above, on

multiple occasions, the state court expressly stated that there *was* probable cause for the AG to

prosecute Mr. Gressett.  *See, e.g.*, Boley Decl., Ex. K at 3, 17, 44 (state court order).  Notably,

although the Superior Court granted the motion to dismiss the indictment on state constitutional due

process grounds, it denied Mr. Gressett's motion to dismiss on the basis of California Penal Code §

995.  Section 995 provides that an indictment shall be set aside where "the defendant has been

indicted without reasonable or probable cause."  Cal. Pen. Code § 995.  The state court's finding of

probable cause is contrary to there being a favorable termination because it goes against Mr.

Gressett being innocent with respect to the alleged rape.  *Compare Jaffe*, 18 Cal. 2d at 151-52

(stating that, if a "complaint is dismissed for failure to produce a case against the defendant, there is

a favorable termination sufficient to form the basis of a tort action"; also stating that a favorable

1  termination is on "of such character as establishes or fairly implies, lack of a reasonable ground for

2  [the plaintiff's] prosecution").

3          At the hearing, Mr. Gressett argued that the state court's finding of probable cause was based

4  solely on information that was actually presented to the grand jury, not the withheld information.

5  According to Mr. Gressett, once the state court considered information that was withheld from the

6  grand jury, the state court indicated it was reasonably probable that the grand jury would have

7  declined to find probable cause.

8          It is true that the state court found there was a reasonable likelihood that, had it been

9  presented with all the information, including the withheld exculpatory evidence, the grand jury may

10 have decided not to return the indictment.  *See* Boley Decl., Ex. K at 63 (stating that "it may be

11 concluded that had the grand jury had knowledge of the omitted evidence there is a reasonable

12 probability they would not have returned an indictment").  However, the court's estimate of the

13 potential impact upon the *grand jury's* decision is a different question from whether the *court itself*

14 found there was probable cause.  In concluding there was in fact probable cause to indict, the state

15 court was well aware of and indeed discussed the omitted evidence in the same sentence in which it

16 stated there was probable cause.  For example, the state court noted:

17              [E]ven though there was sufficient probable cause to indict the
              defendant, because of the extent and nature of inadmissible evidence
18              introduced to the grand jury, coupled with the prosecutor's failure to
              advise of its limited admissibility, when combined with the
19              prosecutor's failure to disclose to the grand jury Ms. Doe's claim and
              settlement along with her alleged statement that she was raped by
20              strangers was such that these cumulative errors violated defendant's
              right to due process under the State Constitution to not be indicted in
21              the absence of a determination of probable cause by a grand jury
              acting independently and impartially.

22

23 Boley Decl., Ex. K at 3 (state court order); *see also* Boley Decl., Ex. K at 44 (state court order)

24 (stating "[t]he court does not find had the grand jury only known of Ms. Doe's claim and monetary

25 settlement that such evidence on its own would have been sufficient to have raised doubts as to the

26 veracity of Ms. Doe's testimony, which the court finds provided compelling evidence sufficient to

27 support a finding of probable cause").

28

Even if there were some ambiguity as to whether the state court's finding of probable cause accounted for the exculpatory evidence withheld from the grand jury, there is no ambiguity that the dismissal on due process grounds was based not on Mr. Gressett's innocence, but rather on irregularity in the prosecutorial process which undermined the independent role of the grand jury. Specifically, the state court concluded that due process was violated because the grand jury's ability to act independently and impartially had been compromised as a result of the failure to disclose to the grand jury the information about Ms. Doe's claim and settlement and alleged rape by strangers. *See* Boley Decl., Ex. K at 42-44 (state court order). The state court found the failure to present exculpatory evidence undermined "the protective role of the grand jury by ensuring that the indictment is returned by an impartial and independent grand jury." Boley Decl., Ex. K at 52 (state court order). In a revealing passage the state court summarized its holding as follows:

> The court has evaluated the record as a whole, taking into consideration all relevant evidence, including the strength and nature of both the undisclosed exculpatory evidence and the evidence supporting the probable cause finding necessary to indict. Probable cause may exist although there may be some room for doubt. In the present case the court finds itself left with serious doubt as to whether a properly informed grand jury would have found probable cause to indict had it known of Ms. Doe's claim and settlement as well as her claim she was abducted and raped by strangers.

Boley Decl., Ex. K at 57-58 (state court order). It is for that reason that the state court found, "it may be concluded that had the grand jury had knowledge of the omitted evidence there is a reasonable possibility that they would not have returned an indictment." *Id.* at 63.

Hence, the state court dismissed the indictment on procedural due process grounds based on the failure to disclose all evidence to the grand jury, thus compromising its independent role. While the court found the omitted evidence sufficiently material to cast doubt on whether the grand jury would have indicted had it been presented with the evidence, the court did not disclaim its own view repeated several times in its order that there was probable cause to support an indictment. The court never opined there was not sufficient cause for the jury *to* indict. In this regard, the state court's dismissal of the indictment (which was without prejudice to re-indictment) was analogous to a judge granting a new trial, an act which generally does not constitute favorable termination. *Cf. DiBlasio v. City of New York*, 102 F.3d 654, 658 (2d Cir. 1996) (in § 1983 malicious prosecution case, stating

United States District Court
For the Northern District of California

1   that, "[a]lthough in some instances a habeas court may terminate a criminal proceeding in the

2   defendant's favor, the reversal of a conviction and remand for a new trial does not constitute such a

3   termination"); *Owens v. Balt. City State's Attys. Office*, 767 F.3d 379, 390 (4th Cir. 2014) (noting

4   that "[t]he grant of a new trial does not terminate the proceedings against the defendant 'in such a

5   manner that [they] cannot be revived'" but rather "provides a procedural victory, which simply

6   postpones the proceedings' ultimate outcome").

7          And in any event, even if Mr. Gressett's contention that the state court's probable case

8   finding was based solely on the information presented to the grand jury (rather than the complete

9   record), the fact remains that the court – when considering the withheld information as well –

10  ultimately concluded that it was *equally* reasonably probable that the grand jury could have found

11  probable cause or no probable cause. *See* Boley Decl., Ex. K at 63 (state court order).  A

12  determination that a reasonable jury could find probable cause does not establish or fairly imply Mr.

13  Gressett's innocence.

14         The Court therefore concludes that, as a matter of law, the state court's order dismissing the

15  indictment was not a termination favorable to Mr. Gressett.

16                    b.    AG's Decision Not to Refile Charges

17         Implicitly recognizing the difficulty with relying on the state court order as a basis for

18  favorable termination, Mr. Gressett, at the hearing, focused instead on the AG's decision not to refile

19  charges against him.  *See Awabdy*, 368 F.3d at 1068 (stating that " dismissal in the interests of

20  justice satisfies [the favorable termination] requirement if it reflects the opinion of the prosecuting

21  party or the court that the action lacked merit or would result in a decision in favor of the

22  defendant").  In a prior order (at the 12(b)(6) phase), the Court indicated that this fact could be

23  favorable to Mr. Gressett because "it is a reasonable inference that one does not simply abandon a

24  meritorious action once instituted."  Docket No. 165, at 5 (order).

25         The burden of proving favorable termination rests with the plaintiff.  *See Williams v. Taylor*,

26  129 Cal. App. 3d 745, 754 (1982) (stating that, for a malicious prosecution claim, the plaintiff has

27  the burden of demonstrating, *inter alia*, favorable termination); *see also Antounian v. Louis Vuitton*

28  *Malletier*, 189 Cal. App. 4th 438, 455 (2010).  In the case at bar, to establish that the AG's decision

United States District Court

For the Northern District of California

1  not to refile was not a favorable termination, Defendants have now submitted (at the summary

2  judgment phase) a declaration from Mr. Flores, a Deputy AG and the lead attorney working on the

3  prosecution.  In the declaration, Mr. Flores testifies as follows:

> Following the order by Judge Hastings dismissing the indictment, I
> and the Attorney General's Office trial team were prepared to refile a
> criminal complaint . . . . I contacted Ms. Doe, who had by then moved
> to Florida.  She told me that she was not willing to return to California
> to testify in the criminal trial.  Because there was no way of
> successfully proceeding without her testimony and because I could not
> compel her to testify at trial, I and the trial team decided not to refile
> the complaint at that time.  Ms. Doe's unwillingness to testify at the
> criminal trial was the only reason I decided not to refile criminal
> charges against Mr. Gressett.  Nevertheless, I and the trial team would
> re-evaluate proceeding with a criminal prosecution if Ms. Doe agreed
> to return to California and testify.

11  Flores Decl. ¶ 32.  Mr. Flores's declaration is consistent with the deposition testimony of his

12  supervisor, Joyce Blair.  For example, in her deposition, Ms. Blair stated that the AG decided not to

13  refile charges against Mr. Gressett because "[t]he victim had moved out of state.  She had moved on

14  and was not interested, at that time, in participating."  Walker Decl., Ex. B at 53 (Blair deposition).

15  Based on the testimony of Mr. Flores and Ms. Blair, Defendants argue that it can no longer be

16  inferred that the AG's decision not to refile reflected the merits of the action and Mr. Gressett's

17  innocence.

18        Failure to reinstitute prosecution, not because of perceived inability to prove the

19  prosecution's case for lack of evidence, but because of the unavailability of an essential witness, is

20  not a favorable termination.  *See, e.g.*, *Deal v. Alegre*, No. C 04-03778 PVT, 2006 WL 436144, at *4

21  (N.D. Cal. Feb. 21, 2006) (stating that neither key prosecution witness's "unavailability, nor the

22  termination of his employment for failures to follow store policies and procedures, indicates that [the

23  plaintiff] was innocent of the crime charged").  Mr. Gressett contends that the testimony of Mr.

24  Flores and Ms. Blair on this point should be stricken or discounted in its entirety because both

25  individuals asserted privilege when he tried to find out more information about the AG's decision

26  not to refile.  *See, e.g.*, Walker Decl., Ex. B at 267-68 (Blair deposition) (stating that, while an

27  evaluation on refiling was done after the indictment was dismissed, "I won't tell you what went into

28  the evaluation"); Walker Decl., Ex. C at 16 (Flores deposition) (counsel for Mr. Flores stating that

United States District Court

For the Northern District of California

"the Attorney General's position is that questions calling for the mental impressions and evaluation of evidence by the prosecution in the underlying criminal case is privileged under the work product, prosecutorial immunity and deliberative process privileges"). But the authority on which Mr. Gressett relies is not availing. *Beck v. City of Upland*, 527 F.3d 853 (9th Cir. 2008), addressed the ramifications of an invocation of privilege by a prosecutor in the context of whether there should be a presumption of prosecutorial independence which breaks the chain of causation between the defendant's wrongful acts and the initiation or maintenance of the prosecution. *See id.* at 869 (stating that, "where invocations of privilege render 'relevant evidence' concerning the prosecutor's decision to prosecute unavailable, no presumption of prosecutorial independence arises, and the plaintiff need not rebut it"). The issue of prosecutorial independence is related to causation (*i.e.*, whether the prosecutor's actions are an intervening cause) and does not concern the issue of favorable termination at all.

The question for Mr. Gressett is why he failed to take any action himself once Mr. Flores and Ms. Blair invoked the various privileges. Mr. Gressett easily could have moved to compel – especially as the work product and deliberative process privileges are only qualified privileges and he could also raise the argument of waiver – but he did not. In failing to act, he assumed the risk of what this would mean for him at summary judgment where he, as the party with the burden of proof, would have to show a genuine dispute of material fact with regard to there being a favorable termination. Rather than exercising reasonable diligence in trying to uncover a reason for not re-filing charges which would constitute a favorable termination, Mr. Gressett rested on the record and placed in one basket his motion to strike the unfavorable evidence. Being the party charged with the burden of proof, Mr. Gressett now must live with the consequence of his gamble.

At the hearing, Mr. Gressett argued that this failure was inconsequential because, ultimately, whether Mr. Flores and Ms. Blair's testimony about the decision not to refile was believable was a credibility issue, and credibility issues cannot be resolved at summary judgment. But Mr. Gressett fails to take into account that " the general rule is that specific facts must be produced in order to put credibility in issue so as to preclude summary judgment. Unsupported allegations that credibility is in issue will not suffice." Wright, *et al.*, Fed. Prac. & Proc. § 2726; *see also Frederick S. Wyle*

United States District Court

For the Northern District of California

*Professional Corp. v. Texaco, Inc.*, 764 F.2d 604, 608 (9th Cir. 1985) (stating that "[n]either a desire to cross-examine affiant nor an unspecified hope of undermining his or her credibility suffices to avert summary judgment, unless other evidence about an affiant's credibility raises a genuine issue of material fact"); *Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120, 130 (3d Cir. 1998) (stating that "[i]t is by now axiomatic that 'a nonmoving party . . . cannot defeat summary judgment simply by asserting that a jury might disbelieve an opponent's affidavit to that effect'").  Here, Mr. Gressett has failed to point to any specific facts that would raise an issue with regard to Mr. Flores and/or Ms. Blair's credibility.

Moreover, Mr. Gressett did have an opportunity to question Ms. Doe during her deposition about her unwillingness to testify, and there is nothing in the record to suggest she refused to provide testimony on this point.  When questioned by defense counsel, Ms. Doe explained that she did not want to testify against Mr. Gressett in a criminal case because she wanted to put the incident behind her and move on with her life (*e.g.*, get married and start a family), something she could not do when the criminal process could take years and with a great deal of publicity.  *See* Boley Decl., Ex. O at 66-68 (Doe deposition).  Ms. Doe also indicated that she was reluctant to testify because there was a low likelihood of getting a conviction – not because the case lacked merit but because "[y]ou are asking a lot of a jury to hear that someone was willing to have consensual sex with another person but did not consent to that particular kind of sex.  Juries don't want to hear that.  It's hard for juries to get that."  Boley Decl., Ex. O at 68 (Doe deposition).

Accordingly, the Court is left with uncontested evidence that the AG's Office decided not to refile solely because Ms. Doe no longer wanted to testify for reasons that do not indicate a lack of merit to the charges.  *See Deal*, 2006 WL 436144, at *4 (stating that neither key prosecution witness's "unavailability, nor the termination of his employment for failures to follow store policies and procedures, indicates that [the plaintiff] was innocent of the crime charged").  Based on this record, Mr. Gressett has failed to establish a favorable termination as a matter of law.

///

///

///

United States District Court
For the Northern District of California

2.      Probable Cause

Based on the Court's ruling on favorable termination alone, Defendants are entitled to summary judgment on the malicious prosecution claim.  However, there is also an independent ground for summary judgment – *i.e.*, the existence of probable cause for the prosecution.

"'Probable cause exists when there is a fair probability or substantial chance of criminal activity.'" *Lacey v. Maricopa County*, 693 F.3d 896, 918 (9th Cir. 2012).  The basic inquiry is "whether, under the totality of the circumstances, a prudent officer would have believed that there was a fair probability that [the defendant] committed a crime."[2]  *United States v. Collins*, 427 F.3d 688, 691 (9th Cir. 2005).  Conclusive guilt is not necessary under this standard, nor "certainty or even a preponderance of the evidence," *United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006), but "[m]ere suspicion, common rumor, or even strong reason to suspect are not enough." *Torres v. City of L.A.*, 548 F.3d 1197, 1206-07 (9th Cir. 2008) (internal quotation marks omitted). Probable cause is a question of law for the Court to decide.  *See* Docket No. 165, at 8 (order).  A jury, however, must resolve any dispute concerning the underlying facts.  *See Drummond v. Desmarais*, 176 Cal. App. 4th 439, 453 (2009) (noting that, with respect to probable cause, a jury must resolve any dispute concerning the facts, but "[i]t is a question of law for the court . . . whether the facts support a tenable claim").

In the instant case, Mr. Gressett, again tasked with the burden of proof, contends that there are genuine disputes of material fact with regard to the underlying facts, which should preclude summary judgment.  But, based on the Court's assessment of the record, there are either no such disputes or, even if there are such disputes (*e.g.*, whether Defendants harbored political animus against Mr. Gressett), the evidence, even when construed in Mr. Gressett's favor, is insufficient to negate probable cause.  As discussed below, the Court concludes, as a matter of law, that there was

---

[2] As indicated by the language "would have believed," probable cause is assessed at the time of the events at issue.  At the hearing, Mr. Gressett also conceded such.  *Cf. United States v. Fowlkes*, 770 F.3d 748, 763 (9th Cir. 2014) (in evaluating whether there was probable cause justifying a warrantless entry, stating that, "[e]xamining the totality of the circumstances known to the officers at the time, the officers here had probable cause sufficient to believe there was contraband at [the] apartment").

**United States District Court**
For the Northern District of California

1 sufficient probable cause for the criminal prosecution against Mr. Gressett to be initiated and

2 maintained after his arrest.[3]

3        As previously noted, probable cause simply requires that there be a fair probability that a

4 crime was committed.  Here, a prudent officer would have believed that Mr. Gressett sexually

5 assaulted Ms. Doe without consent, based on, *inter alia*:

6  •    Ms. Doe's detailed account of what had allegedly taken place.  *See Stoot v. City of Everett*,

7        582 F.3d 910, 919 (9th Cir. 2009) (stating that "[l]aw enforcement officers may obviously

8        rely on statements made by the victims of a crime to identify potential suspects"; adding that

9        "such information does not, on its own, support a finding of probable cause if the

10       information is not reasonably trustworthy or reliable").

11 •    Ms. Doe's contacting, on the day of the alleged rape, a friend from law school who used to

12       be a nurse.  *See* Sylvia Decl., Ex. C at M20 (Police report).  The friend believed Ms. Doe to

13       be "absolutely truthful," stated that Ms. Doe was "hysterical and couldn't think straight," and

14       noted that she talked to Ms. Doe several times daily during the weekend after the alleged

15       rape and that Ms. Doe continued to be hysterical and confused.  Sylvia Decl., Ex. C at M24

16       (Police report).

17 •    Ms. Doe's contacting, on the morning after the alleged rape, her sister.  Her sister flew out

18       that same evening – from Indiana – to be with Ms. Doe in California.  Ms. Doe's sister

19       believed Ms. Doe to be truthful and stated that, when she visited Ms. Doe, Ms. Doe "was a

20       completely different person," "was completely devastated," "acted like something really bad

21       happened to her," and "was visibly in pain, particularly while walking."  Sylvia Decl., Ex. C

22       at M26 (Police report).

---

[3] At the hearing, Mr. Gressett argued that, in assessing probable cause, the Court should consider not only what was known to Defendants at the time but also what should have been known. While it is not clear that this is the right legal standard, for purposes of this opinion, the Court assumes that it is.  That is, the Court has taken into account all of the evidence that Mr. Gressett has pointed to in support of his position that there was no probable cause for the initiation of the criminal prosecution or for its continuance.

- Ms. Doe's seeking medical treatment after the alleged rape (even if she did not ultimately suffer from a bladder infection or ovarian damage). *See* Boley Decl., Ex. K at 27 (state court order).

- Ms. Doe's taking time off after the alleged rape. *See* Flores Decl., Ex. A at A14 (probable cause statement by Mr. Sylvia).

- The overall consistency in Ms. Doe's recounting of the events (*e.g.*, the use of a gun, an ice pick, and handcuffs) to various persons, including her friend, her sister, Mr. McKenna, and even the investigators.[4]

- Ms. Doe's demeanor during her September 2008 interview with, *inter alia*, MPD law enforcement. *See* Sylvia Decl., Ex. C at M15 (MPD police report) (stating that "[i]t was obvious that she was upset about the event as she cried several times throughout the interview" and that "[w]e had to take several short pauses during the interview to gain her composure").

- The recovery from Mr. Gressett's residence of items described by Ms. Doe as being used during the alleged rape, including a handgun and icepick and handcuffs. *See* Flores Decl., Ex. B at A473 (probable cause statement of Ms. Ramirez-Doty).

- Ms. Doe's DNA being found on the handle of the ice pick which Mr. Gressett is alleged to have inserted into Ms. Doe's vagina.[5] *See* Flores Decl. ¶ 25.

- The recovery from Mr. Gressett's residence of a County case file regarding a pending rape case, which involved a victim who had been tied up, sodomized, and then washed by the assailant – details bearing similarity to those described by Ms. Doe in her case for which Mr. Gressett did not have a compelling explanation. *See* Flores Decl., Ex. B at A476 (probable cause statement of Ms. Ramirez-Doty); Boley Decl., Ex. K at 8 (state court order) (noting

---

[4] The Court acknowledges that there may have been some inconsistencies – *e.g.*, regarding the time of day that the events took place, what Mr. Gressett said to Ms. Doe during the alleged rape, etc. However, these inconsistencies were, relatively speaking, not fundamental.

[5] In support of his opposition to Defendants' motion, Mr. Gressett offered a declaration from an expert stating his view that Ms. Doe was simply not excluded as a source of the DNA. *See* Fedor Decl. ¶ 4. But even under this narrower view, the evidence still supported there being probable cause.

that "[Mr. Gressett] had been assigned the case, however the grand jury heard evidence that the case had already proceeded to a preliminary hearing in August 2007 and had been in a holding pattern from April 1, 2008 to July 2008 [and] [t]here was evidence that it was a redacted copy of the report, making it difficult to work from and there was no need for a deputy district attorney to take such a report home[;] [t]his provided further circumstantial evidence to support an inference that the sexual scenarios described by the defendant were connected to his own personal sexual fantasies.").

All this is not to say that Ms. Doe's credibility was unassailable.  As Mr. Gressett has argued, there were questions raised about Ms. Doe's credibility based on, *e.g.*, statements about Ms. Doe made by other Deputy DAs, inconsistencies in Ms. Doe's version of the events, Ms. Doe's sending a pornographic photo to Mr. Gressett the day after the alleged rape, and a third party's failure to notice anything wrong with her immediately after the alleged rape.  But although these facts "diminished" Ms. Doe's credibility, her credibility was not "seriously" or "entirely undermined" as a result, particularly because there was evidence corroborating her account.  *United States v. Ruiz*, 758 F.3d 1144, 1150, 1152 (9th Cir. 2014) (concluding that there was "enough evidence in the record corroborating [the victim's and his girlfriend's] statements to 'diminish[] the adverse effect' of their credibility issues in the context of the probable cause inquiry"); *cf. Illinois v. Gates*, 462 U.S. 213, 238 (1983) (stating that, to determine whether an informant's tip is sufficient to support a finding of probable cause, a court must use a totality-of-the-circumstances approach, which takes into consideration, *inter alia*, the informant's veracity or reliability and his basis of knowledge).

In his papers, Mr. Gressett contends still that, following his arrest, "significant evidence was discovered that indicated that [he] was innocent, that the complaining witness was not credible, and that those who were investigating him were motivated by extreme malice."  Opp'n at 30.  But this argument is unavailing.

As an initial matter, Mr. Gressett's focus on the investigators' malice is misplaced.  For the tort of malicious prosecution, the element of malice by prosecutors is separate and distinct from the element of probable cause.  Even if the investigators did harbor malice against Mr. Gressett, that fact

United States District Court
For the Northern District of California

1    – in and of itself – is not exculpatory evidence which would negate or help negate probable cause.

2    More would need to be shown – *e.g.*, that inculpatory evidence was actually fabricated as a result of

3    the investigators' malice and thus cannot be included in the calculus of probable cause.  There is no

4    assertion that the inculpatory evidence described above was fabricated by malicious prosecutors.

5         As for Mr. Gressett's other assertions, his brief does not make clear what "significant

6    evidence was [later] discovered that indicated that [he] was innocent" or that Ms. Does "was not

7    credible."  Opp'n at 30.  In fact, much of Mr. Gressett's fact section focuses on information already

8    known *before* he was arrested – *e.g.*, that there were political overtones to the case, that Defendants

9    did not take immediate action after being alerted to Ms. Doe's claim of rape, that Defendants or

10   others knew or considered Ms. Doe unstable, that Ms. Doe had or could have had a motive to lie

11   about the rape (*i.e.*, to keep her job), and that Mr. Gressett was arrested with only limited witness

12   interviews taking place.  But, in its prior orders, the Court has already given an explanation as to

13   why this pre-arrest information is of limited exculpatory value, not enough to negate or put into

14   serious question Ms. Doe's credibility.[6]  Moreover, these assertions largely go to the Defendants'

15   motives with respect to the conduct of the investigation, not the existence of probable cause.  To the

16   extent these assertions are relevant to show that exculpatory information was either not developed or

17   slow in developing because of Defendants' actions, Mr. Gressett has failed to demonstrate that the

18   exculpatory evidence now presented by Defendants negates probable cause; the inculpatory

19   evidence was and remains substantial.

20        As for the post-arrest information to which Mr. Gressett points, a significant problem is that

21   much of it is not exculpatory at all.  For example, Mr. Gressett takes note of Deputy DAs who

22   testified in their depositions that Mr. Sequeira intimidated them during their interviews.  But even

23   accepting that testimony, the Deputy DAs went on to say that they did not withhold any exculpatory

24   information as a result of the intimidation.  *See, e.g.*, Boley Decl., Ex. U at 56-57 (Bravmann

25

26       [6] In its prior orders, the Court did not address Defendants' failure to take immediate action.
But even this fact is of limited value to Mr. Gressett.  Mr. Gressett argues that the fact is exculpatory

27   because it shows that Defendants did not themselves believe Ms. Doe's story – thus, they did
nothing.  But even accepting such, that does not put into serious question Ms. Doe's credibility.  As

28   the Court noted in its prior orders, her sister and her friend – both of whom Ms. Doe contacted
shortly after the alleged rape – *did* believe her.

United States District Court
For the Northern District of California

deposition) ("I think I got out everything I wanted to get out."); Boley Decl., Ex. V at 132 (Tavenier deposition) ("I can't think of any one thing I would have necessarily said that I was dissuaded from saying because of how he was acting.").  As another example, Mr. Gressett maintains that Mr. Jackson must have talked to Ms. Doe prior to her second interview in November 2008 because the transcript of the interview suggests such on its face.  But even accepting that, and even accepting that she was effectively "prepped . . . on the questions that were going to be asked," Opp'n at 17, Mr. Gressett does not explain what exculpatory information was withheld as a result or what inculpatory information was fabricated.

Other post-arrest information on which Mr. Gressett relies has at best limited exculpatory value.  For example, in her pre-arrest interview, Ms. Doe stated that she did not want to have anal sex with Mr. Gressett because "I just don't do that."  Boley Decl., Ex. G at 2 (September 2008 interview of Ms. Doe).  Mr. Gressett asserts that this is inconsistent with what Ms. Doe told other Deputy DAs, as they testified in their post-arrest interviews.  But even if Ms. Doe had previously had anal sex, as one Deputy DA claimed in a post-arrest interview, *see* Walker Decl., Ex. H at 23 (McCosker deposition) (testifying that Ms. Doe said she had had anal sex), that does not mean that Ms. Doe was necessarily willing to have anal sex again, particularly under the violent circumstances she described.  *Cf. Ullah v. Office of the DA*, No. 07 Civ. 2687 (DAB) (GWG), 2009 U.S. Dist. LEXIS 61607, at *16-17 (S.D.N.Y. July 20, 2009) (report and recommendation, ultimately approved, adopted, and ratified) (noting that "the police could have reasonably believed that Morton might have consented to have nude pictures taken of her but not consented to have sexual intercourse" and that, "even if Morton had consented to some sexual activity, this would not eliminate the possibility that this consent could end over the course of the night").  As another example, Mr. Gressett points to the Jesse DeGuzman incident.  Ms. DeGuzman was a prostitute "who [had] accused Mr. Gressett of paying for sex with her in exchange for leniency in her boyfriend's case."  TAC ¶ 61.  Mr. Gressett's theory seems to be that Defendants conspired with Mr. O'Malley to have Ms. DeGuzman come forward with this inculpatory evidence.  But even accepting that, the inculpatory evidence went nowhere; no charges were ever brought against Mr. Gressett. More important, even if Mr. Gressett did not do anything wrong vis-a-vis the DeGuzman case, that

United States District Court

For the Northern District of California

1   does not thereby negate potential wrongdoing in Ms. Doe's case, especially when there was no

2   dispute that there was sex in Ms. Doe's case; the only question was whether the sex was consensual.

3   As a final example, Mr. Gressett takes note that, post-arrest, he learned of the opinion letter that Mr.

4   Kochly obtained from Mr. Mayer, which advised Mr. Kochly to immediately investigate Ms. Doe's

5   rape claim (but Mr. Kochly did not).  But, at best, this evidence simply suggested that Defendants

6   may have questioned Ms. Doe's credibility.  This does not detract from the fact that others – namely,

7   her sister and friend whom Ms. Doe spoke with shortly after the alleged rape – found Ms. Doe to be

8   credible.

9        At the end of the day, the best post-arrest exculpatory evidence that Mr. Gressett has pointed

10   to is: (1) Ms. Doe's filing of civil claim against the City, which ultimately settled for $450,000, and

11   (2) the testimony of Ms. Bravmann (now Patterson), a Deputy DA, that she was told by another

12   Deputy DA – Ms. Smith – that Ms. Doe was abducted and raped by a stranger.  *See* Boley Decl., Ex.

13   FF at 2 (interview of Ms. Bravmann in October 2008).  Both pieces of evidence do call into question

14   Ms. Doe's credibility.  But in a prior order, the Court has explained why the first piece of evidence –

15   at least by itself – is not significantly exculpatory:

16               [A]lthough the DFEH charge and settlement could be indicative of
              [Ms. Doe's] motivation to lie, they could also be indicative of the truth
17               of her rape allegation, as she consistently alleged in two separate fora
              that she was subjected to sexual assault. [Also,] Plaintiff does not
18               allege any sort of temporal nexus between [Ms. Doe's] allegation of
              rape and her DFEH charge and settlement that would suggest they
19               were part of an overall scheme on her part.

20   Docket No. 118, at 33 (order).  Ms. Doe gave testimony and statements about the alleged rape long

21   before she filed a DFEH claim.  *Cf.* Fed. R. Evid. 801(d)(1)(B) (admissibility of witness's prior

22   consistent statement to rebut charge of recent fabrication).  As for the second piece of evidence, the

23   interview of Ms. Bravmann also reflects that Ms. Smith later told Ms. Bravmann that she "'knew it

24   was Gressett the whole time, I just couldn't tell you for obvious reasons.'" Boley Decl., Ex. FF at 3

25   (interview of Ms. Bravmann in October 2008).  While Ms. Bravmann did question Ms. Smith's

26   claim – stating that Ms. Smith truly seemed to believe there had been a stranger rape when they first

27   talked – Ms. Bravmann was ultimately equivocal in her testimony on this point.  *See, e.g.*, Boley

28   Decl., Ex. FF at 7 (interview of Ms. Bravmann in October 2008 ("I thought about it since then and

United States District Court

For the Northern District of California

1    I'm like, *Well maybe she did know* . . . . I mean really can't tell whether she knew or didn't know.")

2    (emphasis in original).  Significantly, other than this double hearsay, there is no direct evidence that

3    Ms. Doe made such a claim.  Indeed, in her deposition testimony, Ms. Doe denied telling Melissa

4    Smith that she had been abducted and sexually assaulted by strangers.  *See* Docket No. 200-1, at 71

5    (deposition of Ms. Doe) (sealed).

6            In short, while the two pieces of evidence were potentially exculpatory, calling into question

7    to some extent Ms. Doe's credibility, neither was particularly strong exculpatory evidence and was

8    not enough to substantially discredit Ms. Doe's story, particularly in light of the corroborating

9    evidence for her claim (*e.g.*, the statements of her sister and her friend to whom Ms. Doe talked

10   shortly after the alleged rape).  *See Collins*, 427 F.3d at 691 (asking "whether, under the totality of

11   the circumstances, a prudent officer would have believed that there was a fair probability that [the

12   defendant] committed a crime").  Admittedly, the state court in its order dismissing the indictment

13   found it reasonably probable that a grand jury could have declined to indict had it known this

14   information.  But as noted above, the state court's order also indicated that it was equally probable

15   that a grand jury would still have found probable cause with the information in hand.  Further, as

16   noted above, the state court was of the view there was probable cause to indict even in light of all the

17   evidence.

18           Accordingly, the Court concludes that, as a matter of law, there was sufficient probable cause

19   to initiate and thereafter maintain the criminal prosecution against Mr. Gressett.

20   C.     Defamation

21           In addition to his malicious prosecution claims against the individual defendants and the

22   County, Mr. Gressett has brought a defamation claim against two of the individual defendants: Mr.

23   Sequeira (Assistant Chief Deputy DA) and Mr. Jackson (investigator).

24           1.     Mr. Sequeira

25           Based on the record before the Court, the alleged defamation by Mr. Sequeira consists of the

26   following:

27

28

United States District Court

For the Northern District of California

(a)     Mr. Sequeira's referring to Mr. Gressett as a sexual deviant during the witness interviews of David Brown and Ms. Zelis (both Deputy DAs).  *See* Boley Decl., Ex. W at 2 (interrogatory response).

(b)     Mr. Sequeira's referring to Mr. Gressett as a sexual deviant or a deviant during a conversation in which Mr. Gressett was involved, with the conversation taking place before Mr. Gressett's October 2008 arrest.  *See* Boley Decl., Ex. U at 126-27 (Bravmann deposition).

The Court grants Mr. Sequeira partial summary judgment with respect to the defamation claim based on (a) above.  Even if Mr. Sequeira referred to Mr. Gressett as a sexual deviant during witness interviews, his conduct is protected by California Government Code § 821.6.  That statute provides as follows: "A public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause."  Cal. Gov't Code § 821.6.  Immunity under the statute "is not limited to claims for malicious prosecution, but also extends to other causes of action arising from conduct protected under the statute, including defamation."  *Gillan v. City of San Marino*, 147 Cal. App. 4th 1033, 1048 (2007) (also stating that "California courts construe section 821.6 broadly in furtherance of its purpose to protect public employees in the performance of their prosecutorial duties from the threat of harassment through civil suits").  In addition, immunity under the statute has been construed to cover "not only the act of filing or prosecuting a judicial or administrative complaint, but also [to] extend[] to actions taken in preparation of such formal proceedings" – including "[a]n investigation before the institution of a judicial proceeding is part of the prosecution of a judicial proceeding . . . even if the authorities later decide not to file charges."  *Id.* at 1048.  Clearly, witness interviews are part of an investigation.  *Cf. id.* (stating that "[a]cts undertaken in the course of an investigation, including press releases reporting the progress or results of the investigation, cannot give rise to liability").  Therefore, Mr. Sequeira has § 821.6 immunity for alleged defamatory statements made during witness interviews.

As for the defamation claim based on (b) above, here, the Court grants partial summary judgment as well.  In her deposition, Ms. Bravmann (a Deputy DA) testified that she had a "vague

United States District Court

For the Northern District of California

1  recollection" of Mr. Sequeira using the term "sexual deviant" or "deviant" with respect to Mr.

2  Gressett – at some point before Mr. Gressett's arrest.  Boley Decl., Ex. U at 126-27 (Bravmann

3  deposition).  Ms. Bravmann further testified: "[T]here was a conversation that Mr. Gressett would

4  have been a part of and from whatever was said, the comment was made that Mr. Gressett is a

5  deviant."  Boley Decl., Ex. U at 127 (Bravmann deposition).  Although Mr. Sequeira has not made

6  this specific argument, Ms. Bravmann's testimony indicates that any defamation claim based on the

7  "deviant" comment is time barred.  The comment took place before Mr. Gressett's arrest in October

8  2008, and Mr. Gressett "would have been a part of" that conversation – *i.e.*, he was put on notice of

9  the comment well in advance of his arrest.  Mr. Gressett, however, did not initiate this lawsuit until

10  May 2012 – *i.e.*, more than three years later.  There is a one-year statute of limitations for

11  defamation claims.  *See* Cal. Civ. Code § 340(c) (providing for a one-year statute of limitations for

12  an action for libel or slander).  Moreover, as discussed below, any reference to Mr. Gressett as a

13  "sexual deviant" is ultimately an opinion (that has a factual basis).  Furthermore, as noted below,

14  Mr. Gressett has not shown the statement was in fact false.

15        2.    Mr. Jackson

16        Based on the record before the Court, the alleged defamation by Mr. Jackson consists of the

17  following:

18  (a)   Mr. Jackson's referring to Mr. Gressett as a sexual deviant during the witness interview of

19        Mr. Peterson.  *See* Boley Decl., Ex. W at 2 (interrogatory response);

20  (b)   Mr. Jackson's statement to Ms. Barrick (Mr. Gressett's former girlfriend) – made after the

21        witness interview was formally over – "to the effect that they [sic] had evidence to support

22        [Ms. Doe's] allegations and that her insides were all torn up.  He insinuated that the

23        allegations were backed up by medical records."  Barrick Decl. ¶ 4.

24  (c)   Mr. Jackson's statement to Ms. Zelis to the effect of "[i]f you knew what I knew, you would

25        know he was guilty."  Walker Decl., Ex. H at 54 (McCosker deposition).

26  (d)   Mr. Jackson's referring to Mr. Gressett as a sexual deviant during a conversation at a lunch

27        table, the conversation taking place at some point before the arrest of Mr. Gressett.  *See*

28        Boley Decl., Ex. U at 124 (Bravmann deposition).

**United States District Court**
For the Northern District of California

1    For the alleged defamation described in (a) – *i.e.*, Mr. Jackson's referring to Mr. Gressett as a

2    sexual deviant during a witness interview – Mr. Jackson is entitled to partial summary judgment

3    because (as discussed above) § 821.6 immunity should apply.

4    For the alleged defamation described in (b) – *i.e.*, Mr. Jackson's indication that there was

5    evidence to support Ms. Doe's allegations, including medical evidence – Mr. Gressett has failed to

6    adequately establish falsity. *See Taus v. Loftus*, 40 Cal. 4th 683, 720 (2007) (stating that "[t]he tort

7    of defamation 'involves (a) a publication that is (b) false, (c) defamatory, and (d) unprivileged, and

8    that (e) has a tendency to injury or that causes special damage'"), *overruled on other grounds as*

9    *stated in Burrill v. Nair*, 217 Cal. App. 4th 357, 380 (2013).  As discussed above, there was probable

10   cause to support the criminal proceedings against Mr. Gressett and therefore there was evidence to

11   support Ms. Doe's allegations.  Moreover, that Ms. Doe ultimately never suffered from a bladder

12   infection or ovarian damage, *see* Boley Decl., Ex. K at 27 (state court order), does not detract from

13   the fact that she did seek medical care soon after the alleged rape, a fact that corroborated her claim.

14   As for the alleged defamation described in (c), the statement, "If you knew what I knew, you

15   would know he was guilty," amounts to an opinion based on implied, undisclosed facts.  As one

16   state court has noted, "an opinion based on implied, undisclosed facts is actionable if the speaker has

17   no factual basis for the opinion."  *Bently Reserve LP v. Papaliolios*, 218 Cal. App. 4th 418, 427

18   (2013).  Otherwise, it is not actionable.  Here, as discussed above regarding the Court's finding of

19   probable cause, Mr. Jackson had a factual basis for his opinion.  Accordingly, the defamation claim

20   based on (c) fails as well.

21   Finally, for the alleged defamation described in (d), *i.e.*, Mr. Jackson's reference to Mr.

22   Gressett as a "sexual deviant," the analysis above (for (c)) is largely applicable.  Moreover, Mr.

23   Gressett has failed to show falsity as, regardless of whether Ms. Doe consented to the sexual acts, he

24   has not established that the use of a handgun, icepick, and/or handcuffs during sex falls within

25   accepted norms.  *See* http://www.merriam-webster.com/thesaurus/deviant (last visited February 18,

26   2015) (defining "deviant" as "a person who does not conform to generally accepted standards or

27   customs").

28

### III.   CONCLUSION

For the foregoing reasons, the Court concludes that Defendants are entitled to summary judgment, both for the malicious prosecution claim and the defamation claim.  Because this ruling resolves all claims remaining in this case, the Court orders the Clerk of the Court to enter judgment in accordance with this opinion and close the file in this case.

This order disposes of Docket No. 203.

IT IS SO ORDERED.

Dated:  March 10, 2015

_____
EDWARD M. CHEN
United States District Judge

**United States District Court**
For the Northern District of California